**UNITED STATES of America**

v.

**Archie W. BRAWNER, Appellant.**

No. 22714.

United States Court of Appeals,
District of Columbia Circuit.

Argued En Banc April 12, 1972.

Decided June 23, 1972.

Rehearing Denied Aug. 21, 1972.

Mr. Richard J. Flynn, Washington, D. C. (appointed by this court), with whom Mr. Richard G. Clemens, Washington, D. C., was on the brief, for appellant.

Mr. John D. Aldock, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty. at the time the brief was filed, and John A. Terry, Earl J. Silbert, Oscar Altshuler, Daniel J. Bernstein, Asst. U. S. Attys., and Miss Beatrice Rosenberg, Atty., Dept. of Justice, were on the brief, for appellee.

Mr. William H. Dempsey, Jr., Washington, D. C. (appointed by the court), as amicus curiae.

Messrs. Peter Barton Hutt, James H. Heller and Ralph J. Temple, Washington, D. C., filed a brief on behalf of The American Civil Liberties Union Fund of the National Capital Area as amicus curiae.

Messrs. Allan Ashman and John Shullenberger filed a brief on behalf of National Legal Aid and Defender Assn. as amicus curiae.

Messrs. Joseph P. Busch, Jr., Harry Wood, Eugene D. Tavris, and Arnold T. Guminski, Los Angeles, Cal., filed a brief on behalf of the National District Attorneys Assn. as amicus curiae.

Miss Marilyn Cohen, Washington, D. C., filed a brief on behalf of Public Defender Service and The Georgetown Legal Intern Project as amici curiae.

Mr. Warren E. Magee, Washington, D. C., filed a brief on behalf of American Psychiatric Assn. as amicus curiae.

Professor David L. Chambers, III, filed a brief as amicus curiae.

Messrs. Bruce L. Montgomery and Michael N. Sohn, Washington, D. C., filed a brief on behalf of the American Psychological Assn., as amicus curiae. Mr. James F. Fitzpatrick, Washington, D. C., also entered an appearance for the American Psychological Assn.

Mr. Paul A. Lenzini, Washington, D. C., filed a brief on behalf of the Bar Assn. of the District of Columbia, as amicus curiae.

## ON REHEARING EN BANC

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB, and WILKEY, Circuit Judges, sitting en banc.

LEVENTHAL, Circuit Judge:

The principal issues raised on this appeal from a conviction for second degree murder and carrying a dangerous weapon relate to appellant's defense of insanity. After the case was argued to a division of the court, the court *sua sponte* ordered rehearing en banc. We identified our intention to reconsider the appropriate standard for the insanity defense, authorized counsel to file supplemental briefs, invited the Public Defenders' Service "to submit an additional brief on behalf of the appellant," and appointed William H. Dempsey, Jr., Esq., as *amicus curiae*, without instruction as to result or theory, "to research the authorities on the issue of criminal responsibility," to advise the court thereon and to present oral argument. We advised a number of organizations of our action, and invited briefs *amicus curiae*. Subsequently we directed the Clerk to notify all concerned of questions the court requested be discussed (Appendix A).

In the course of our reconsideration of the rule governing the insanity defense, we have studied the opinions of other courts, particularly but not exclusively the opinions of the other Federal circuits, and the views of the many scholars who have thoughtfully pondered the underlying issues. Our file includes presentations of counsel, both Government lawyers and counsel appointed to represent defendant, and submissions of those who have responded to the invitation to comment as amicus curiae on a considerable number of inter-related matters.

We have stretched our canvas wide; and the focal point of the landscape before us is the formulation of the American Law Institute. The ALI's primary provision is stated thus in its Model Penal Code, see § 4.01(1).

*Section 4.01 Mental Disease or Defect Excluding Responsibility.*

(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of the law.

We have decided to adopt the ALI rule as the doctrine excluding responsibility for mental disease or defect, for application prospectively to trials begun after this date.

The interest of justice that has called us to this labor bids us set forth comments in which we review the matters we concluded were of primary consequence—though we cannot practicably retraverse all the ground covered in our reflection. These comments also contain features of the rule in which we, like other courts, have recorded our adjustments of the rule and understandings concerning its application that are stated as part of the adoption of the rule, to improve its capacity to further its underlying objectives. We highlight, as most notable of these, our decision to retain the definition of "mental illness or defect" that we evolved in our 1962 *McDonald* [1] opinion en banc. Others are prompted by the submissions which rais-

---

1. McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847 (en banc, 1962).

ed, as points of objection to the ALI rule, matters that we think can be fairly taken into account by clarifying comments. For the assistance of the reader we insert at this point a Table of Contents identifying the topics discussed in this opinion.

TABLE OF CONTENTS

A. The Trial Record ............ 974

B. Prior Developments of the Insanity Defense in this Jurisdiction .................... 975

C. Insanity Rule in Other Circuits ...................... 978

D. Comments Concerning Reason for Adoption of ALI Rule and Scope of Rule as Adopted by This Court ................. 981

 1. Need to depart from "productivity" formulation and undue dominance by experts ................. 981

 2. Retention of McDonald definition of "mental disease or defect" .............. 983

 3. Interest of uniformity of judicial approach and vocabulary, with room for variations and adjustments .... 984

 4. Consideration and rejection of other suggestions ...... 985

 a. Proposal to abolish insanity defense ......... 985

 b. Proposal for defense if mental disease impairs capacity to such an extent that defendant "cannot justly be held responsible." ........... 986

 5. ALI rule is contemplated as improving the process of adjudication, not as affecting number of insanity acquittals .................... 989

 6. Elements of the ALI rule adopted by this court ..... 990

 a. Intermesh of components 991

 b. The "result" of the mental disease ............ 991

 c. At the time of the conduct ................. 991

 d. Capacity to appreciate wrongfulness of his conduct ................. 991

 e. Caveat paragraph ...... 992

 f. Broad presentation to the jury ................. 994

E. Inter-related Doctrines and Implementing Instructions ...... 995

 1. Suggested instruction ..... 995
 Burden of Proof ......... 996

 2. The "Lyles" instruction— as to effect of verdict of not guilty by reason of insanity ..................... 996

 3. Mental condition, though insufficient to exonerate, may be relevant to specific mental element of certain crimes or degrees of crime ....... 998

F. Disposition of the Case .......1003

 1. Issue of Causality Testimony .....................1003

 2. Prosecutor's conduct ......1003

 3. Remand ................1004

G. Supplement to Clarify Matters Discussed in Separate Opinion. .1005

Appendix A ....................1007

Appendix B ....................1008

## A. The Trial Record

Passing by various minor disagreements among the witnesses, the record permits us to reconstruct the events of September 8, 1967, as follows: After a morning and afternoon of wine-drinking, appellant Archie W. Brawner, Jr. and his uncle Aaron Ross, went to a party at the home of three acquaintances. During the evening, several fights broke out. In one of them, Brawner's jaw was injured when he was struck or pushed to the ground. The time of the fight was approximately 10:30 p.m. After the fight, Brawner left the party. He told Mr. Ross that some boys had jumped him. Mr. Ross testified that Brawner "looked like he was out of his mind". Other witnesses who saw him after the

fight testified that Brawner's mouth was bleeding and that his speech was unclear (but the same witness added, "I heard every word he said"); that he was staggering and angry; and that he pounded on a mailbox with his fist. One witness testified that Brawner said, "[I'm] going to get my boys" and come back, and that "someone is going to die tonight."

Half an hour later, at about eleven p. m., Brawner was on his way back to the party with a gun. One witness testified that Brawner said he was going up there to kill his attackers or be killed.

Upon his arrival at the address, Brawner fired a shot into the ground and entered the building. He proceeded to the apartment where the party was in progress and fired five shots through the closed metal hallway door. Two of the shots struck Billy Ford, killing him. Brawner was arrested a few minutes later, several blocks away. The arresting officer testified that Brawner appeared normal, and did not appear to be drunk, that he spoke clearly, and had no odor of alcohol about him.

After the Government had presented the evidence of its non-expert witnesses, the trial judge ruled that there was insufficient evidence on "deliberation" to go to the jury: accordingly, a verdict of acquittal was directed on first degree murder.

The expert witnesses, called by both defense and prosecution, all agreed that Brawner was suffering from an abnormality of a psychiatric or neurological nature. The medical labels were variously given as "epileptic personality disorder," "psychologic brain syndrome associated with a convulsive disorder," "personality disorder associated with epilepsy," or, more simply, "an explosive personality." There was no disagreement that the epileptic condition would be exacerbated by alcohol, leading to more frequent episodes and episodes of greater intensity, and would also be exacerbated by a physical blow to the head. The experts agreed that epilepsy *per se* is not a mental disease or defect, but a neurological disease which is often associated with a mental disease or defect. They further agreed that Brawner had a mental, as well as a neurological, disease.

Where the experts disagreed was on the part which that mental disease or defect played in the murder of Billy Ford. The position of the witnesses called by the Government is that Brawner's behavior on the night of September 8 was not consistent with an epileptic seizure, and was not suggestive of an explosive reaction in the context of a psychiatric disorder. In the words of Dr. Platkin of St. Elizabeths Hospital, "He was just mad."

The experts called by the defense maintained the contrary conclusion. Thus, Dr. Eugene Stanmeyer, a psychologist at St. Elizabeths, was asked on direct by counsel for defense, whether, assuming accused did commit the act which occurred, there was a causal relationship between the assumed act and his mental abnormality. Dr. Stanmeyer replied in the affirmative, that there was a cause and effect relationship.

Later, the prosecutor asked the Government's first expert witness Dr. Weickhardt: "Did you . . . come to any opinion concerning whether or not the crimes in this case were causally related to the mental illness which you diagnosed?" An objection to the form of the question was overruled. The witness then set forth that in his opinion there was no causal relationship between the mental disorder and the alleged offenses. Brawner claims that the trial court erred when it permitted a prosecution expert to testify in this manner. He relies on our opinion in Washington v. United States, 129 U.S.App.D.C. 29, 390 F.2d 444 (1967).

B. *Prior Developments of the Insanity Defense in this Jurisdiction*

History looms large in obtaining a sound perspective for a subject like this one. But the cases are numerous. And since our current mission is to illuminate the present, rather than to linger over

the past, it suffices for our purposes to review a handful of our opinions on the insanity defense.

1. The landmark opinion was written by Judge Bazelon in Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862 (1954). Prior to *Durham* the law of the District of Columbia was established by United States v. Lee, 15 D.C. (4 Mackey) 489, 496 (1886) and Smith v. United States, 59 App.D.C. 144, 36 F.2d 548 (1929), which, taken together, stated a traditional test of insanity, in terms of right and wrong[2] and irresistible impulse.[3] *Durham* adopted the "product rule," pioneered in State v. Pike, 49 N. H. 399, 402 (1869-70), and exculpated from criminal responsibility those whose forbidden acts were the product of a mental disease or defect.

Few cases have evoked as much comment as *Durham*. It has sparked widespread interest in the legal-judicial community and focused attention on the profound problems involved in defining legal responsibility in case of mental illness. It has been hailed as a guide to the difficult and problem-laden intersection of law and psychiatry, ethics and science. It has been scored as an unwarranted loophole through which the cunning criminal might escape from the penalty of the law. We view it more modestly, as the court's effort, designed in the immemorial manner of the case method that has built the common law, to alleviate two serious problems with the previous rule.

The first of these was a problem of language which raised an important symbolic issue in the law. We felt that the language of the old right-wrong/irresistible impulse rule for insanity was antiquated, no longer reflecting the community's judgment as to who ought to be held criminally liable for socially destructive acts. We considered the rule as restated to have more fruitful, accurate and considered reflection of the sensibilities of the community as revised and expanded in the light of continued study of abnormal human behavior.

The second vexing problem that *Durham* was designed to reach related to the concern of the psychiatrists called as expert witnesses for their special knowledge of the problem of insanity, who often and typically felt that they were obliged to reach outside of their professional expertise when they were asked, under the traditional insanity rule established in 1843 by *M'Naghten's* Case,[4] whether the defendant knew right from wrong. They further felt that the narrowness of the traditional test, which framed the issue of responsibility solely in terms of cognitive impairment, made it impossible to convey to the judge and jury the full range of information material to an assessment of defendant's responsibility.

2. Discerning scholarship now available asserts that the experts' fears and concerns reflected a misapprehension as to the impact of the traditional standard in terms of excluding relevant evidence.

Wigmore states the rule to be that when insanity is in issue, "any and all conduct of the person is admissible in evidence." And the cases support Wigmore's view. The almost unvarying policy of the courts has been to admit *any* evidence of abberational behavior so long as it is probative of the

---

2. United States v. Lee, 15 D.C. 489, 496 (1886) :

The rule of law is very plain that in order that the plea of insanity shall prevail, there must have been that mental condition of the party which disabled him from distinguishing between right and wrong in respect of the act committed.

3. Smith v. United States, 59 App.D.C. 144, 145, 36 F.2d 548, 549 (1929) :

[it must be found that defendant's] reasoning powers were so far dethroned by his diseased mental condition as to deprive him of the will power to resist the insane impulse to perpetrate the deed, though knowing it to be wrong.

4. 10 Clark & F. 200, 2 Eng.Rep. 718 (H.L. 1843).

defendant's mental condition, without regard to the supposed restrictions of the test used to define insanity for the jury.[5]

Moreover if the term "know" in the traditional test of "know right from wrong" is taken as denoting affective knowledge, rather than merely cognitive knowledge, it yields a rule of greater flexibility than was widely supposed to exist. Livermore and Meehl, The Virtues of M'Naghten, 51 Minn.L.Rev. 789, 800–08 (1967).

We need not occupy ourselves here and now with the question whether, and to what extent, the *M'Naghten* rule, ameliorated by the irresistible impulse doctrine, is susceptible of application to include medical insights and information as justice requires. In any event, the experts felt hemmed in by the traditional test; they felt that they could not give the jury and judge the necessary information in response to the questions which the traditional test posed, see 37 F.R.D. 365, 387 (1964).

The rule as reformulated in *Durham* permitted medical experts to testify on medical matters properly put before the jury for its consideration, and to do so without the confusion that many, perhaps most, experts experienced from testimony structured under the *M'Naghten* rule. That was a positive contribution to jurisprudence—and one that was retained when the American Law Institute undertook to analyze the problem and proposed a different formulation.

3. A difficulty arose under the *Durham* rule in application. The rule was devised to facilitate the giving of testimony by medical experts in the context of a legal rule, with the jury called upon to reach a composite conclusion that had medical, legal and moral components.[6] However the pristine statement of the *Durham* rule opened the door to "trial by label." *Durham* did distinguish between "disease," as used "in the sense of a condition which is considered capable of either improving or deteriorating," and "defect," as referring to a condition not capable of such change "and which may be either congenital or the result of injury, or the residual effect of a physical or mental disease." 94 U.S.App.D.C. at 241, 214 F.2d at 875. But the court failed to explicate what abnormality of

5. A. Goldstein, The Insanity Defense 54 (1967), *citing* 1 Wigmore Evidence § 228 (1940) and numerous cases.

6. *Durham* contemplated from the start that the jury would have the guidance of "wider horizons of knowledge" from the medical experts than was available under the prior rule, but that in the last analysis the ultimate question is left to the jury "to perform its traditional function . . . to apply 'our inherited ideas of moral responsibility to individuals prosecuted for crime.' [Juries will] continue to make moral judgments. . . ." 94 U.S.App.D.C. at 242, 214 F.2d at 876. *See also*, King v. United States, 125 U.S.App.D.C. 318 at 323–324, 372 F.2d 383 at 388–389 "The question for the jury requires the application to medical knowledge, and the lay evidence as well, of the understanding and judgment of the community as reflected in the jury. . . . [In] view of the complicated nature of the decision to be made—intertwining moral, legal, and medical judgments—it will require an unusually strong showing to induce us to reverse a conviction because the judge left the critical issue of responsibility with the jury."

Holloway v. United States, 80 U.S.App. D.C. 3, 4, 148 F.2d 665, 666 (1945): "Legal tests of criminal insanity are not and cannot be the result of scientific analysis or objective judgment. . . . They must be based on the instinctive sense of justice of ordinary men. This sense of justice assumes that there is a faculty called reason which is separate and apart from instinct, emotion, and impulse, that enables an individual to distinguish between right and wrong and endows him with moral responsibility for his acts. . . . Our collective conscience does not allow punishment where it cannot impose blame."

Sauer v. United States, 241 F.2d 640, 649 (9th Cir. 1957), quoting *Holloway*, refers to the court's "awareness that the jury will eventually exercise a moral judgment as to the sanity of the accused."

United States v. Wilson, 399 F.2d 459, 463 (4th Cir. 1968): "There is enough doubt about a sociopath such as [defendant] to call for an exercise of the jury's moral judgment. . . ."

mind was an essential ingredient of these concepts. In the absence of a definition of "mental disease or defect," medical experts attached to them the meanings which would naturally occur to them—medical meanings—and gave testimony accordingly. The problem was dramatically highlighted by the weekend flip flop case, In re Rosenfield, 157 F.Supp. 18 (D.D.C.1957). The petitioner was described as a sociopath. A St. Elizabeths psychiatrist testified that a person with a sociopathic personality was not suffering from a mental disease. That was Friday afternoon. On Monday morning, through a policy change at St. Elizabeths Hospital, it was determined as an administrative matter that the state of a psychopathic or sociopathic personality did constitute a mental disease.[7]

The concern that medical terminology not control legal outcomes culminated in McDonald v. United States, 114 U.S.App. D.C. 120, 312 F.2d 847, 851 (en banc, 1962), where this court recognized that the term, mental disease or defect, has various meanings, depending upon how and why it is used, and by whom. Mental disease means one thing to a physician bent on treatment, but something different, if somewhat overlapping, to a court of law. We provided a legal definition of mental disease or defect, and held that it included "any abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavior controls." (312 F.2d at 851). "Thus the jury would consider testimony concerning the development, adaptation and functioning of these processes and controls." *Id.*

While the *McDonald* standard of mental disease was not without an attribute of circularity, it was useful in the administration of justice because it made plain that clinical and legal definitions of mental disease were distinct, and it

helped the jury to sort out its complex task and to focus on the matters given it to decide.

4. The *Durham* rule also required explication along other lines, notably the resolution of the ambiguity inherent in the formulation concerning actions that were the "product" of mental illness. It was supplemented in Carter v. United States, 102 U.S.App.D.C. 227 at 234, 235, 252 F.2d 608 at 615–616 (1957):

> The simple fact that a person has a mental disease or defect is not enough to relieve him of responsibility for a crime. There must be a relationship between the disease and the criminal act; and the relationship must be such as to justify a reasonable inference that the act would not have been committed if the person had not been suffering from the disease.

Thus *Carter* clarified that the mental illness must not merely have entered into the production of the act, but must have played a necessary role. *Carter* identified the "product" element of the rule with the "but for" variety of causation.

The pivotal "product" term continued to present problems, principally that it put expert testimony on a faulty footing. Assuming that a mental disease, in the legal sense, had been established, the fate of the defendant came to be determined by what came to be referred to by the legal jargon of "productivity." On the other hand, it was obviously sensible if not imperative that the experts having pertinent knowledge should speak to the crucial question whether the mental abnormality involved is one associated with aberrant behavior. But since "productivity" was so decisive a factor in the decisional equation, a ruling permitting experts to testify expressly in language of "product" raised in a different context the concern lest the ultimate issue be in fact turned over to the experts rather

---

7. *Compare* Campbell v. United States, 113 U.S.App.D.C. 260, 261, 307 F.2d 597, 598 (1962):

 As an administrative matter, "emotionally unstable personality" has been regarded by the staff at St. Elizabeths as a mental disease only since November 1957.

than retained for the jurors representing the community.

The problem was identified by then Circuit Judge Burger in his concurring opinion in *Blocker:* [8]

> The hazards in allowing experts to testify in precisely or even substantially the terms of the ultimate issue are apparent. This is a course which, once allowed, risks the danger that lay jurors, baffled by the intricacies of expert discourse and unintelligible technical jargon may be tempted to abdicate independent analysis of the facts on which the opinion rests. . .

As early as *Carter,* we had warned that the function of an expert was to explain the origin, development and manifestations of mental disorders, in terms that would be coherent and meaningful to the jury. "Unexplained medical labels . . . are not enough." (102 U.S.App.D.C. at 236, 252 F.2d at 617). Even after *McDonald,* however, we continued to see cases where the testimony of the experts was limited to the use of conclusory labels, without the explication of the underlying analysis. We do not say this was deliberate by the experts. It seems in large measure to have reflected tactical decisions of counsel, and perhaps problems of communications between the disciplines.

It was in this context that the court came to the decision in Washington v. United States, 129 U.S.App.D.C. 29, 390 F.2d 444 (1967), which forbade experts from testifying as to productivity altogether. Chief Judge Bazelon's opinion illuminates the basis of the ruling, as one intended "to help the psychiatrists understand their role in court, and thus eliminate a fundamental cause of unsatisfactory expert testimony," namely, the tendency of the expert to use "concepts [which] can become slogans, hiding facts and representing nothing more than the witness's own conclusion about the defendant's criminal responsibility." (at 41, 390 F.2d at 456).

## C. *Insanity Rule in Other Circuits*

The American Law Institute's Model Penal Code expressed a rule which has become the dominant force in the law pertaining to the defense of insanity. The ALI rule is eclectic in spirit, partaking of the moral focus of *M'Naghten,* the practical accommodation of the "control rules" (a term more exact and less susceptible of misunderstanding than "irresistible impulse" terminology), and responsive, at the same time, to a relatively modern, forward-looking view of what is encompassed in "knowledge."

For convenience, we quote again the basic rule propounded by the ALI's Model Penal Code:

> A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of the law.

A subsidiary rule in paragraph (2), stating what has come to be known as the "caveat" paragraph, has had a mixed reception in the courts and discussion of that problem will be deferred.

The core rule of the ALI has been adopted, with variations, by all save one of the Federal circuit courts of appeals, and by all that have come to reconsider the doctrine providing exculpation for mental illness. Their opinions have been exceptionally thoughtful and thorough in their expositions of the interests and values protected. United States v. Freeman, 357 F.2d 606 (2d Cir. 1966); United States v. Currens, 290 F.2d 751 (3d Cir. 1961); United States v. Chandler, 393 F.2d 920 (4th Cir. 1968); Blake v. United States, 407 F.2d 908 (5th Cir. 1969); United States v. Smith, 404 F.2d 720 (6th Cir. 1968); United States v. Shapiro, 383 F.2d 680 (7th Cir. 1967); Pope v. United States, 372 F.2d 710 (8th Cir. 1967); Wade v. United States, 426 F.2d 64 (9th Cir. 1970); Wion v. United States, 325 F.2d 420 (10th Cir. 1963).

---

8. Blocker v. United States, 110 U.S.App.D.C. 41, 51, 288 F.2d 853, 863 (en banc 1961).

These opinions show that the ALI rule has proved peculiarly subject to successful adaptation, permitting variations but within a framework of uniformity.

The first was *Currens*, where Chief Judge Biggs of the Third Circuit defined the test:

> The jury must be satisfied that at the time of committing the prohibited act the defendant, as a result of mental disease or defect, lacked substantial capacity to conform his conduct to the requirements of the law which he is alleged to have violated. (290 F.2d at 774) (footnote omitted).

This formula is explicitly derived from the ALI rule. (*Id.* at 774 footnote 32.) It takes an additional step, however, in that it treats cognitive impairments as "surplusage" to a test of criminal responsibility. *Ibid.* The premise is that an abnormality in the cognitive function is neither sufficient nor necessary. If it does not result in a substantial incapacity of the volitional function, it is not sufficient in law; and a substantial incapacity of the volitional function results in exculpation even though it does not involve the cognitive faculties.

Thus *Currens* capped the history of the insanity defense—which began with impairment of knowledge and proceeded to impairment of control—by dropping the knowledge feature as merely one aspect of the ultimate control element. Though not without considerable force and logic *Currens* has not been followed by the other Federal courts, which adhere more closely to the ALI model.

We refer to the other Federal circuits in numerical order. The First Circuit has not spoken. The Second Circuit adopted the ALI rule in *Freeman* in terms, believing it to be "sufficiently precise . . . to provide the jury with a workable standard," while "eschew[ing] rigid classification." 357 F.2d at 623.

The position of the Fourth Circuit was announced by Chief Judge Haynsworth in *Chandler:*

The American Law Institute's formulation has achieved wide acceptance. Some Courts of Appeals have adopted it exclusively, another approvingly but not rigidly, still others with prescribed variations which subordinate the cognitive portion of the problem or satisfy semantic preferences. . . . [I]t is, in our opinion, the preferred formulation. With appropriate balance between cognition and volition, it demands an unrestricted inquiry into the whole personality of a defendant who surmounts the threshold question of doubt of his responsibility. Its verbiage is understandable by psychiatrists; it imposes no limitation upon their testimony, and yet, to a substantial extent, it avoids a diagnostic approach and leaves the jury free to make its findings in terms of a standard which society prescribes and juries may apply. (393 F.2d at 926, footnotes omitted.)

The court, however, "abjure[d] any formalistic approach which might foreclose variation." (at 927). Thus the court declined to require any exact form of words by way of instructions.

In *Blake* the Fifth Circuit stressed the value of uniformity. While affirming the utility of variation as a form of social experiment, and noting that variation among the circuits was not inconsiderable, it stated that, at least as within the circuit, uniformity was a preferable value. "We think [the ALI formula] lends itself as a uniform standard." 407 F.2d at 915.

The Sixth Circuit has been content to leave the precise wording of the jury instructions to the discretion of the trial court, preferring to frame its approach in terms of getting the answers to three irreducible questions: First, was defendant "suffering from a mental illness at the time of the commission of the crime?" Second, "Was that illness such as to prevent his knowing the wrongfulness of his act?" Third, "Was the mental illness such as to render him substantially incapable of conforming his conduct

to the requirements of the law he is charged with violating?" This formulation in *Smith*, 404 F.2d at 727, is essentially a restatement of the core of the ALI test.

In *Shapiro*, the Seventh Circuit stated, 383 F.2d at 685, that it preferred the ALI rule to other possible formulae on the ground that it resulted in a charge shorter, simpler, and more congruent to the expert testimony than the charge based on Davis v. United States, 165 U.S. 373, 17 S.Ct. 360, 41 L.Ed. 750 (1897), which was a traditional test and itself based on *M'Naghten*; it found the ALI test more comprehensible than *Durham* and more helpful to the jury.

The position of the Eighth Circuit was staked out in *Pope* by then Circuit Judge Blackmun:

> We hold again, and we stress by repetition, that if the trial court freely admits all evidence which appears to be relevant and *if the charge appropriately embraces and requires positive conclusions by the jury as to the defendant's cognition, his volition, and his capacity to control his behavior, and if these three elements of knowledge, will and choice are emphasized in the charge as essential and critical constituents of legal sanity, we shall usually regard the charge as legally sufficient.* 372 F.2d at 736 (Italics in original.)

The court said (p. 735) that it would look with approval upon any form of instruction so long as it resulted in presenting the issue to the jury with as much information as possible on cognition, volition, and the capacity to choose.

In *Wade*, the latest of the Federal opinions, the Ninth Circuit approved the basic ALI rule, though rejecting the "caveat" second paragraph. The court noted that the traditional *M'Naghten* rule asked the jury to determine the existence of a "perverted and deranged condition of the mental and moral faculties," while the ALI's "mental disease or defect" language was preferable, focusing on disabling impairments in terms closer to the kind of expert testimony which the jury will hear.

The position of the Tenth Circuit, very near to that of the Eighth, was stated in *Wion* where Judge Murrah presented, as a "simple test of criminal responsibility," language that restated the essence of the ALI rule. Noting that the test permitted behavioral scientists latitude to put their professional findings and conclusions before the court he concluded: "This should go far toward bridging the gulf between psychiatry and the law, if indeed, there is one, and it will also give the trial judge a definition which he can articulate to the lay jury." 325 F.2d at 430.

### D. *Comments Concerning Reason for Adoption of ALI Rule and Scope of Rule as Adopted By This Court*

In the foreglimpse stating that we had determined to adopt the ALI rule we undertook to set forth comments stating our reasons, and also the adjustments and understandings defining the ALI rule as adopted by this Court. Having paused to study the rulings in the other circuits, we turn to our comments, and to our reflections following the extensive, and intensive, exposure of this court to insanity defense issues.[9]

### 1. *Need to depart from "product" formulation and undue dominance by experts.*

A principal reason for our decision to depart from the *Durham* rule is the undesirable characteristic, surviving even the *McDonald* modification, of undue dominance by the experts giving testimony. The underlying problem was identified, with stress on different

---

9. Ten years ago Judge Burger said: "While the time span since 1954 is brief, our total study and collective case consideration of the problem is equal perhaps to as much as a half century of case review of this problem in most jurisdictions." Blocker v. United States, 110 U.S.App.D.C. at 52, 288 F.2d at 864 (en banc, 1961) (concurring opinion).

facets, in the *Carter, Blocker* (concurring), and *Washington* opinions. The difficulty is rooted in the circumstance that there is no generally accepted understanding, either in the jury or the community it represents, of the concept requiring that the crime be the "product" of the mental disease.

When the court used the term "product" in *Durham* it likely assumed that this was a serviceable, and indeed a natural, term for a rule defining criminal responsibility—a legal reciprocal, as it were, for the familiar term "proximate cause," used to define civil responsibility. But if concepts like "product" are, upon refinement, reasonably understood, or at least appreciated, by judges and lawyers, and perhaps philosophers, difficulties developed when it emerged that the "product" concept did not signify a reasonably identifiable common ground that was also shared by the nonlegal experts,[10] and the laymen serving on the jury as the representatives of the community.

The doctrine of criminal responsibility is such that there can be no doubt "of the complicated nature of the decision to be made—intertwining moral, legal, and medical judgments," see King v. United States, 125 U.S.App.D.C. 318, 324, 372 F.2d 383, 389 (1967) and *Durham* and other cases cited *supra,* note 6. Hence, as *King* and other opinions have noted, jury decisions have been accorded unusual deference even when they have found responsibility in the face of a powerful record, with medical evidence uncontradicted, pointing toward exculpation.[11] The "moral" elements of the decision are not defined exclusively by religious considerations but by the totality of underlying conceptions of ethics and justice shared by the community, as expressed by its jury surrogate. The essential feature of a jury "lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence." Williams v. Florida, 399 U.S. 78, 100, 90 S.Ct. 1893, 1906, 26 L.Ed.2d 446 (1970).

The expert witnesses—psychiatrists and psychologists—are called to adduce relevant information concerning what may for convenience be referred to as the "medical" component of the responsibility issue. But the difficulty—as emphasized in *Washington*—is that the medical expert comes, by testimony given in terms of a non-medical construct ("product"), to express conclusions that

---

10. A difference in language perception probably contributed to the development that psychiatric testimony concerning "product" causal relationship did not develop along the lines presaged by legal students of the problem. Early critiques in journals asserted that a but-for test of "product" would rarely, if ever, permit a psychiatrist to testify as to the existence of mental illness coexisting with a lack of "product" causal relationship to the crime. *See, e. g.,* Wechsler, The Criteria of Criminal Responsibility, 22 U. Chi.L.Rev. 367, 371 (1955); De Grazia, The Distinction of Being Mad, 22 U.Chi. L.Rev. 339, 343 (1955). Presumably, the force of this analysis was strengthened when "mental disease or defect" was defined and tightened in *McDonald.* As events have developed, however, it has become almost commonplace that psychiatrists testifying as to the presence of mental disease have nevertheless found an absence of "product" causal rela-

tion with the crime, or at least expressed substantial doubt as to such relationship. Perhaps more to the point, it has become commonplace for psychiatrists called by Government and defense to be in agreement on the mental disease aspects of their testimony and to differ on the issue of "product" relationship. This is not intended, in any way, as a criticism of any particular testimony. There is often a genuine and difficult question as to the relationship between a particular mental disease and particular offense. What is our concern, however, is that the inherent difficulty of this core problem has been intensified, and the sources of confusion compounded, by a kind of mystique that came to surround the "product" test, and testimony cast in that language.

11. *E. g.,* Hawkins v. United States, 114 U.S.App.D.C. 44, 310 F.2d 849 (1962); Isaac v. United States, 109 U.S.App. D.C. 34, 284 F.2d 168 (1960).

in essence embody ethical and legal conclusions. There is, indeed, irony in a situation under which the *Durham* rule, which was adopted in large part to permit experts to testify in their own terms concerning matters within their domain which the jury should know, resulted in testimony by the experts in terms not their own to reflect unexpressed judgments in a domain that is properly not theirs but the jury's. The irony is heightened when the jurymen, instructed under the esoteric "product" standard, are influenced significantly by "product" testimony of expert witnesses really reflecting ethical and legal judgments rather than a conclusion within the witnesses' particular expertise.

It is easier to identify and spotlight the irony than to eradicate the mischief. The objective of *Durham* is still sound—to put before the jury the information that is within the expert's domain, to aid the jury in making a broad and comprehensive judgment. But when the instructions and appellate decisions define the "product" inquiry as the ultimate issue, it is like stopping the tides to try to halt the emergence of this term in the language of those with a central role in the trial—the lawyers who naturally seek to present testimony that will influence the jury who will be charged under the ultimate "product" standard, and the expert witnesses who have an awareness, gained from forensic psychiatry and related disciplines, of the ultimate "product" standard that dominates the proceeding.

The experts have meaningful information to impart, not only on the existence of mental illness or not, but also on its relationship to the incident charged as an offense. In the interest of justice this valued information should be available, and should not be lost or blocked by requirements that unnaturally restrict communication between the experts and the jury. The more we have pondered the problem the more convinced we have become that the sound solution lies not in further shaping of the *Durham* "product" approach in more refined molds, but in adopting the ALI's formulation as the linchpin of our jurisprudence.

The ALI's formulation retains the core requirement of a meaningful relationship between the mental illness and the incident charged. The language in the ALI rule is sufficiently in the common ken that its use in the courtroom, or in preparation for trial, permits a reasonable three-way communication—between (a) the law-trained, judges and lawyers; (b) the experts and (c) the jurymen—without insisting on a vocabulary that is either stilted or stultified, or conducive to a testimonial mystique permitting expert dominance and encroachment on the jury's function. There is no indication in the available literature that any such untoward development has attended the reasonably widespread adoption of the ALI rule in the Federal courts and a substantial number of state courts.

2. *Retention of McDonald definition of "mental disease or defect."*

 Our ruling today includes our decision that in the ALI rule as adopted by this court the term "mental disease or defect" includes the definition of that term provided in our 1962 en banc *McDonald* opinion, as follows:

[A] mental disease or defect includes any abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavior controls.

McDonald v. United States, 114 U.S.App. D.C. at 124, 312 F.2d at 851.

We take this action in response to the problem, identified by amicus comments of Mr. Dempsey and the D.C. Bar Association, that the ALI's rule, lacking definition of "mental disease or defect," contains an inherent ambiguity. These comments consider this a reason for avoiding the ALI rule. We find more merit in the suggestion of Mr. Flynn, counsel appointed to represent appellant,

that the *McDonald* definition be engrafted on to the ALI rule.[12]

In our further discussion of ALI and *McDonald,* we shall sometimes refer to "mental disease" as the core concept, without specifically referring to the possibility of exculpation by reason of a non-altering "mental defect."

The *McDonald* rule has helped accomplish the objective of securing expert testimony needed on the subject of mental illness, while guarding against the undue dominance of expert testimony or specialized labels. It has thus permitted the kind of communication without encroachment, as between experts and juries, that has prompted us to adopt the ALI rule, and hence will help us realize our objective. This advantage overrides the surface disadvantage of any clumsiness in the blending of the *McDonald* component, defining mental disease, with the rest of the ALI rule, a matter we discuss further below.

3. *Interest of uniformity of judicial approach and vocabulary, with room for variations and adjustments*

Adoption of the ALI rule furthers uniformity of judicial approach—a feature eminently desirable, not as a mere glow of "togetherness," but as an appreciation of the need and value of judicial communication. In all likelihood, this court's approach under *Durham,* at least since *McDonald,* has differed from that of other courts in vocabulary more than substance. Uniformity of vocabulary has an important value, however, as is evidenced from the familiar experience of meanings that "get lost in translation." No one court can amass all the experience pertinent to the judicial administration of the insanity defense. It is helpful for courts to be able to learn from each other without any blockage due to jargon. It is an impressive virtue of the common law, that its distinctive reliance on judicial decisions to establish the corpus of the law furthers a multiparty conversation between men who have studied a problem in various places at various times.

The value of uniformity of central approach is not shattered by the circumstance that in various particulars the different circuits have inserted variations in the ALI rule. Homogeneity does not mean rigidity, and room for local variation is likely a strength, providing a basis for comparison,[13] not a weakness. Nor is the strength of essential uniformity undercut by the caution of our appointed amicus that the formulation of the ALI rule provides extremely broad flexibility.[14] Flexibility and ductility are inherent in the insanity defense, as in any judicial rule with an extensive range—say, negligence, or proximate cause—and the ALI rule permits appropriate guidance of juries.

In prescribing a departure from *Durham* we are not unmindful of the concern that a change may generate uncertainties as to corollaries of the change.[15] While the courts adopting the ALI rule have stated variations, as we have noted, these were all, broadly, in furtherance of

12. This was also the suggestion of the National District Attorneys Association, subject to caveats, as the test recommended if the court did not accept its submission that the insanity defense should be abolished entirely.

13. Compare New State Ice Co. v. Liebmann, 285 U.S. 262, 280, 52 S.Ct. 371, 76 L.Ed. 747 (1932) (dissenting opinion of Brandeis, J.).

14. Amicus points out that in *Freeman* the Second Circuit referred to the fact that the Third and Tenth Circuits "have employed their own language approaching the objectives of the Model Penal Code formulation," and then offered a discussion of guiding policy considerations, including Senator Dodd's espousal of an approach sending "marginal" cases to a hospital rather than prison, that, as amicus puts it, "strikes quite a different tone than, say, the analogous discussion of the Tenth Circuit in Wion."

15. See, *e. g.,* Report of President's D.C. Crime Commission at pp. 550 *ff.* A majority of the members of the Commission preferred the ALI rule, but were concerned lest depature from *Durham-McDonald* spawn confusion.

one or more of the inter-related goals of the insanity defense:

(a) a broad input of pretinent facts and opinions

(b) enhancing the information and judgment

(c) of a jury necessarily given latitude in light of its functioning as the representative of the entire community.

We are likewise and for the same objectives defining the ALI rule as adopted by the court, with its contours and corollaries given express statement at the outset so as to minimize uncertainty. We postpone this statement to a subsequent phase of the opinion (see p. 990 et seq.) in order that we may first consider other alternatives, for in some measure our adaptation may obviate or at least blunt objections voiced to the ALI rule.

### 4. Consideration and rejection of other suggestions

#### a. Proposal to abolish insanity defense

A number of proposals in the journals recommend that the insanity defense be abolished altogether.[16] This is advocated in the amicus brief of the National District Attorneys Association as both desirable and lawful.[17] The amicus brief of American Psychiatric Association concludes it would be desirable, with appropriate safeguards, but would require a constitutional amendment. That a constitutional amendment would be required is also the conclusion of others, generally in opposition to the proposal.[18]

This proposal has been put forward by responsible judges for consideration, with the objective of reserving psychiatric overview for the phase of the criminal process concerned with disposition of the person determined to have been the actor.[19] However, we are convinced that the proposal cannot properly be imposed by judicial fiat.

The courts have emphasized over the centuries that "free will" is the postulate of responsibility under our jurisprudence. 4 Blackstone's Commentaries 27. The concept of "belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil" is a core concept that is "universal and persistent in mature systems of law." Morissette v. United States, 342 U.S. 246, 250, 72 S.Ct. 240, 243, 96 L.Ed. 288 (1952). Criminal responsibility is assessed when through "free will" a man elects to do evil. And while, as noted in *Morissette*, the legislature has dispensed with mental element in some statutory offenses, in furtherance of a paramount need of the community, these instances mark the exception and not the rule, and only in the most limited instances has the mental element been omitted by the legislature as a requisite for an offense that was a crime at common law.

16. "[I]t may be that psychiatry and the other social and behavioral sciences cannot provide sufficient data relevant to a determination of criminal responsibility no matter what our rules of evidence are. If so, we may be forced to eliminate the insanity defense altogether, or refashion it in a way which is not tied so tightly to the medical model." Washington v. United States, 129 U.S.App.D.C. at 42, n. 33, 390 F.2d at 457 (1967).

17. It suggests that a mental condition be exculpatory solely as it negatives mens rea.

18. *E. g.*, Mr. Dempsey. To the same general effect is the position in the research memorandum from the University of Virginia Law School Research Group to Mr. Flynn, appellant's appointed counsel attached to his brief.

19. See *e. g.*, Burger, then Circuit Judge, Proceedings of the Sixth Annual Meeting of the National Conference of State Trial Judges, Chicago, Illinois, Aug. 9–11, 1963, quoted in Wion v. United States, 325 F. 2d at 428, n. 10; Bazelon, Chief Judge, in Washington v. United States, 129 U.S. App.D.C. at 42, n. 33, 390 F.2d at 457 (1967); Haynesworth, Chief Judge, in en banc opinion in United States v. Chandler, 393 F.2d at 928 (1968); see also remarks of Chief Justice Weintraub (of New Jersey) in Insanity as a Defense—Panel Discussion, Annual Judicial Conference, Second Circuit, 37 F.R.D. 365, 369 (1964).

The concept of lack of "free will" is both the root of origin of the insanity defense and the line of its growth.[20] This cherished principle is not undercut by difficulties, or differences of view, as to how best to express the free will concept in the light of the expansion of medical knowledge. We do not concur in the view of the National District Attorneys Association that the insanity defense should be abandoned judicially, either because it is at too great a variance with popular conceptions of guilt[21] or fails "to show proper respect for the personality of the criminal [who] is liable to resent pathology more than punishment."[22]

These concepts may be measured along with other ingredients in a legislative re-examination of settled doctrines of criminal responsibility, root, stock and branch. Such a reassessment, one that seeks to probe and appraise the society's processes and values, is for the legislative branch, assuming no constitutional bar. The judicial role is limited, in Justice Holmes's figure, to action that is molecular, with the restraint inherent in taking relatively small steps, leaving to the other branches of government whatever progress must be made with seven-league leaps. Such judicial restraint is particularly necessary when a proposal requires, as a mandatory ingredient, the kind of devotion of resources, personnel and techniques that can be accomplished only through whole-hearted legislative commitment.

To obviate any misunderstanding from our rejection of the recommendation of those proposing judicial abolition of the insanity defense, we expressly commend their emphasis on the need for improvement of dispositional resources and programs. The defense focuses on the kind of impairment that warrants exculpation, and necessarily assigns to the prison walls many men who have serious mental impairments and difficulties. The needs of society—rooted not only in humanity but in practical need for attempting to break the recidivist cycles, and halt the spread of deviant behavior—call for the provision of psychiatrists, psychologists and counselors to help men with these mental afflictions and difficulties, as part of a total effort toward a readjustment that will permit re-integration in society.

b. *Proposal for defense if mental disease impairs capacity to such an extent that the defendant cannot "justly be held responsible."*

We have also pondered the suggestion that the jury be instructed that the defendant lacks criminal responsibility if the jury finds that the defendant's mental disease impairs his capacity or controls to such an extent that he cannot "justly be held responsible."

This was the view of a British commission,[23] adapted and proposed in 1955 by Professor Wechsler, the distinguished Reporter for the ALI's Model Penal Code, and sustained by some, albeit a minority, of the members of the ALI's Council.[24] In the ALI, the contrary view prevailed because of a concern over presenting to

20. Davis v. United States, 160 U.S. 469, 484-485, 16 S.Ct. 353, 40 L.Ed. 499 (1895); Durham v. United States, *supra*, 94 U.S.App.D.C. at 242, 214 F.2d at 876.

21. Amicus argues that penal systems can only survive so long as they "accord substantially with the popular estimate of the enormity of guilt," citing 1 W. Lecky, History of the Rise and Influence of the Spirit of Rationalism in Europe 336-337 (1891).

22. Citing Harris, Respect for Persons in Ethics and Society 129-130 (R. De George ed. 1966).

23. In 1953 the British Royal Commission on Capital Punishment proposed:
[A person is not responsible for his unlawful act if] at the time of the act the accused was suffering from disease of the mind (or mental deficiency) *to such a degree that he ought not to be held responsible.*

24. The minority, together with the Reporter for the Model Penal Code (Pro-

the jury questions put primarily in the form of "justice."

The proposal is not to be condemned out of hand as a suggestion that the jury be informed of an absolute prerogative that it can only exercise by flatly disregarding the applicable rule of law. It is rather a suggestion that the jury be informed of the matters the law contemplates it will take into account in arriving at the community judgment concerning a composite of factors.[25]

However, there is a substantial concern that an instruction overtly cast in terms of "justice" cannot feasibly be restricted to the ambit of what may properly be taken into account but will splash with unconfinable and malign consequences. The Government cautions that "explicit appeals to 'justice' will result in litigation of extraneous issues and will encourage improper arguments to the jury phrased solely in terms of 'sympathy' and 'prejudice.'"

Nor is this solely a prosecutor's concern.

Mr. Flynn, counsel appointed to represent defendant, puts it that even though the jury is applying community concepts of blameworthiness "the jury should not be left at large, or asked to find out for itself what those concepts are."

The amicus submission of the Public Defender Service argues that it would be beneficial to focus the jury's attention on the moral and legal questions intertwined in the insanity defense. It expresses concern, however, over a blameworthiness instruction without more, saying (Br. 19) "it may well be that the 'average' American condemns the mentally ill."[26] It would apparently accept an approach not unlike that proposed by the ALI Reporter, under which the justice standard is coupled with a direction to consider the individual's capacity to control his behavior. Mr. Dempsey's recommendation is of like import, with some simplification.[27] But the problem remains, whether, assuming justice calls for the exculpation and treatment of the mentally ill, that is more likely to be gained from a jury, with "average" notions of mental illness, which is explicitly set at large to convict or acquit persons with impaired mental capacity according to its concept of justice.

The brief of the D.C. Bar Association as amicus submits that with a "justly responsible" formulation the test of insanity "would be largely swallowed up by this consideration." And it observes that the function of giving to the jury the law to be applied to the facts is not only the duty of the court, see Sparf v. United States, 156 U.S. 51, 102, 15 S.Ct. 273, 39 L.Ed. 343 (1895), but is also "a bedrock right of every citizen"—and, possibly, his "only protection," citing Justice Story in United States v. Battiste, 2 Sumn. 240, 244, Fed.Cas. No. 14,545 (C.C.D.Mass. 1835).

---

fessor Herbert Wechsler), proposed the following test of insanity:

> A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect his capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law is *so substantially impaired that he cannot justly be held responsible.*

This proposal appears as alternative (a) to paragraph (1) of Model Penal Code § 4.01 (Tent. Draft No. 4, 1955) (emphasis added).

25. See authorities cited *supra,* note 6.

26. See, *e. g.,* Szasz, Psychiatry, Ethics and the Criminal Law, 58 Colum.L.Rev. 183, 195 (1958) "[To] have a 'psychopathic' personality is only a more elegant way of expressing moral condemnation." See also, Star, "The Public's Ideas About Mental Illness" (National Opinion Research Center, 1955); H. Kalven and H. Zeisel, The American Jury 405 (1966).

27. He proposes (Br. 78) an instruction with this crucial sentence: "It is up to you to decide whether defendant had such an abnormal mental condition, and if he did whether the impairment was substantial enough, and was so related to the commission of the crime, *that he ought not be held responsible.*" (Emphasis added.)

We are impressed by the observation of Professor Abraham S. Goldstein, one of the most careful students of the problem:

> [The] overly general standard may place too great a burden upon the jury. If the law provides no standard, members of the jury are placed in the difficult position of having to find a man responsible for no other reason than their personal feeling about him. Whether the psyches of individual jurors are strong enough to make that decision, or whether the "law" should put that obligation on them, is open to serious question. It is far easier for them to perform the role assigned to them by legislature and courts if they know—or are able to rationalize—that their verdicts are "required" by law.[28]

Professor Goldstein was referring to the broad "justice" standard recommended by the Royal Commission. But the problems remain acute even with the modifications in the proposal of the ALI Reporter, for that still leads to "justly responsible" as the ultimate and critical term.

There may be a tug of appeal in the suggestion that law is a means to justice and the jury is an appropriate tribunal to ascertain justice. This is a simplistic syllogism that harbors the logical fallacy of equivocation, and fails to take account of the different facets and dimensions of the concept of justice. We must not be beguiled by a play on words. The thrust of a rule that in essence invites the jury to ponder the evidence on impairment of defendant's capacity and appreciation, and then do what to them seems just, is to focus on what seems "just" as to the particular individual. Under the centuries-long pull of the Judeo-Christian ethic, this is likely to suggest a call for understanding and forgiveness of those who have committed crimes against society, but plead the influence of passionate and perhaps justified grievances against that society, perhaps grievances not wholly lacking in merit. In the domain of morality and religion, the gears may be governed by the particular instance of the individual seeking salvation. The judgment of a court of law must further justice to the community, and safeguard it against undercutting and evasion from overconcern for the individual. What this reflects is not the rigidity of retributive justice—an eye for an eye—but awareness how justice in the broad may be undermined by an excess of compassion as well as passion. Justice to the community includes penalties needed to cope with disobedience by those capable of control, undergirding a social environment that broadly inhibits behavior destructive of the common good. An open society requires mutual respect and regard, and mutually reinforcing relationships among its citizens, and its ideals of justice must safeguard the vast majority who responsibly shoulder the burdens implicit in its ordered liberty. Still another aspect of justice is the requirement for rules of conduct that establish reasonable generality, neutrality and constancy. Cf. L. Fuller, The Morality of Laws 33–94 (1964). This concept is neither static nor absolute, but it would be sapped by a rule that invites an ad hoc redefinition of the "just" with each new case.

It is the sense of justice propounded by those charged with making and declaring the law—legislatures and courts—that lays down the rule that persons without substantial capacity to know or control the act shall be excused. The jury is concerned with applying the community understanding of this broad rule to particular lay and medical facts. Where the matter is unclear it naturally will call on its own sense of justice to help it determine the matter. There is wisdom in the view that a jury generally understands well enough that an instruction composed in flexible terms gives it sufficient latitude so that, without disregarding the instruction, it can provide that application of the instruction which

---

28. A. Goldstein, The Insanity Defense 81–82 (1967).

harmonizes with its sense of justice.[29] The ALI rule generally communicates that meaning. Wade v. United States, *supra*, 426 F.2d at 70–71. This is recognized even by those who might prefer a more explicit statement of the matter.[30] It is one thing, however, to tolerate and even welcome the jury's sense of equity as a force that affects its application of instructions which state the legal rules that crystallize the requirements of justice as determined by the lawmakers of the community. It is quite another to set the jury at large, without such crystallization, to evolve its own legal rules and standards of justice. It would likely be counter-productive and contrary to the larger interest of justice to become so explicit—in an effort to hammer the point home to the very occasional jury that would otherwise be too rigid—that one puts serious strains on the normal operation of the system of criminal justice.

Taking all these considerations into account we conclude that the ALI rule as announced is not productive of injustice, and we decline to proclaim the broad "justly responsible" standard.

5. *ALI rule is contemplated as improving the process of adjudication, not as affecting number of insanity acquittals*

Amicus Dempsey is concerned that a change by this court from *Durham-Mc-Donald* to ALI will be taken as an indication that this court intends that the number and percentage of insanity acquittals be modified. That is not the intendment of the rule adopted today, nor do we have any basis for forecasting that effect.

a. Statistical data concerning the use of insanity in criminal trials in this jurisdiction were presented in the December 15, 1966, Report of the President's Commission on Crime in the District of Columbia.[31] These data have been up-dated in Mr. Dempsey's brief, with the aid of data helpfully supplied by the United States Attorney's office. At least since *Durham* was modified by *McDonald,* insanity acquittals have run at about 2% of all cases terminated. In the seven years subsequent to *McDonald* jury verdicts of not guilty by reason of insanity averaged only 3 per annum.[32] In trials by the court, there has been an annual average of about 38 verdicts of not guilty by reason of insanity; these typically are cases where the Government psychiatrists agreed that the crime was the product of mental illness.[33] We perceive no basis in these data for any conclusion that the number of percentage of insanity acquittals has been either excessive or inadequate.

We have no way of forecasting what will be the effect on verdicts, of juries or judges, from the reduction in influence of expert testimony on "productivity"

---

29. See H. Kalven and H. Zeisel, The American Jury (1966), passim, and particularly Chapters 5, 8, 12, 15 et seq. See also, Rifkind, Follow-up: The Jury, The Center Magazine 59, 64 (July, 1970).

30. See *e. g.,* the response of the Attorney General in Ramer v. United States, 390 F.2d 564, 575, n. 10 (9th Cir. en banc, 1968).

31. See ch. 7, section III: The Mentally Ill Offender, subsection "Experience Under the Durham Rule," at p. 534 ff of the Report, including Tables 1–10.

32. *McDonald* was decided in 1962. For fiscal years ending June 30, 1964–1970, there were 21 verdicts of not guilty by reason of insanity in trials by jury, 265 such verdicts in trials by court. These

data appear in Appendix C of Mr. Dempsey's brief, as revised by submission of Sept. 21, 1971.

Mr. Dempsey provides data on all terminations for fiscal 1964–1968. The data for these five years show 7537 terminations, and 194 verdicts of not guilty by reason of insanity. The other terminations are: 3500 verdicts of guilty on plea, 1567 verdicts of guilty after trial, and 629 verdicts of not guilty.

33. These trials are discussed in the amicus submission of David Chambers, consultant, who prepared a report on the John Howard Pavilion at St. Elizabeths Hospital, submitted to the Hospital and the National Institutes of Mental Health.

Professor Chambers characterizes most insanity trials to the courts as more

that reflects judgments outside the domain of expertise.[34] Whatever its effect, we are confident that the rule adopted today provides a sounder relationship in terms of the giving, comprehension and application of expert testimony. Our objective is not to steer the jury's verdict but to enhance its deliberation.[35]

b. Some judges have viewed the ALI test as going beyond *Durham* in enlarging the category of persons who may win acquittals.[36] The 1966 report of the President's Crime Commission (*supra* note 15) apparently concludes that the debate over *Durham* was stilled by *McDonald*, and that *Durham-McDonald* is not significantly different in content from the ALI test. In contrast, Mr. Dempsey is concerned that a person's ability to control his behavior could be "substantially impaired" by mental condition, thus qualifying the defense under *McDonald*, while still leaving him with "substantial capacity," rendering the defense unavailable under the ALI rule. We have no way of knowing whether psychiatrists giving testimony would draw such a distinction, and moreover there would be no difference in result unless one also indulges the assumption,

which is dubious, that the jury would reason that the crime may have been the "product" of the mental condition of a man even though he retained substantial capacity.

In the last analysis, however, if there is a case where there would be a difference in result—and it would seem rare —we think the underlying freedom of will conception renders it just to assign responsibility to a person, even though his controls have been impaired, if his residual controls give him "substantial capacity" both to appreciate the wrongfulness of his conduct and to conform it to the requirement of law. Whether the ALI standard is to be given a narrow or broad conception rests not on abstract analysis [37] but on the application reflecting the underlying sense of responsibility of the jury, as the community's surrogate.[38]

### 6. *Elements of the ALI rule adopted by this court*

Though it provides a general uniformity, the ALI rule leaves room for variations. Thus, we have added an adjustment in the *McDonald* definition of mental disease, which we think fully

nearly comparable to the taking of guilty pleas—consisting of a stipulated statement of facts; a conclusory Hospital report that the crime was the product of mental illness; and brief supporting testimony from a single John Howard psychiatrist—all in a context of a "tacit or explicit understanding" that the defendant will not contest his indefinite commitment to the Hospital.

34. Any such analysis of the productivity testimony and verdicts not only would require prodigious time and effort, but might well be inconclusive in view of the way experts testifying on the "product" issues come to diametric differences in the same trial.

35. We do not share the cynical view that treats the instruction as devoid of consequence. In a study of the reactions of more than a thousand jurors to two experimental trials involving a defense of insanity, it was found that juries deliberated significantly longer when instructed under *Durham* than under *M'Naghten*. Yet this did not undercut

consensus; there was no significant difference in the percentages of hung juries. R. Simon, The Jury and the Defense of Insanity 213 *ff.* (1967).

36. See the opinion of Trask, J., for six of the 13 judges on the Ninth Circuit, in *Wade v. United States,* 426 F.2d 64, 75, 79.

37. Mr. Dempsey is concerned lest the ALI test assigns responsibility unless capacity has been reduced "to the vagrant and trivial dimensions characteristic of the most severe afflictions of the mind," *see* Wechsler, Codification of Criminal Law in the United States: The Model Penal Code, 68 Colum.L.Rev. 1425, 1443 (1968). But the application in fact will depend in the last analysis on the jury's application of community standards to the evidence adduced.

38. Even under *McDonald* the jury has frequently brought in a verdict of guilty, when the exculpatory rules would plainly permit, or even contemplate, a verdict of not guilty by reason of insanity. *King v. United States, supra.*

compatible with both the spirit and text of the ALI rule. In the interest of good administration, we now undertake to set forth, with such precision as the subject will permit, other elements of the ALI rule as adopted by this court.

The two main components of the rule define (1) mental disease, (2) the consequences thereof that exculpate from responsibility.

### a. *Intermesh of components*

The first component of our rule, derived from *McDonald,* defines mental disease or defect as an abnormal condition of the mind, and a condition which substantially (a) affects mental or emotional processes and (b) impairs behavioral controls. The second component, derived from the Model Penal Code, tells which defendant with a mental disease lacks criminal responsibility for particular conduct: it is the defendant who, as a result of this mental condition, at the time of such conduct, either (i) lacks substantial capacity to appreciate that his conduct is wrongful, or (ii) lacks substantial capacity to conform his conduct to the law.

■■ The first component establishes eligibility for an instruction concerning the defense for a defendant who presents evidence that his abnormal condition of the mind has substantially impaired behavioral controls. The second component completes the instruction and defines the ultimate issue, of exculpation, in terms of whether his behavioral controls were not only substantially impaired but impaired to such an extent that he lacked substantial capacity to conform his conduct to the law.[39]

### b. *The "result" of the mental disease*

■ The rule contains a requirement of causality, as is clear from the term "result." Exculpation is established not by mental disease alone but only if "as a result" defendant lacks the substantial capacity required for responsibility.

Presumably the mental disease of a kleptomaniac does not entail as a "result" a lack of capacity to conform to the law prohibiting rape.

### c. *At the time of the conduct*

■ Under the ALI rule the issue is not whether defendant is so disoriented or void of controls that he is never able to conform to external demands, but whether he had that capacity at the time of the conduct. The question is not properly put in terms of whether he would have capacity to conform in some untypical restraining situation—as with an attendant or policeman at his elbow. The issue is whether he was able to conform in the unstructured condition of life in an open society, and whether the result of his abnormal mental condition was a lack of substantial internal controls. These matters are brought out in the ALI's comments to § 4.01 of the Model Penal Code Tentative Draft #4, p. 158:

> The schizophrenic . . . is disoriented from reality; the disorientation is extreme; but it is rarely total. Most psychotics will respond to a command of someone in authority within the mental hospital; they thus have some capacity to conform to a norm. But this is very different from the question whether they have the capacity to conform to requirements that are not thus immediately symbolized by an attendant or policeman at the elbow. Nothing makes the inquiry into responsibility more unreal for the psychiatrist than limitation of the issue to some ultimate extreme of total incapacity, when clinical experience reveals only a graded scale with marks along the way.

### d. *Capacity to appreciate wrongfulness of his conduct*

■ As to the option of terminology noted in the ALI code, we adopt the formulation that exculpates a defendant

---

39. *Defendant is also exculpated if he lacks substantial capacity to appreciate the conduct is wrongful.*

whose mental condition is such that he lacks substantial capacity to appreciate the wrongfulness of his conduct. We prefer this on pragmatic grounds to "appreciate the criminality of his conduct" since the resulting jury instruction is more like that conventionally given to and applied by the jury. While such an instruction is of course subject to the objection that it lacks complete precision, it serves the objective of calling on the jury to provide a community judgment on a combination of factors. And since the possibility of analytical differences between the two formulations is insubstantial in fact in view of the control capacity test, we are usefully guided by the pragmatic considerations pertinent to jury instructions.[40]

In adopting the ALI formulation, this court does not follow the *Currens* opinion of the Third Circuit, which puts it that the sole issue in every case is defendant's capacity to control his behavior, and that as a matter of analysis a person who lacks substantial capacity to appreciate the wrongfulness [criminality] of his conduct necessarily lacks substantial capacity to control his behavior. Like the other circuits, we resist the *Currens*

lure of logic in order to make certain that the jury will give heed to the substantiality of a defense of lack of substantial capacity to appreciate wrongfulness, a point that may elude a jury instructed solely in terms of control capacity. In a particular case, however, defendant may have reason to request omission of the phrase pertaining to lack of capacity to appreciate wrongfulness, if that particular matter is not involved on the facts, and defendant fears that a jury that does not attend rigorously to the details of the instruction may erroneously suppose that the defense is lost if defendant appreciates wrongfulness. Here again, it is not enough to rely solely on logic, when a simple change will aid jury understanding. In such a case, if defendant requests, the judge should limit the instruction to the issue involved in that case, and charge that the jury shall bring in a verdict of not guilty if as a result of mental illness defendant lacked substantial capacity to conform his conduct to the requirements of the law.

### e. *Caveat paragraph*

Section 4.01 of the Model Penal Code as promulgated by ALI contains in sub-

---

40. In *M'Naghten's* case, 10 Cl. & F. 200, 211, 8 Eng.Rep. 718, 722 (H.L.1843), the majority opinion of Lord Chief Justice Tindal ruled that the jury should be instructed in terms of the ability of the accused "to know that he was doing an act that was wrong," adding: "If the question were to be put as to the knowledge of the accused solely and exclusively with reference to the law of the land, it might tend to confound the jury, by inducing them to be believe that an actual knowledge of the law of the land was essential in order to lead to a conviction."

When the question arose as to whether "wrong" means moral or legal wrong, the American courts split. One group, following *M'Naghten*, held the offender sane if he knew the act was prohibited by law. A second group, following the lead of Judge Cardozo in People v. Schmidt, 216 N.Y. 324, 110 N.E. 945, 948–950 (1915) ruled that, *e. g.*, the defense was available to a defendant who knew the killing was legally wrong but thought it morally right because he was so ordered by God. The issue is discussed and authorities col-

lected in A. Goldstein, The Insanity Defense, and notes thereto. In Sauer v. United States, 241 F.2d 640, 649 (9th Cir. 1957), Judge Barnes summed up the practicalities: "[The] practice has been to state merely the word 'wrong' and leave the decision for the jury. While not entirely condonable, such practice is explained in large measure by an awareness that the jury will eventually exercise a moral judgment as to the sanity of the accused."

This issue rarely arose under *M'Naghten*, and its substantiality was reduced if not removed by the control capacity test, since anyone under a delusion as to God's mandate would presumably lack substantial capacity to conform his conduct to the requirements of the law.

We are not informed of any case where a mental illness left a person with capacity to appreciate wrongfulness but not a capacity to appreciate criminality. If such a case ever arises, supported by credible evidence, the court can then consider its correct disposition more meaningfully, in the light of a concrete record.

section (2) what has come to be known as the "caveat paragraph":

> (2) The terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct.

The purpose of this provision was to exclude a defense for the so-called "psychopathic personality."[41]

There has been a split in the Federal circuits concerning this provision. Some of the courts adopting the ALI rule refer to both subsections but without separate discussion of the caveat paragraph—as in the *Chandler* and *Blake* opinions. As to the decisions considering the point, those of the Second and Third Circuits conclude the paragraph should be retained (in *Freeman* and *Currens*), while the *Smith* and *Wade* decisions, of the Sixth and Ninth Circuits, conclude it should be omitted. The Sixth Circuit's position is (404 F.2d at 727, fn. 8) that there is "great dispute over the psychiatric soundness" of the caveat paragraph. The *Wade* opinion considers the matter at great length and puts forward three grounds for rejecting the caveat paragraph: (1) As a practical matter, it would be ineffectual in keeping sociopaths out of the definition of insanity; it is always possible to introduce some evidence, other than past criminal behavior, to support a plea of insanity.

(2) The criminal sanction ought not be sought for criminal psychopaths—constant recidivists—because such people should be taken off the streets indefinitely, and not merely for a set term of years. (3) Its third ground is stated thus (426 F.2d at 73):

> It is unclear whether [the caveat paragraph] would require that a defendant be considered legally sane if, although the only overt acts manifesting his disease or defect were "criminal or otherwise anti-social," there arises from his acts a reasonable inference of mental derangement either because of the nature of the acts or because of credible medical or other evidence.

Our own approach is influenced by the fact that our rule already includes a definition of mental disease (from *McDonald*). Under that definition, as we have pointed out, the mere existence of "a long criminal record does not excuse crime." Williams v. United States, 114 U.S.App.D.C. 135, 137, 312 F.2d 862, 864 (1962). We do not require the caveat paragraph as an insurance against exculpation of the deliberate and persistent offender.[42] Our *McDonald* rule guards against the danger of misunderstanding and injustice that might arise, say, from an expert's classification that reflects only a conception[43] defining all criminality as reflective of

---

41. See Comments to Fourth Draft, p. 160:

 6. Paragraph (2) of section 4.01 is designed to exclude from the concept of "mental disease or defect" the case of so-called "psychopathic personality." The reason for the exclusion is that, as the Royal Commission put it, psychopathy "is a statistical abnormality; that is to say, the psychopath differs from a normal person only quantitatively or in degree, not qualitatively; and the diagnosis of psychopathic personality does not carry with it any explanation of the causes of the abnormality." While it may not be feasible to formulate a definition of "disease," there is much to be said for excluding a condition that is manifested only by the behavior phenomena that must, by hypothesis, be the result of disease for irresponsibility to be established. Although British psychiatrists

 had agreed, on the whole, that psychopathy should not be called "disease," there is considerable difference of opinion on the point in the United States. Yet it does not seem useful to contemplate the litigation of what is essentially a matter of terminology; nor is it right to have the legal result rest upon the resolution of a dispute of this kind.

42. We note that the Second Circuit adopted the caveat paragraph on the ground that

 a contrary holding would reduce to absurdity a test designed to encourage full analysis of all psychiatric data and would exculpate those who knowingly and deliberately seek a life of crime. (*Freeman*, 357 F.2d at 625).

43. See, e. g., D. Abrahamsen, Who Are the Guilty? 125 (1952).

mental illness. There must be testimony to show both that the defendant was suffering from an abnormal condition of the mind and that it substantially affected mental or emotional processes and substantially impaired behavioral controls.

In this context, our pragmatic approach is to adopt the caveat paragraph as a rule for application by the judge, to avoid miscarriage of justice, but not for inclusion in instructions to the jury.

 The judge will be aware that the criminal and antisocial conduct of a person—on the street, in the home, in the ward—is necessarily material information for assessment by the psychiatrist. On the other hand, rarely if ever would a psychiatrist base a conclusion of mental disease solely on criminal and anti-social acts. Our pragmatic solution provides for reshaping the rule, for application by the court, as follows: The introduction or proffer of past criminal and anti-social actions is not admissible as evidence of mental disease unless accompanied by expert testimony, supported by a showing of the concordance of a responsible segment of professional opinion, that the particular characteristics of these actions constitute convincing evidence of an underlying mental disease that substantially impairs behavioral controls.

This formulation retains the paragraph as a "caveat" rather than an inexorable rule of law. It should serve to obviate distortions of the present state of knowledge that would constitute miscarriages of justice. Yet it leaves the door open— on shouldering the "convincing evidence" burden—to accommodate our general rule to developments that may lie ahead. It is the kind of imperfect, but not unfeasible, accommodation of the abstract and pragmatic that is often found to serve the administration of justice.

We do not think it desirable to use the caveat paragraph as a basis for instructions to the jury. It would be difficult for a juryman—or anyone else—to reconcile the caveat paragraph and the basic (*McDonald*) definition of mental disease if a psychiatrist testified that he discerned from particular past criminal behavior a pattern that established defendant as suffering from an abnormal condition of the mind that substantially impaired behavioral controls. If there is no such testimony, then there would be no evidence that mere misconduct betokens mental illness, it would be impermissible for defense counsel to present such a hypothesis to the jury, and there would be very little likelihood that a jury would arrive at such a proposition on its own. On the other hand, an instruction along the lines of the caveat paragraph runs the risk of appearing to call for the rejection of testimony that is based materially, but only partially, on the history of criminal conduct.

### f. Broad presentation to the jury

 Our adoption of the ALI rule does not depart from the doctrines this court has built up over the past twenty years to assure a broad presentation to the jury concerning the condition of defendant's mind and its consequences. Thus we adhere to our rulings admitting expert testimony of psychologists,[44] as well as psychiatrists, and to our many decisions contemplating that expert testimony on this subject will be accompanied by presentation of the facts and premises underlying the opinions and conclusions of the experts,[45] and that the Government and defense may present, in Judge Blackmun's words, "all possibly relevant evidence" bearing on cognition, volition and capacity.[46] We agree with the amicus submission of the National District Attorneys Association

44. Jenkins v. United States, 113 U.S.App. D.C. 300, 307 F.2d 637 (en banc, 1962) (assuming substantial experience in the diagnosis of disease in association with psychiatrists or neurologists).

45. *E. g.*, the opinions in *Durham, Carter, McDonald* and *Washington*, and Judge Burger's concurring opinion in *Blocker*.

46. Pope v. United States, 372 F.2d 710, 736 (8th Cir. 1967).

that the law cannot "distinguish between physiological, emotional, social and cultural sources of the impairment"—assuming, of course, requisite testimony establishing exculpation under the pertinent standard—and all such causes may be both referred to by the expert and considered by the trier of fact.[47]

Breadth of input under the insanity defense is not to be confused with breadth of the doctrines establishing the defense. As the National District Attorneys Association brief points out, the latitude for salient evidence of e. g., social and cultural factors pertinent to an abnormal condition of the mind significantly affecting capacity and controls, does not mean that such factors may be taken as establishing a separate defense for persons whose mental condition is such that blame can be imposed. We have rejected a broad "injustice" approach that would have opened the door to expositions of e. g., cultural deprivation, unrelated to any abnormal condition of the mind.

We have recognized that "Many criminologists point out that even normal human behavior is influenced by such factors as training, environment, poverty and the like, which may limit the understanding and options of the individual." King v. United States, supra, 125 U.S.App.D.C. at 323, 372 F.2d at 388. Determinists may contend that every man's fate is ultimately sealed by his genes and environment, over which he has no control. Our jurisprudence, however, while not oblivious to deterministic components, ultimately rests on a premise of freedom of will. This is not to be viewed as an exercise in philosophic discourse, but as a governmental fusion of ethics and necessity, which takes into account that a system of rewards and punishments is itself part of the environment that influences and shapes human conduct. Our recognition of an insanity defense for those who lack the essential, threshold free will possessed by those in

the normal range is not to be twisted, directly or indirectly, into a device for exculpation of those without an abnormal condition of the mind.

Finally, we have not accepted suggestions to adopt a rule that disentangles the insanity defense from a medical model, and announces a standard exculpating anyone whose capacity for control is insubstantial, for whatever cause or reason. There may be logic in these submissions, but we are not sufficiently certain of the nature, range and implications of the conduct involved to attempt an all-embracing unified field theory. The applicable rule can be discerned as the cases arise in regard to other conditions—somnambulism or other automatisms; blackouts due, e. g. to overdose of insulin; drug addiction. Whether these somatic conditions should be governed by a rule comparable to that herein set forth for mental disease would require, at a minimum, a judicial determination, which takes medical opinion into account, finding convincing evidence of an ascertainable condition characterized by "a broad consensus that free will does not exist." Salzman v. United States, 131 U.S.App.D.C. 393, 400, 405 F.2d 358, 365 (1968) (concurring opinion of Judge Wright).

### E. Inter-related Doctrines and Implementing Instructions

For sake of clarity, and to obviate misunderstanding and unnecessary litigation, we undertake by today's ruling to accompany our definition of the underlying doctrine on insanity as a defense negativing criminal responsibility, with comments on implementing instructions and certain inter-related doctrines as they will stand hereafter.

#### 1. Suggested instruction

Appendix B contains a suggested instruction in the thought that the trial judges may consider it useful for their consideration and guidance in the

---

47. The Association points out that "the effects of poverty, historical factors and

prejudice may well have an adverse effect upon an individual's mental condition."

task of making the adjustments in practices and routines required by our ruling.

*Burden of Proof*

Appendix B contains alternate wordings on burden of proof. One wording conforms to the doctrine of Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895), that the Government has the burden of proving beyond a reasonable doubt that the defendant was not entitled to exculpation as a result of his mental disease or defect. The other version is cast in the wording of the last sentence of 24 D.C.Code § 301 (j), as added to the law in 1970:[48] "No person accused of an offense shall be acquitted on the ground that he was insane at the time of its commission unless his insanity, regardless of who raises the issue, is affirmatively established by a preponderance of the evidence."

Questions have been raised as to the constitutionality of this 1970 provision,[49] its applicability to offenses committed prior to the 1970 enactment, and its applicability to offenses committed in the District of Columbia which are not violations of the D.C.Code but are violations of the United States Code.[50] We do not think it appropriate to decide such questions at this time, and accordingly have provided alternate versions in the instruction suggested in Appendix B.

2. *The "Lyles" instruction—as to effect of verdict of not guilty by reason of insanity*

By a statute of August 9, 1955, passed in the wake of *Durham,* Congress added to 24 D.C.Code § 301, provisions on mandatory commitment of persons acquitted by reason of insanity, set forth in subsection (d), and provisions governing the release of persons so committed, set forth in subsection (e).

In Lyles v. United States, 103 U.S.App. D.C. 22, 254 F.2d 725 (en banc, 1957), the majority of the court concurred in Part I of the opinion filed by Judges Prettyman and Burger that the jury, which knows the meaning of a verdict of guilty and not guilty "has a right to know the meaning of [the insanity] verdict as accurately as it knows by common knowledge the meaning of the other two possible verdicts." The court said, 103 U.S.App.D.C. at 25, 254 F.2d at 728:

> We think that when the instruction is given the jury should simply be informed that a verdict of not guilty by reason of insanity means that the accused will be confined in a hospital for the mentally ill until the superintendent has certified, and the court is satisfied, that such person has recovered his sanity and will not in the reasonable future be dangerous to himself or others, in which event and at which time the court shall order his release either unconditionally or under such conditions as the court may see fit.

The court provided for omission of such an instruction on the affirmative request of a defendant.

Bolton v. Harris, 130 U.S.App.D.C. 1, 395 F.2d 642 (1968) read § 301(d) as permitting mandatory commitment for the purpose of a mental examination, but as containing a requirement of a judicial hearing, on the question of whether the defendant involved ought to be retained

---

48. By § 207(6) of the D.C. Court Reform and Criminal Procedure Act of 1970, P.L. 91–358.

49. *E. g.,* Bazelon, C. J., concurring in United States v. Eichberg, 142 U.S.App. D.C. 110, 114, 439 F.2d 620, 624 (1971), where the vitality of Leland v. Oregon, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952) is questioned in view of In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

See also Report of the President's D.C. Crime Commission (1966) 553: "The majority of the Commission also believes that the views of the dissenting justices in Leland v. Oregon are grounds for caution. * * * We believe that there is at least a substantial question whether requiring the defendant to prove insanity in a Federal court would be upheld by the Supreme Court."

50. United States v. Thompson, 147 U.S. App.D.C. 1, 452 F.2d 1333 (1971).

in custody on the basis of his current mental condition, with procedures substantially similar to those in proceedings, under 21 D.C.Code § 545(b), for civil commitment of the dangerous mentally ill. The court also construed § 301(e) to entitle the patient to periodic examinations by the hospital staff, to an examination by an outside psychiatrist, and to a court hearing if any one of the examining physicians believes he should no longer be hospitalized.

Finally, the court construed § 301(g), reserving the right of a confined person to establish eligibility for release under this section by habeas corpus, to require the person confined to prove by a preponderance of the evidence that his detention is illegal. "Thus, the court must find, by the preponderance of the evidence, that the patient's commitment is no longer valid—*i. e.*, that he is no longer 'likely to injure himself or other persons' due to 'mental illness.'" (130 U.S.App. D.C. at 12, 395 F.2d at 653.) The Court referred to its ruling as similar to that in the concurring opinion of Judge Fahy in Ragsdale v. Overholser, 108 U.S.App. D.C. 308, 315, 281 F.2d 943, 950 (1960).

As to the *Lyles* instruction, the *Bolton* opinion (at note 50) held that it should be changed to comport with the procedures then construed to be required under the law. The D.C. Court Reform and Criminal Procedure Act of 1970, P.L. 91–358, retained what was formerly § 301(d) as § 301(d)(1) of 24 D.C. Code, and retained § 301(e) unchanged. Accordingly, the 1970 law retains the Bolton v. Harris construction of what is now § 301(d)(1), as providing mandatory commitment for the purpose of examination, and its construction of § 301 (e), as to provisions for release. However, the 1970 law adds a new provision, see 24 D.C.Code § 301(d)(2):

(2) A person confined pursuant to paragraph (1) shall have a hearing, unless waived, within 50 days of his confinement to determine whether he is entitled to release from custody. At the conclusion of the criminal action referred to in paragraph (1) of this subsection, the court shall provide such person with representation by counsel—

(A) in the case of a person who is eligible to have counsel appointed by the court, by continuing any appointment of counsel made to represent such person in the prior criminal action or by appointing new counsel; or

(B) in the case of a person who is not eligible to have counsel appointed by the court, by assuring representation by retained counsel.

If the hearing is not waived, the court shall cause notice of the hearing to be served upon the person, his counsel, and the prosecuting attorney and hold the hearing. Within ten days from the date the hearing was begun, the court shall determine the issues and make findings of fact and conclusions of law with respect thereto. The person confined shall have the burden of proof. If the court finds by a preponderance of the evidence that the person confined is entitled to his release from custody, either conditional or unconditional, the court shall enter such order as may appear appropriate.

Section 301(d)(2), as added in 1970, gives specific implementation to the construction of Bolton v. Harris, which requires a judicial hearing, following the initial examination, prior to an order of mandatory commitment under 301(d). It differs to the extent that Bolton v. Harris contemplated a burden of proof on the Government in 301(d) commitment proceedings, like that in civil commitment proceedings. Section 301(d)(2) now provides that the person confined "shall have the burden of proof"—to establish eligibility for release under the standards of § 301(e). Accordingly the *Lyles* instruction must be recast as to persons governed by the 1970 law. This is a suggested form:

If the defendant is found not guilty by reason of insanity, it becomes the duty of the court to commit him to St. Elizabeths Hospital. There will be a

hearing within 50 days to determine whether defendant is entitled to release. In that hearing the defendant has the burden of proof. The defendant will remain in custody, and will be entitled to release from custody only if the court finds by preponderance of the evidence that he is not likely to injure himself or other persons due to mental illness.

As to the possibility of an attack on the constitutionality of § 301(d)(2), that question has not been briefed or argued, and it is not now being decided.[51]

3. *Mental condition, though insufficient to exonerate, may be relevant to specific mental element of certain crimes or degrees of crime.*

Our decision accompanies the redefinition of when a mental condition exonerates a defendant from criminal responsibility with the doctrine that expert testimony as to a defendant's abnormal mental condition may be received and considered, as tending to show, in a responsible way, that defendant did not have the specific mental state required for a particular crime or degree of crime —even though he was aware that his act was wrongful and was able to control it, and hence was not entitled to complete exoneration.

Some of the cases following this doctrine use the term "diminished responsibility," but we prefer the example of the cases that avoid this term (*e. g.*, note 57, *infra*), for its convenience is outweighed by its confusion: Our doctrine

has nothing to do with "diminishing" responsibility of a defendant because of his impaired mental condition,[52] but rather with determining whether the defendant had the mental state that must be proved as to all defendants.

Procedurally, the issue of abnormal mental condition negativing a person's intent may arise in different ways: For example, the defendant may offer evidence of mental condition not qualifying as mental disease under *McDonald*. Or he may tender evidence that qualifies under *McDonald*, yet the jury may conclude from all the evidence that defendant has knowledge and control capacity sufficient for responsibility under the ALI rule.

The issue often arises with respect to mental condition tendered as negativing the element of premeditation in a charge of first degree premeditated murder. As we noted in Austin v. United States, 127 U.S.App.D.C. 180, 382 F.2d 129 (1967), when the legislature modified the common law crime of murder so as to establish degrees, murder in the first degree was reserved for intentional homicide done deliberately and with premeditation, and homicide that is intentional but "impulsive," not done after "reflection and meditation," was made murder only in the second degree. (127 U.S.App.D.C. at 187, 382 F.2d at 135).

An offense like deliberated and premeditated murder requires a specific intent that cannot be satisfied merely by showing that defendant failed to conform to an objective standard.[53]

---

51. In *Bolton* the court relied in part on the circumstance that an acquittal by reason of insanity might reflect only a doubt as to sanity. This may be affected by the 1970 provision putting the trial burden on defendant to establish his insanity.

We are not addressing ourselves to the procedure that would result if a court concludes that § 301(d)(2) is unconstitutional.

52. Our doctrine is different from the doctrine of "partial responsibility" that permits a jury to find that a defendant's mental condition was such that he is only

"partly responsible," and therefore entitled to a verdict reducing the degree of the offense. See Model Penal Code, Comments to Art. 201, app. B at 111 (Tentative Draft No. 9, 1959), quoting the English Homicide Act of 1957, 5 & 6 Eliz. 2, c. 11.

53. The term "malice" in second degree murder has been extended to include recklessness where defendant had awareness of a serious danger to life and displayed wanton disregard for human life. Lee v. United States, 72 App.D.C. 147, 150–151, 112 F.2d 46, 49–50 (1940); Austin v. United States, *supra*, 127 U.S.App-

This is plainly established by the defense of voluntary intoxication. In Hopt v. Utah, 104 U.S. 631, 634, 26 L.Ed. 873 (1881), the Court, after stating the familiar rule that voluntary intoxication is no excuse for crime, said:

[W]hen a statute establishing different degrees of murder requires deliberate premeditation in order to constitute murder in the first degree, the question of whether the accused is in such a condition of mind, by reason of drunkenness or otherwise, as to be capable of deliberate premeditation, necessarily becomes a material subject of consideration by the jury.

In Bishop v. United States, 71 App. D.C. 132, 136, 107 F.2d 297, 301 (1939), Justice Vinson noted that while voluntary intoxication per se is no defense to guilt, "the stated condition of a defendant's mind at the time of the killing . . . is now a proper subject for consideration, inquiry, and determination by the jury." Thus "voluntary intoxication will not excuse murder, but it may negative the ability of the defendant" as to premeditation, and hence effect "a reduction to second degree murder."

Enlarging on *Hopt* and *Bishop*, Judge Burger's opinion in Heideman v. United States, 104 U.S.App.D.C. 128, 131, 259 F.2d 943, 946 (1958), points out:

Drunkenness is not per se an excuse for crime, but nevertheless it may in many instances be relevant to the issue of intent. One class of cases where drunkenness may be relevant on the issue of intent is the category of crimes where specific intent is required. Robbery falls into this category, and a defendant accused of robbery is entitled to an instruction on drunkenness as bearing on intent if the evidentiary groundwork has been adequately laid.

As Judge Burger points out there must be a showing of drunkenness that does more than remove inhibitions, and is

such an "incapacitating state" as to negate intent. But he also notes, citing *Hopt*, and *Bishop*, that a lesser state of drunkenness, insufficient to negate the specific intent required for robbery, may suffice to negate the premeditation required for first degree murder.

Neither logic nor justice can tolerate a jurisprudence that defines the elements of an offense as requiring a mental state such that one defendant can properly argue that his voluntary drunkenness removed his capacity to form the specific intent but another defendant is inhibited from a submission of his contention that an abnormal mental condition, for which he was in no way responsible, negated his capacity to form a particular specific intent, even though the condition did not exonerate him from all criminal responsibility.

In Fisher v. United States, 80 U.S. App.D.C. 96, 149 F.2d 28 (1946), the court upheld the trial court's refusal to instruct the jury that on issues of premeditation and deliberation "it should consider the entire personality of the defendant, his mental, nervous, emotional and physical characteristics as developed by the evidence in the case." Justice Arnold's abbreviated opinion was evidently premised on two factors: (1) that the instruction confused the issue of insanity with the issue of deliberation; (2) that "To give an instruction like the above is to tell the jury they are at liberty to acquit one who commits a brutal crime because he has the abnormal tendencies of persons capable of such crimes." His opinion made no effort to come to terms with the *Hopt* opinion, stressed by Fisher's counsel.

*Fisher* went to the Supreme Court and there was affirmed, but on the limited ground of disinclination to "force" this court in a choice of legal doctrine for the District of Columbia, 328 U.S. 463, 66 S.Ct. 1318, 90 L.Ed. 1382 (1946). The Court said (at 476, 66 S.Ct. at 1325) that such a change was "more properly a

D.C. at 184, 382 F.2d at 133; United States v. Dixon, 135 U.S.App.D.C. 401,

405, 419 F.2d 288, 292 (1969) (concurring opinion).

subject for the exercise of legislative power or at least for the discretion of the courts of the District."

In *Stewart I*, Stewart v. United States, 94 U.S.App.D.C. 293, 214 F.2d 879 (1954) which issued only two weeks after *Durham* was announced, we said that "reconsideration of our decision in Fisher should wait until we can appraise the results [of Durham]." In Stewart v. United States, 107 U.S.App.D.C. 159, 275 F.2d 617 (1960), the court en banc again stated that more experience with *Durham* was required to evaluate *Fisher,* and the matter was appropriate for legislative consideration. That was *Stewart II.*[54]

■■■ Today we are again *en banc,* and we have the benefit of many years of experience with *Durham-McDonald.* We are changing the insanity rule, on a prospective basis, to take into account intervening scholarship and court opinions. As a corollary, we deem it appropriate to change the rule of *Fisher* on a prospective basis, and to accept the approach which the Supreme Court declined to "force" upon us in 1946, but which

has been adopted by the overwhelming majority of courts that have recently faced the question. We are convinced by the analysis set forth in the recent opinions of the highest courts of California,[55] Colorado,[56] New Jersey,[57] Iowa,[58] Ohio,[59] Idaho,[60] Connecticut,[61] Nebraska,[62] New Mexico[63] and Nevada.[64] They have joined the states that spoke out before *Fisher*—New York, Rhode Island, Utah, Wisconsin and Wyoming.[65]

The pertinent reasoning was succinctly stated by the Colorado Supreme Court as follows:[66]

The question to be determined is not whether defendant was insane, but whether the homicidal act was committed with deliberation and premeditation. The evidence offered as to insanity may or may not be relevant to that issue. * * * "A claim of insanity cannot be used for the purpose of reducing a crime of murder in the first degree to murder in the second degree or from murder to manslaughter. If the perpetrator is responsible at all in this respect, he is responsible in the same degree as a sane man; and

54. There was no independent consideration in Stewart v. United States, 129 U.S. App.D.C. 303, 394 F.2d 778 (1968), which was not an en banc court, and merely cited the earlier cases.

55. People v. Nicolaus, 65 Cal.2d 866, 56 Cal.Rptr. 635, 423 P.2d 787 (1967); People v. Goedecke, 65 Cal.2d 850, 56 Cal. Rptr. 625, 423 P.2d 777 (1967); People v. Ford, 65 Cal.2d 41, 52 Cal.Rptr. 228, 416 P.2d 132 (1966); People v. Conley, 64 Cal.2d 310, 49 Cal.Rptr. 815, 411 P.2d 911 (1966); People v. Wolff, 61 Cal.2d 795, 40 Cal.Rptr. 271, 394 P.2d 959 (1964); People v. Gorshen, 51 Cal.2d 716, 336 P.2d 492 (1959); People v. Wells, 33 Cal.2d 330, 202 P.2d 53 (1949).

56. Schwickrath v. People, 159 Colo. 390, 411 P.2d 961 (1966); Gallegos v. People, 159 Colo. 379, 411 P.2d 956 (1966); Becksted v. People, 133 Colo. 72, 292 P. 2d 189 (1956); Battalino v. People, 118 Colo. 587, 199 P.2d 897 (1948); Ingles v. People, 92 Colo. 518, 22 P.2d 1109 (1933).

57. State v. Di Paolo, 34 N.J. 279, 168 A.2d 401 (1961), clarified in State v. Sikora, 44 N.J. 453, 210 A.2d 193 (1965).

58. State v. Gramenz, 256 Iowa 134, 126 N.W.2d 285 (1964).

59. State v. Nichols, 3 Ohio App.2d 182, 209 N.E.2d 750 (1965).

60. State v. Clokey, 83 Idaho 322, 364 P. 2d 159 (1961).

61. State v. Donahue, 141 Conn. 656, 109 A.2d 364 (1954).

62. Starkweather v. State, 167 Neb. 477, 93 N.W.2d 619 (1958).

63. State v. Padilla, 66 N.M. 289, 347 P. 2d 312 (1959).

64. Fox v. State, 73 Nev. 241, 316 P.2d 924 (1957).

65. New York, People v. Moran, 249 N.Y. 179, 163 N.E. 553 (1928); Rhode Island, State v. Fenik, 45 R.I. 309, 121 A. 218 (1923); Utah, State v. Green, 78 Utah 580, 6 P.2d 177 (1931); Wisconsin, Hempton v. State, 111 Wis. 127, 86 N.W. 596 (1901) and Wyoming, State v. Pressler, 16 Wyo. 214, 92 P. 806 (1907).

66. Battalino v. People, 118 Colo. 587, 199 P.2d 897, 901 (1948).

if he is not responsible at all, he is entitled to an acquittal in both degrees. However, . . . *evidence of the condition of the mind* of the accused at the time of the crime, together with the surrounding circumstances, may be introduced, not for the purpose of establishing insanity, but to prove that the situation was such that a specific intent was not entertained—that is, *to show absence of any deliberate or premeditated design.*" (Emphasis in original.)

On the other side of the coin, very few jurisdictions which have recently considered this question have held to the contrary position.[67]

Intervening developments within our own jurisdiction underscore the soundness of a doctrine for consideration of abnormal mental condition on the issue of specific intent. In the *Fisher* opinion of 1946, the court was concerned lest such a doctrine "tell the jury that they are at liberty to acquit one who commits a brutal crime because he has the abnormal tendencies of persons capable of such crimes." [That a man's abnormal mental condition short of legal insanity may be material as negativing premeditation and deliberation does not set him "at liberty" but reduces the degree of the criminal homicide.] Our 1967 opinion in *Austin, supra,* clarifies that even "a particularly frightful and horrible murder" may not be murder in the first degree, that "many murders most brutish and bestial are committed in a consuming frenzy or heat of passion, and that these are in law only murder in the second degree."[68] Indeed the action of the trial judge in acquitting defendant of first degree murder indicates how the refine-

ment of *Austin* has undercut the *Fisher* approach. Though the defendant went back to get his gun,[69] the judge concluded that the evidence as a whole—including defendant's broken jaw, the blood streaming down his face, and his irrational pounding on the mailbox—did not establish a reasonable foundation for inferring a calculated, deliberate mind at the time of shooting. We are not called upon to consider whether that action was proper in this case; what we do take note of is the inevitable implication of *Austin.*

There has also been a material legislative development since both *Fisher* and *Stewart II.* In 1964, after extensive hearings, Congress enacted the Hospitalization of the Mentally Ill Act, which provides civil commitment for the "mentally ill" who are dangerous to themselves or others.[70] Both the terminology and the underlying conception of this statute reflected a deliberate change from the 1939 law and its use of the term "insanity," which prior to *Durham* tended to be equated to psychosis and to disorientations like delusions. The enlarged conception underlying the 1964 law has been accorded a "liberal construction"[71] for the protection of the community, going so far as to include commitment of a disturbed mental defective with behavioral reactions resulting in danger-productive behavior.[72] The law is broad enough to include not only mental illness requiring confinement in St. Elizabeths, but also conditions of mental illness calling for placement in nursing homes,[73] or, where appropriate, halfway houses or requirement of outpatient care.[74] These statutory provisions provide a shield against danger from per-

---

67. State v. Janovic, 101 Ariz. 203, 417 P. 2d 527 (1966); Armstead v. State, 227 Md. 73, 175 A.2d 24 (1961); State v. Flint, 142 W.Va. 509, 96 S.E.2d 677 (1957); Ezzell v. State, 88 So.2d 280 (Fla.1956).

68. 127 U.S.App.D.C. at 189–190, 382 F. 2d at 138–139.

69. *See* Belton v. United States, 127 U.S. App.D.C. 201, 203, 382 F.2d 150, 152 (1967).

70. 78 Stat. 944 (1960), 21 D.C.Code § 501 et seq.

71. Millard v. Harris, 132 U.S.App.D.C. 146, 150, 406 F.2d 964, 968 (1968).

72. In re Alexander, 124 U.S.App.D.C. 352, 372 F.2d 925 (1967).

73. Lake v. Cameron, 124 U.S.App.D.C. 264, 364 F.2d 657 (1966).

74. S.Rep.No.925, 88th Cong., 2d Sess., 31 (1964).

sons with abnormal mental condition—a danger which in all likelihood bolstered, or even impelled, the draconic *Fisher* doctrine.

Further, to the extent that the 1970 law (*supra,* note 48) leads to a conviction of first degree murder when the evidence is in equipoise on the issue of insanity, there would be an additional miscarriage of justice if the evidence were not available for consideration as raising a reasonable doubt on the issue of premeditation and deliberation.

In providing for the admission and consideration of expert testimony on abnormal mental condition insufficient for complete exoneration, we insert some observations prompted by State v. Sikora, 44 N.J. 453, 210 A.2d 193 (1965), *supra,* note 57. The doctrine does not permit the receipt of psychiatric testimony based on the conception that mental disorder is only a relative concept and that the behavior of every individual is dictated by forces—ultimately, his genes and lifelong environment—that are unconscious and beyond his control. As we have already made clear, we are not embarked on enquiry that must yield to

tenets of the philosophy of determinism. The law accepts free will and blameworthiness as a general premise. Expert psychiatric testimony negativing blameworthiness for a crime—whether on ground of general exoneration or lack of requisite specific intent—must rest on the premise of an exception due to abnormal mental condition.

■■■ Our rule permits the introduction of expert testimony as to abnormal condition if it is relevant to negative, or establish, the specific mental condition that is an element of the crime. The receipt of this expert testimony to negative the mental condition of specific intent requires careful administration by the trial judge. Where the proof is not offered in the first instance as evidence of exonerating mental disease or defect within the ALI rule the judge may, and ordinarily would, require counsel first to make a proffer of the proof to be adduced outside the presence of the jury. The judge will then determine whether the testimony is grounded in sufficient scientific support to warrant use in the courtroom, and whether it would aid the jury in reaching a decision on the ultimate issues.[75]

75. At the risk of repetition, but out of abundance of caution, and in order to obviate needless misunderstanding, we reiterate that this opinion retains the "abnormal mental condition" concept that marks the threshold of *McDonald.* Assuming the introduction of evidence showing "abnormal mental condition," the judge will consider an appropriate instruction making it clear to the jury that even though defendant did not have an abnormal mental condition that absolves him of criminal responsibility, *e. g.,* if he had substantial capacity to appreciate the wrongfulness of his act or to control his behavior he may have had a condition that negatives the specific mental state required for a higher degree of crime, *e. g.,* if the abnormal mental condition existing at the time of the homicide deprived him of the capacity for the premeditation required for first degree murder.

To avoid needless confusion, we contemplate strict adherence to the term "abnormal mental condition," and do not

contemplate use of terms such as "mental unsoundness," which might confuse a juror who considered that any defendant committing a wanton act is "unsound," and, presumably, suffering from "mental unsoundness."

Since the defense relates to a specific mental element of a crime, it is not applicable to "malice" established on an objective standard in a case of second degree murder (*supra,* note 53). Whether it may be applicable in a case where malice is established on a subjective standard, so as to reduce the offense to manslaughter, is a matter that requires further analysis and reflection. The cases are in conflict, *see* Annot., 22 A.L.R.3d 1228 (1968). Generally, at least, a defendant with substantial capacity to appreciate the wrongfulness of his crime would appear to have the capacity requisite for malice. Without further study, however, we hesitate to rule as a matter of law concerning the possibility that there may be abnormal mental conditions falling short of legal insanity that would leave the defendant

### F. *Disposition of the Case*

#### 1. *Issue of Causality Testimony*

We are urged to reverse appellant's conviction on the ground that the trial court erred in allowing Government experts to testify in terms of "causality."

The rule of Washington v. United States, 129 U.S.App.D.C. 29, 390 F.2d 444 (1967) that experts must not frame their testimony in terms of "product," was aimed at relieving a stubborn and recurring problem—that of experts using their facility with the esoteric and imprecise language of mental disease to exert an undue dominion over the jury's deliberations. The *Washington* opinion did not refer to the prior opinion in Harried v. United States, 128 U.S.App.D.C. 330, 389 F.2d 281 (1967), wherein the court stated that narrowly drawn, concrete questions addressed to the experts on the causal connection between the forbidden act and the alleged mental disease were permissible.

 Since both *Washington* and *Harried* are superseded—on this point—by our change today of the ultimate rule, it would be bootless to consider to what extent *Washington* superseded *Harried.* It suffices for disposition of this case to say only: (1) Under the rule of *Harried* the questioning of Government experts on the question of the causal connection between appellant's crime and his mental disease or defect was proper. (2) Assuming, arguendo, that these questions were not consonant with *Washington* we are unable, on this record, to dis-

cern prejudice. We think the expert testimony in this case adequately and lucidly ventilated the issues, there was no use of the term "product," and we see no sign of overreaching.[76]

Our conclusion is also impelled by the fact that it was defendant himself who first sought expert testimony on the question of causal connection. The doctrine of curative admissibility rests upon "the necessity of removing prejudice in the interest of fairness," United States v. Winston, 145 U.S.App.D.C. 67, 447 F.2d 1236, 1240 (1971), quoting Crawford v. United States, 91 U.S.App.D.C. 234, 237, 198 F.2d 976, 979 (1952). In this case, the interests of fairness were served by permitting additional inquiry on the subject of the relationship between the murder and the appellant's mental status. Defense questioning established that, in the opinion of defense experts, there was a causal connection between the act and the defendant's mental disorder. It would be unfair, and against the interest of justice, for us to hold that the jury had to retire to consider the case believing that this question was beyond medical dispute.

#### 2. *Prosecutor's conduct*

It is also urged upon us that reversal of appellant's conviction is required because the prosecutor went beyond the limits of the permissible in his summation, by attempting to discredit the projective tests the St. Elizabeths psychologist had given to the defendant. Excerpts from this summation are set out in a footnote.[77]

with capacity to appreciate the wrongfulness of his acts, but without awareness of the danger of serious harm. The problem is remitted to future consideration, which we think will be aided by the availability of a specific factual context.

76. *Compare* Washington v. United States, 129 U.S.App.D.C. 29, 35, 390 F.2d 444, 450 (1967); "[T]he persistent use of conclusory labels may have hindered the jury in getting to the underlying facts. But we think the jury obtained enough concrete information to preclude us from disturbing the verdict. The defense psy-

chiatrists and, on cross-examination, the Government psychiatrists gave some meaningful descriptions of defendant's mental and emotional processes. . . . [T]aken as a whole, the testimony in this case was, if anything, a little better than in most insanity cases. Under these circumstances, reversal seems inappropriate."

77. "Now, another one, you remember on the same test, that drawing test, the doctor said he had ten of those little things and they had squiggles and lines and angles, and he was asked to draw those,

 It is unfortunate that the prosecutor's summation incorporated, as an approach to the projective tests: "After all, they are just blots of ink." The prosecutor, who speaks in court in behalf of the public interest, has a responsibility to refrain from know-nothing appeals to ignorance. The prosecutor is not free to offer his own opinions and attitudes on matters of expert knowledge, even in camouflaged form. The prosecutor was free to adduce appropriate expert testimony, on direct or cross-examination, to attack the validity of such tests, or perhaps to adduce limitations on their value and significance. However, in this trial the prosecutor's cross-examination was not oriented in that manner, but sought rather to probe the basis for the expert's conclusion, and his use of the tests. That was an entirely permissible course, particularly since the witness agreed that interpretation of the tests involves a subjective evaluation, over and above the underlying training and expertise of the expert. But there was neither testimony adduced on cross-examination, nor testimony of a prosecutor's witness, to support a disparagement of the very concept of projective tests, as based on mere ink blots.

While the prosecutor's summation contains an approach we do not expect to recur, it was neither as aggravated nor as prolonged as that in *King*.[78] And the record context includes clarifying questions by the trial judge that brought out for the jury both the long and widespread use of projective tests, and their use as a basis for this expert's conclusions. We do not find reversible error.

### 3. *Remand*

 Our action today in stating a new rule for insanity, and for receipt and consideration of expert testimony on

---

ten of them separately. And the doctor said he rotated, he rotated one. And I said, well, what was the significance of that. Well, the significance is that shows that there is organic brain damage. That is a very hard indicator of organic brain damage. Why organic brain damage. He said he meant structural damage, something physically wrong with the brain, a part missing, a dead cell, something like that, a lesion in the brain.

"And I asked the doctor how many of them did he rotate, how many of them did he turn the picture a little bit. I asked him how many did he rotate 90 degrees, and I think he said it was, how many out of those ten—one. That is a hard indicator, that is a hard indicator of organic brain damage.

"Ladies and gentlemen, then we came to that ink blot, and the doctor said, well, the usual thing about that was those anatomical things, and how many of them were there. Well, let's see, and he counts, and there are four. How many responses. Fourteen of them. Fourteen responses and four of them turn out to be anatomical things—hearts or whatever it happened to be.

"Is there something unusual about that? Is a man crazy when he sees a heart or something else four times, four different anatomical things or maybe the same things in those little drawings, these little ink blots. And all, they are just

blots of ink. Is a man crazy when he sees them? And how about that last one, that rocket one. He says he sees a rocket going off.

"I asked him doctor, was there any rocket fired during that period of time that might stick in a man's brain and might suggest it to him. The doctor doesn't know. But there is something explosive about a personality if he sees a rocket on a little ink blot.

"Well, ladies and gentlemen, there is not much I can say about that; I am not an expert. You heard the expert on the stand and he testified about that.

"But I can say one thing: that it is a jury decision. It is your province. It is your function to take that evidence and weigh that evidence and decide whether what that doctor said as far as you are concerned made any sense at all."

\*　　\*　　\*　　\*　　\*

78. In King v. United States, we pointed out (at 125 U.S.App.D.C. 325, 372 F. 2d 390):

[T]he prosecutor persistently drummed into the jury—without evidentiary basis, and contrary to the uncontradicted testimony of the Government psychiatrists called by the defense—the assertion that organic [brain] damage was negatived by the failure to detect it by physical tests, and that psychological tests could not establish organic brain damage. . . .

abnormal mental condition that does not establish an insanity defense but is material to a substantive element of the offense, is effective prospectively for all trials beginning after this date.[79] However, under established doctrines of the judicial function we conclude that the benefit of the rule cannot wholly be withheld from the defendant in whose case it was established.[80] We do not, however, think it appropriate for us to determine at this juncture whether a jury which convicted under our old insanity standard might have acquitted under the new standard. While we hesitate to burden the trial judge further, we are remanding to the trial judge to determine whether a new trial is appropriate in the interest of justice, rather than considering that question at the appellate level in the first instance, because the trial judge has a superior vantage point for assessing whether there is a substantial possibility that the jury, if instructed under our new rule, would have found that appellant should be acquitted by reason of insanity. If a new trial is denied, the trial judge will re-enter a judgment on the verdict of guilty.[81]

## G. *Supplement To Clarify Matters Discussed in Separate Opinion*

A number of matters are discussed in the separate opinion of Chief Judge

79. We are aware that other circuits, in adopting the ALI test of criminal responsibility, have made their decisions retrospective, see *e. g.*, United States v. Tarrago, 398 F.2d 621 (2d Cir. en banc, 1968) giving retrospective effect to its decision in *Freeman*, cited *supra*. However, we think sound principles—applied in Stovall v. Denno, 388 U.S. 293, 296 ff., 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) so as to give only prospective effect even to constitutional rights—lead to the conclusion that our adoption of the ALI test be prospective. We liken this opinion to our decisions adopting a rule in the exercise of our supervisory jurisdiction for prospective application, see *e. g.*, United States v. Thomas, 146 U.S.App.D.C. 101, 449 F.2d 1177, 1187 (1971) ; Harris v. United States, 140 U.S.App.D.C. 21, 23, 433 F.2d 1127, 1129 (1970).

In *Tarrago* the Second Circuit noted that its retroactivity ruling concerned only two cases and hence involved no problem of "significant burden on administration of justice." Our court would be confronted with a substantially different problem. The criminal appeals pipeline in our court, unlike other Federal courts, relates for the most part to common law crimes. While acquittals for insanity are only in a range of 40 per annum (*supra*, p. 989) almost 700 persons per year are sent to St. Elizabeths Hospital for psychiatric examination with a view towards the possibility of presenting an insanity defense. See data for 1968 and 1969 in Broderick, Involuntary Hospitalization for Mental Illness, 20 Catholic U.L.Rev. 564, n. 80.

More significantly, this opinion is not, like *Freeman*, a change in substantive law from outmoded doctrine retained for a long period without critical examination and modification. In this circuit, that kind of departure was wrought in *Durham*—which, incidentally, was made prospective. In this opinion we have acknowledged and retained the positive contribution of the 1954 decision in *Durham* (see p. 977, *supra*), relating legal doctrine to modern medical thinking, together with *McDonald's* 1962 improvement in the judicial definition of mental disease and defect. The President's Commission noted in 1966 (see *supra*, p. 990) that *Durham-McDonald* is not significantly different in substantive content from the ALI test. Although today we drop the term "product," we retain the underlying concept of causal relationship. Our change helps cope with the problem of oversteering and lack of communication, but that problem had also been considered in the 1967 *Washington* opinion, prescribing a course for "future cases" (129 U.S.App.D.C. at 36, 390 F. 2d at 451). Today's course is likewise for future trials.

While our change in formulation will, we think, be helpful to the jury, it does not require retrospective application as indispensable to integrity in the fact-finding process. As we have already pointed out, we did not adopt the new rule in the contemplation that it would affect a significant number of verdicts.

80. Stovall v. Denno, 388 U.S. 293, 301, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

81. As to this judgment, the District Court may exercise its discretion to revise the sentence. The foregoing is without prejudice to an appeal from the judgment, if appellant be so advised, on the ground that it is not consistent with our opinion and mandate.

Bazelon. For the most part, where that opinion takes issue with the approach of the majority opinion the issue is reasonably clearly joined and refinement or elaboration would be in the service of rhetoric rather than clarity. Certain passages of the separate opinion, however, set forth a view of the majority opinion which is not congruent with its intent or thrust as understood by the judges subscribing to that opinion. The matters most requiring comment, in order to avoid a misinference that supposes that failure to speak means acquiescence, are as follows:

1. The court's failure to discuss various procedural aspects of the insanity defense and its presentation reflects neither unawareness nor indifference. As the questions communicated through the Clerk (Appendix A) make clear, however, this review en banc was intended to focus on the ultimate standard, and not to expatiate broadly on the administration of the insanity defense. There is no intent to override various decisions of this court, evolved during the past twenty years, on matters of procedure and administration that are important, to be sure, but do not turn on the ultimate standard. And of course we always contemplate improvements ahead, in all aspects of the administration of justice. It is our belief that they can be both accommodated within and enhanced by a context that defines the governing standard as avoiding the conviction as criminals of those who as a result of mental disease or defect lack substantial capacity to control the criminal behavior in question (or to appreciate its wrongfulness).

2. The goal of avoiding undue dominance of the jury by expert testimony does not require ostrich disregard of the key issue of causality. That issue, however, is focused more meaningfully, for both expert and jury, by asking whether the mental disease or defect resulted in lack of substantial capacity to control the behavior in question (or appreciate its wrongfulness). The question is differently put under *Durham* and the difference has proved to be both confusing and significant. The issue today is not whether this confusion could or should have been foreseen, but whether it shall be corrected. The rule contemplating expert testimony as to the existence and consequence of a mental disease or defect is not to be construed as permission to testify solely in terms of expert conclusions. Our jurisprudence to the contrary is not undone, it is rather underscored. It is the responsibility of all concerned—expert, counsel and judge —to see to it that the jury in an insanity case is informed of the expert's underlying reasons and approach, and is not confronted with ultimate opinions on a take-it-or-leave-it basis. The Appendix to *Washington* is useful in this regard— assuming appropriate modification of the third paragraph, which uses the "product" term.[82] It clarifies the respective roles of the legal and medical professions, and perhaps helps achieve the goal envisaged by Sir James Fitz-James Stephen: "In dealing with matters so obscure and difficult the two great professions ought rather to feel for each other's difficulties than to speak harshly of each other's shortcomings." [83]

The Appendix to *Washington* still stands in effect, although we do not retain *Washington* insofar as it reflects the product rule, and we permit testimony by the expert, and cross-examination,

82. The court will revise the third paragraph of the Washington Appendix (129 U.S.App.D.C. at 42, 390 F.2d at 457) to read:

As an expert witness, you may, if you wish and if you feel you can, give your opinion whether at the time of his conduct the defendant suffered from a mental disease or defect, and whether, as a result, defendant either lacked

substantial capacity to appreciate the wrongfulness of his conduct, or lacked substantial capacity to conform his conduct to the requirements of the law. You may explain in terms of the development, adaptation and functioning of the defendant's behavioral processes.

83. 2 J. Stephen, History of the Criminal Law of England 128 (1883).

on the causal relationship between the mental disease and the existence of substantial capacity .for control (and knowledge) at the time of the act. The jury will consider this testimony under the instruction on need to acquit if as a result of mental disease or defect there is a lack of substantial capacity to control the behavior in question (or appreciate its wrongfulness). We think this sufficiently communicates to the jury the kind of hard question it is called upon to decide, and the instructions will make clear that the jury is not foreclosed by opinions of experts. The experts add to perspective, without governing decision. The law looks to the experts for input, and to the jury for outcome.

\* \* \*

The case is remanded for further consideration by the District Court in accordance with this opinion.

So ordered.

## APPENDIX A

Letter of February 5, 1971, from the Clerk to organizations invited to make a submission amicus curiae.

The Court has directed me to request you to discuss in your briefs the following questions:

1. In this case all four expert witnesses testified on the issue of "productivity." *See* Transcript pp. 335–36, 464–65, 506–07, 539. *But see* bench colloquy at 314–15. Assuming arguendo that this testimony violated the rule of Washington v. United States, 129 U.S.App.D.C. 29, 390 F.2d 444 (1967), is the *Washington* rule a viable device for limiting the role of the expert and preserving the ultimate question of criminal responsibility for the jury? Would it be more effective simply to eliminate the separate inquiry into productivity from our test of responsibility? *See* United States v. Eichberg, 142 U.S.App.D.C. 110 at 117, 118, 439 F.2d 620 at 627, 628 (Decided Jan. 21, 1971) (concurring opinion).

2. What are the theoretical and practical differences between the *Durham-McDonald* test of criminal responsibility,

the ALI test, and the various other tests that have been proposed in recent years by courts and commentators?

3. Should the *Durham-McDonald* formulation be retained as it is?

4. Should the ALI formulation be adopted?

5. If so, should the *McDonald* definition of "mental disease or defect" be applied to the ALI formulation?

6. If a defendant's behavior controls are impaired, should a test of criminal responsibility distinguish between physiological, emotional, social, and cultural sources of the impairment? *See* Transcript pp. 409–11, 477–79. Is it appropriate to tie a test of criminal responsibility to the medical model of mental illness? *See* United States v. Eichberg, *supra*, 142 U.S.App.D.C. at 116, 117, 439 F.2d at 626, 627.

7. Should the results of psychological tests such as the Rorschach test be admissible in evidence? If so, what kind of testimony is necessary or appropriate in order to put the test results in proper perspective? *See* Transcript pp. 318–329, 342–350, 413–452.

8. Have we departed in practice, if not in theory, from the rule that the government has the burden of proving criminal responsibility beyond a reasonable doubt? *See* United States v. Eichberg, *supra*, 142 U.S.App.D.C. at 113–116, 439 F.2d at 623–626.

9. Would it be sound as a matter of policy to abolish the insanity defense? Possible as a matter of law? If so, what are the possible alternatives? Should the issues presently treated under that heading be subsumed under the inquiry into mens rea? Should we reconsider the possibility of "diminished" or "partial" responsibility?

Should you wish a copy of the transcript, I should be pleased to furnish it to you if you intend to submit and file a brief.

Sincerely yours,
Nathan J. Paulson
Clerk

### APPENDIX B

### SUGGESTION FOR INSTRUCTION ON INSANITY *

The defendant in this case asserts the defense of insanity.

You are not to consider this defense unless you have first found that the Government has proved beyond a reasonable doubt each essential element of the offense. One of these elements is the requirement [of premeditation and deliberation for first degree murder] [or of specific intent for ——], on which you have already been instructed. In determining whether that requirement has been proved beyond a reasonable doubt you may consider the testimony as to the defendant's abnormal mental condition.

If you find that the Government has failed to prove beyond a reasonable doubt any one or more of the essential elements of the offense, you must find the defendant not guilty, and you should not consider any possible verdict relating to insanity.

If you find that the Government has proved each essential element of the offense beyond a reasonable doubt, then you must consider whether to bring in a verdict of not guilty by reason of insanity.

The law provides that a jury shall bring in a verdict of not guilty by reason of insanity if, at the time of the criminal conduct, the defendant, as a result of mental disease or defect, either lacked substantial capacity to conform his conduct to the requirements of the law, or lacked substantial capacity to appreciate the wrongfulness of his conduct.

Every man is presumed to be sane, that is, to be without mental disease or defect, and to be responsible for his acts. But that presumption no longer controls when evidence is introduced that he may have a mental disease or defect.

The term insanity does not require a showing that the defendant was disoriented as to time or place.

Mental disease [or defect] includes any abnormal condition of the mind, regardless of its medical label, which substantially affects mental or emotional processes and substantially impairs behavior controls. The term "behavior controls" refers to the processes and capacity of a person to regulate and control his conduct and his actions.

In considering whether the defendant had a mental disease [or defect] at the time of the unlawful act with which he is charged, you may consider testimony in this case concerning the development, adaptation and functioning of these mental and emotional processes and behavior controls.

[The term "mental disease" differs from "mental defect" in that the former is a condition which is either capable of improving or deteriorating and the latter is a condition not capable of improving or deteriorating.]

[Burden of proof—alternate versions:

(a) The burden of proof is on the defendant to establish by a preponderance of the evidence that, as a result of mental disease or defect, he either lacked substantial capacity to conform his conduct to the requirements of the law or lacked substantial capacity to appreciate the wrongfulness of his conduct. If defendant has met that burden you shall bring in a verdict of not guilty by reason of insanity. If he has not met that burden you shall bring in a verdict of guilty of the offenses you found proved beyond a reasonable doubt.

(b) The burden is on the Government to prove beyond a reasonable doubt either that the defendant was not suffering from a mental disease or defect, or else that he nevertheless had

---

* Note: In addition to this instruction, for submission of the insanity issue to the jury, the judge will have given the jury the guidance provided by reading in its presence the instruction to the expert witness required by Washington v. United States, 129 U.S.App.D.C. 29, 42, 390 F.2d 444, 457 (1967), revised in accordance with note 82 of the opinion in United States v. Brawner, 153 U.S.App.D.C. at ——, 471 F.2d at 1006.

substantial capacity both to conform his conduct to the requirements of the law and to appreciate the wrongfulness of his conduct. If the Government has not established this beyond a reasonable doubt, you shall bring in a verdict of not guilty by reason of insanity.]

*Evaluation of Testimony*

In considering the issue of insanity, you may consider the evidence that has been admitted as to the defendant's mental condition before and after the offense charged, as well as the evidence as to defendant's mental condition on that date. The evidence as to the defendant's mental condition before and after that date was admitted solely for the purpose of assisting you to determine the defendant's condition on the date of the alleged offense.

You have heard the evidence of psychiatrists [and psychologists] who testified as expert witnesses. An expert in a particular field is permitted to give his opinion in evidence. In this connection, you are instructed that you are not bound by medical labels, definitions, or conclusions as to what is or is not a mental disease [or defect]. What psychiatrists [and psychologists] may or may not consider a mental disease [or defect] for clinical purposes, where their concern is treatment, may or may not be the same as mental disease [or defect] for the purpose of determining criminal responsibility. Whether the defendant had a mental disease [or defect] must be determined by you under the explanation of those terms as it has been given to you by the Court.

There was also testimony of lay witnesses, with respect to their observations of defendant's appearance, behavior, speech, and actions. Such persons are permitted to testify as to their own observations and other facts known to them and may express an opinion based upon those observations and facts known to them. In weighing the testimony of such lay witnesses, you may consider the circumstances of each witness, his op-portunity to observe the defendant and to know the facts to which he has testified, his willingness and capacity to expound freely as to his observations and knowledge, the basis for his opinion and conclusions, and the nearness or remoteness of his observations of the defendant in point of time to the commission of the offense charged.

You may also consider whether the witness observed extraordinary or bizarre acts performed by the defendant, or whether the witness observed the defendant's conduct to be free of such extraordinary or bizarre acts. In evaluating such testimony, you should take into account the extent of the witness's observation of the defendant and the nature and length of time of the witness's contact with the defendant. You should bear in mind that an untrained person may not be readily able to detect mental disease [or defect] and that the failure of a lay witness to observe abnormal acts by the defendant may be significant only if the witness had prolonged and intimate contact with the defendant.

You are not bound by the opinions of either expert or lay witnesses. You should not arbitrarily or capriciously reject the testimony of any witness, but you should consider the testimony of each witness in connection with the other evidence in the case and give it such weight as you believe it is fairly entitled to receive.

You may also consider that every man is presumed to be sane, that is, to be without mental disease [or defect], and to be responsible for his acts. You should consider this principle in the light of all the evidence in the case and give it such weight as you believe it is fairly entitled to receive.

*Effect of verdict of not guilty by reason of insanity*

If the defendant is found not guilty by reason of insanity, it becomes the duty of the court to commit him to St. Elizabeths Hospital. There will be a hearing within 50 days to determine whether defendant is entitled to release.

In that hearing the defendant has the burden of proof. The defendant will remain in custody, and will be entitled to release from custody only if the court finds by preponderance of the evidence that he is not likely to injure himself or other persons due to mental illness.

Note: If the defendant so requests, this instruction need not be given.

BAZELON, Chief Judge, concurring in part and dissenting in part:

We are unanimous in our decision today to abandon the formulation of criminal responsibility adopted eighteen years ago in Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862 (1954). We held there that a person is not responsible for a criminal act if the act was the product of mental disease or mental defect. In place of the *Durham* jury instruction, juries will now be instructed in terms of the American Law Institute test that a person is not responsible for a criminal act if as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law. But the adoption of this new test is largely an anticlimax, for even though *Durham*'s language survived until today's decision, the significant differences between our approach and the approach of the ALI test vanished many years ago. As described in Judge Leventhal's scholarly opinion, the ALI test may make possible an improvement in the adjudication of the responsibility issue. But on the whole I fear that the change made by the Court today is primarily one of form rather than of substance.[1]

*Durham* was designed to throw open the windows of the defense and ventilate a musty doctrine with all of the informa-tion acquired during a century's study of the intricacies of human behavior. It fueled a long and instructive debate which uncovered a vast range of perplexing and previously hidden questions. And the decision helped to move the question of responsibility from the realm of esoterica into the forefront of the critical issues of the criminal law.

While *Durham* never suffered a shortage of critics, virtually all of them missed what I consider the crucial failure which emerged in its operation. The critics assumed that our ruling would generate far-reaching changes, and they questioned or condemned the changes they foresaw. In fact, for all our efforts to push the defense onto a new and more meaningful track, *Durham* actually produced very little change at all. The first few years' experience dispelled any illusion that the decision would alter fundamentally the operation of the defense.

By its adoption of the American Law Institute test of criminal responsibility, this Court today repudiates none of the objectives of *Durham*, see pages 1030–1031, *infra*, but embraces a new test in the hope that it will succeed where *Durham* failed. The principal question before us, therefore, is whether the adoption of the ALI test is responsive to the lessons we learned from our efforts to implement *Durham*, and whether it offers any promise of resolving the difficulties that have always troubled us. The analysis must begin with a clear understanding of the reasons why *Durham* failed to achieve its objectives.

Plainly, we did not fail for want of trying. *Durham* reformulated the responsibility test in the hope that new and more useful information would be presented to the jury. We acted largely in response to the plea of behavioral

---

1. Our far-ranging experience with the responsibility defense has led me in recent years to urge fundamental changes in the defense. *See* United States v. Alexander & Murdock, 152 U.S.App.D.C. ——, 471 F. 2d 923 (April 21, 1972) (separate opinion); United States v. Leazer, 148 U.S. App.D.C. 356, 460 F.2d 864 (Jan. 19, 1972) (concurring opinion); United States v. Trantham, 145 U.S.App.D.C. 113, 448 F.2d 1036 (1971) (statement in support of rehearing en banc); United States v. Eichberg, 142 U.S.App.D.C. 110, 439 F.2d 620 (1971) (concurring opinion).

scientists that they did not want to decide ultimate questions of law and morality, but wanted only an opportunity to report their findings as scientific investigators without the need to force those findings through the prism of M'Naghten.[2] *See* pages 1015–1016, *infra*. By removing the obstacles to the presentation of those findings, *Durham* challenged the experts to provide the information they had long promised. We expected, perhaps naively, that the presentation of this new information would permit—indeed, require—the jury to undertake a much broader inquiry and to rely less on the ultimate conclusions of the experts. But it quickly became apparent that while our decision produced some expansion of the inquiry, it did not do nearly enough to eliminate the experts' stranglehold on the process. Even after *Durham* counsel for both sides often sought to present the issue to the jury in "simplified" form by eliciting from the experts little more than conclusory yes-or-no answers to the questions, "Was the accused suffering from a mental disease or defect?" "Was his act the product of that disease or defect?" And so the experts continued, on the whole, to speak in conclusory terms which inevitably included but concealed their underlying value judgments, and their own views as to the appropriate legal outcome. The use of conclusory psychiatric labels often provided an aura of certainty which made it difficult to discern the inadequacies of the examination on which the expert testimony was based, and the limitations of psychiatric knowledge generally. *See* pages 1017–1018 and n. 21, *infra*. The experts were able to retain their influence in part because of the manner in which *Durham* was construed. The term "mental disease or mental defect" was saddled with an unintended and astringent medical meaning. And the "productivity" re-

quirement was perversely viewed as a locked door which could only be opened by an expert's key. But most important, the Court failed to deal with crucial practical obstacles that operate under any formulation of the test to impede the flow of information to the jury.

The first of these difficulties was the subject of our 1962 decision in McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847 (1962) (*en banc*), where we attempted to rescue the term "mental disease or defect" from the grip of the expert witnesses. The definition of mental disease adopted in *McDonald*[3] rendered our test, in almost every significant respect, identical to the ALI test. Yet *McDonald*, no less than *Durham*, left the power of the experts intact. Expert witnesses still testify in misleading and conclusory terms about the medical or psychiatric definitions of mental disease. Since the Court today grafts *McDonald* onto the ALI test, this decision provides no new answers to this aspect of the problem. In fact, the Court makes clear that the new test rests squarely on a "medical model," thereby enhancing the power of the experts. *See* pages 1027–1030, *infra*.

The second source of difficulty concerns the productivity requirement—the albatross of the *Durham* decision. This Court's frustration with the conclusory expert testimony on the issue of productivity culminated in our decision in Washington v. United States, 129 U.S. App.D.C. 29, 390 F.2d 444 (1967), which barred such testimony altogether. And yet, in the face of our prohibition, the experts have continued to testify in conclusory terms, as the records in *Brawner* and dozens of other cases attest. A reiteration of our ban will not be effective, and I join the Court's holding that the issue of productivity must henceforth be eliminated from the instructions to the

---

2. Prior to our decision in *Durham*, the test of criminal responsibility in this jurisdiction was the rule established in M'Naghten's Case, 8 Eng.Rep. 718 (1843), joined with the so-called irresistible impulse test. *See* Smith v. United States, 59 App.D.C. 144, 36 F.2d 548 (1929).

3. *McDonald* defined mental disease in legal terms as "any abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavior controls." 114 U.S.App. at 124, 312 F.2d at 851.

jury. But it should be clear that the ALI test comprises its own variant of the productivity requirement. And, as I will point out below, the Court's discussion of that aspect of the ALI test carries the strong implication that the albatross is with us still. In my view, we can prevent encroachments on the jury's function only by adopting an instruction that candidly describes the jury's power and responsibility. Since we have no simple, scientific formula that will provide a clear-cut answer to every case, we have no choice, in my opinion, but to tell the truth: that the jury, not the experts, must judge the defendant's blameworthiness; that a calibrated, easily-applied standard is not yet available to guide that decision; and that the jury must resolve the question with reference to its own understanding of community concepts of blameworthiness. *See* pages 1030–1034, *infra.*

The third source of difficulty—and to my mind the paramount cause of *Durham's* failure—is the cluster of practical obstacles that stand in the way of the full disclosure of information that *Durham* hoped to secure. *See* pages 1034–1039, *infra.* Here too the Court's decision sheds no new light. For no matter how felicitous its phrasing, a responsibility test cannot, singlehanded, overcome these practical obstacles. Neither *Durham* nor *Brawner* lets slip our well-guarded secret that the great majority of responsibility cases concern indigents, not affluent defendants with easy access to legal and psychiatric assistance. In a long line of cases we have been asked to confront difficult questions concerning the right to an adequate psychiatric examination, the right to psychiatric assistance in the prepara-

tion of the defense, the right to counsel at various stages of the process, the role and responsibility of a government expert who testifies on behalf of an indigent defendant, the burden of proof, the right to treatment during postacquittal hospitalization, and many more. If the promise of *Durham* has not been fulfilled, the primary explanation lies in our answers, or lack of answers, to those questions. I fear that it can fairly be said of *Brawner*, just as it should be said of *Durham*, that while the generals are designing an inspiring new insignia for the standard, the battle is being lost in the trenches. In fact, our obligation to confront the practical problems now is greater than it was in 1954, if only because our efforts to implement *Durham* have brought many of these problems to first light.

If *Brawner* is not responsive to the problems uncovered by *Durham* and makes no fundamental change in the operation of the defense,[4] why has the Court bothered to do anything at all? Perhaps the decision rests on an unstated assumption that change is futile because we lack enough information about human behavior to make possible a meaningful use of the defense, or because we are unwilling or unable to act upon the information that is already at hand.[5] Adoption of the uncontroversial ALI test might then be explained as an attempt to discourage the fruitless expenditure of time and energy on an effort doomed to failure. If that is indeed the Court's intention, then this decision will undoubtedly prove a great disappointment. The adoption of this test, or any other new test, is sure to touch off a flurry of litigation in which counsel will call upon us not only to face the under-

4. To be sure, the Court's decision does have the important intention of abolishing the unnecessary and misleading emphasis on productivity that has characterized the adjudication of the responsibility issue in this jurisdiction. *But see* pages 1022–1027, *infra.*

5. *Cf.* United States v. Carter, 141 U.S. App.D.C. 46, 56, 436 F.2d 200, 210 (1970) (concurring opinion): "It may well be that we simply lack the re-

sources—to say nothing of the understanding—that would be required if those who stole to feed their addiction were removed from the criminal process on the ground that they are not responsible for their actions. But if this is so, we should recognize the fact, and not rationalize our treatment of narcotics addicts on the false premise that their crimes are the result of a wrongful exercise of free will."

lying moral questions, but also to pour some concrete meaning into the ambiguous language of the ALI test. True, the adoption of this new test does not foreclose the possibility of further change and development that will respond directly to the central problems of the defense. But the decision does seem to me an important signal of the Court's current attitude. It is an attitude sharply at odds with the spirit of experimentation, inquiry, and confrontation that have characterized so much of our work in this field. *Brawner* offered us an opportunity to explore the most difficult questions— to what end do we maintain the defense? and how can we facilitate a meaningful use of the defense by all defendants, including indigents who must rely on the government for expert assistance? If the Court's decision today rests on the belief that nothing is wrong which cannot be cured by fixing a new label to our test, then eighteen years' experience has surely been wastd.

## TABLE OF CONTENTS

I. The Trial Record ...........1013

II. The Origins and Development of the Durham Rule of Criminal Responsibility ..............1014 –1017

III. The Need to Abandon the Durham-McDonald Test ........1017 –1021

IV. The Court's Articulated Reasons for Replacing Durham-McDonald With ALI-McDonald ........1021 –1030

 A. The Interest of Uniformity ...................1021 –1030

 B. The Need to Depart from the Product Formulation ...1021 –1022

V. The Advantages of a Rule that Instructs the Jury to Acquit the Defendant if He Cannot Justly Be Held Responsible .........:....1022

VI. Practical Problems of the Defense and the Disposition of This Case .....................1034 –1039

VII. Conclusion ................1039

## I. THE TRIAL RECORD

The facts underlying this appeal are simple. After spending an afternoon drinking wine, appellant went to a party at the apartment of three friends. During the evening several fights broke out. Appellant was hit in the jaw and knocked down; he left the apartment immediately. During the next hour he was seen by several friends, who described him as dizzy, unclear of speech and bleeding from the mouth. He refused to go to a hospital for medical attention, and told his friends he had been jumped. Pounding on a mailbox with a fist, he said that someone—perhaps himself— was going to die. Returning to the building in which the party had been held, appellant fired five shots through the closed door of the apartment. Two of the shots struck and killed one of the occupants. Appellant was arrested nearby shortly afterward.

On his own motion appellant was committed to St. Elizabeths Hospital for observation. The standard commitment order asked the Hospital to report on both his competence to stand trial and his responsibility at the time of the act charged.[6] With respect to responsibility, the Hospital was asked "whether the defendant, at the time of the alleged criminal offense, committed on or about September 8, 1967, was suffering from a mental disease, or defect which substantially affected his mental or emotional processes and substantially impaired his behavior controls, and if so, whether his criminal act was the product of his mental condition . . . ."[7] The Hospital's summary report stated that appellant was competent for trial; that he was mentally ill at the time of the act; and

---

6. D.C.Code § 24–301(a) (Supp. V 1972); Winn v. United States, 106 U.S.App. D.C. 133, 270 F.2d 326 (1959).

7. This is of course the legal test of responsibility set forth in Durham v. United States, 94 U.S.App.D.C. 228, 240– 241, 214 F.2d 862, 874–875 (1954), as modified by McDonald v. United States, 114 U.S.App.D.C. 120, 124, 312 F.2d 847, 851 (1962) *(en banc).*

that the act was not causally related to his illness.

At trial, four expert witnesses from the staff of the Hospital testified on the issue of responsibility. All four agreed that appellant was mentally ill at the time of his unlawful act. They used various labels,[8] but in general they agreed that he had an organic brain pathology and an associated explosive personality disorder. The organic damage was indicated by a history of epileptic seizures, an abnormal electroencephalogram test, and a pattern of responses to psychological tests characteristic of persons with organic impairment. The explosive personality disorder was indicated by psychological testing and by psychiatric interviews and observations.

All four experts went into commendable detail in describing the nature of appellant's disorder and its effect on his behavior. Each expert in turn stated that appellant's disorder was manifested in an inability to deal with provocation.[9] Appellant was said to have severe feelings of inadequacy,[10] and to be easily threatened. He would respond to a felt threat without control; his behavior would be explosive, and out of proportion to the situation.

The only conflict in the expert testimony arose in the course of the prohibited inquiry into productivity. Dr. Stammeyer and Dr. Hamman testified that in their view appellant's unlawful act was the product of his explosive epileptoid personality disorder. Dr. Weickhardt and Dr. Platkin, on the other hand, testified that appellant's act in

shooting through the closed door of an apartment was not the product of his illness but rather the product of a normal desire to retaliate for a broken jaw. That is, even if appellant had not been ill, he would have retaliated in this way. Dr. Platkin's notes in the Hospital records describe the act as "a more or less legitimate response to a situation in which he had been severely injured in a fight and was very vindictive." Dr. Platkin testified that "I think I would, too, under the same circumstances want to get even with somebody who broke my jaw."

## II. THE ORIGINS AND DEVELOPMENT OF THE DURHAM RULE OF CRIMINAL RESPONSIBILITY

Eighteen years ago this Court formulated a new test of criminal responsibility for the District of Columbia. In Durham v. United States we held that "an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect."[11] The *Durham* test was formulated in response to the widespread complaints of psychiatrists that under traditional tests of responsibility the law asked them to go beyond their professional competence; the traditional tests seemed to saddle them with the job of deciding which defendants were guilty and which ones should be excused for lack of criminal responsibility. The M'Naghten Rule and the various "irresistible impulse" tests attempted to define the types of illness that the law would regard as exculpatory, and asked the psychiatrist whether the

---

8. "Psychologic brain syndrome associated with convulsive disorder," "personality disorder associated with epilepsy," "explosive personality, or epileptic personality disorder," "explosive personality with epileptoid personality disorder."

9. Dr. Hamman reported exaggerated emotional responses, and a tendency to go into long lasting rages. Dr. Stammeyer, the clinical psychologist, found an explosive response to threats and a tendency to perseverate—to fix on an idea and remain preoccupied with it after it was no longer appropriate. Dr. Weickhardt and

Dr. Platkin stated that in their view appellant's disorder would result in impulsive, purposeless, and uncontrolled acts in immediate and exaggerated response to a situation.

10. Which is not surprising in view of his "dull normal" I.Q. of 82, his sixth grade education, his rejection by the Armed Forces for failure to pass the aptitude test, and his release from various jobs because of asthmatic attacks.

11. 94 U.S.App.D.C. 228, 240–241, 214 F.2d 862, 874–875 (1954).

particular defendant suffered from such an illness at the time of his unlawful act. Thus under M'Naghten the psychiatrist was asked whether the defendant could tell right from wrong, and under the irresistible impulse test he was asked whether the defendant had the capacity to refrain from doing the unlawful act.[12] The psychiatrist's answer was the whole answer to the question of responsibility. The only function of the jury was to choose which expert to believe in case of a conflict.

Psychiatrists vociferously criticized that approach to the problem of criminal responsibility on the ground that it did not correspond to the state of psychiatric knowledge. In their view few if any persons could be said to be totally lacking in the capacity to distinguish right from wrong or to control their actions. At the same time psychiatrists believed that they could provide extensive insights into other aspects of behavior that were highly relevant to the problem of responsibility.[13] Since the traditional tests were deemed too narrow to allow consideration of such insights, many psychiatrists sought to include them under the cover of psychiatric labels and legal conclusions. The expert treated a neutral scientific question about the defendant's mental condition as one addressed to the legal significance of that condition.[14] He was often allowed to do so because the factfinder was happy to be relieved of a difficulty and troubling task, namely, deciding whether the defendant's illness was severe enough to excuse him. The psychiatrist performed

---

12. M'Naghten's Case, 8 Eng.Rep. 718, 722 (1843); Smith v. United States, 59 App.D.C. 144, 146, 36 F.2d 548, 550 (1929) (adding irresistible impulse test to M'Naghten). For critical discussion of the various tests of responsibility, *see* A. Goldstein, The Insanity Defense (1967).

13. *See* Durham v. United States, 94 U.S. App.D.C. at 236–240, 214 F.2d at 870–874 and sources cited. Professor Goldstein has argued persuasively that the traditional rules can be given an expansive reading that meets these objections. "Knowledge" of right and wrong can be read to include emotional appreciation as well as cognition. And the control tests can be read to reach a wide range of impaired behavior controls, in addition to the well-known "irresistible impulse." Goldstein argues that only their own narrow vision prevents defense lawyers and psychiatrists from introducing contemporary psychiatric insights under the traditional tests of responsibility. He suggests that psychiatric testimony has seldom in practice been limited by narrow judicial application of the rules. A. Goldstein, The Insanity Defense 45–79 (1967). In this jurisdiction, however, the traditional rules were regularly applied to prevent psychiatrists from explaining their insights in broad terms. *See, e. g.,* Durham v. United States, 94 U.S.App. D.C. at 234, 214 F.2d at 868. Furthermore, any testimony that passed the initial hurdle of admissibility then had to pass through the eye of a needle in the form of the jury instruction. While I sympathize with Goldstein's proposal for expanding the old tests, it seems to me more effective to adopt a new one, unencumbered with restrictive interpretations. I have no illusions about the power of a new verbal formula to affect the behavior of lawyers and experts, courts and jurors with respect to the troublesome issue of responsibility. Goldstein, *supra,* at 94–95. But our obligation to supervise the administration of the test carries with it the obligation to offer such guidance as we can in the form of analysis and restatement.

14. *See, e. g.* M. Guttmacher & H. Weihofen, Psychiatry and the Law 406–07 (1952), and sources cited. A group of psychiatrists urging a change in the test of responsibility was unusually candid about what they saw as an obligation to temper psychiatric conclusions with moral judgments. "The pivotal assumption [of M'Naghten] is that in some degree a disorder of the cognitive faculty (knowledge) is the *only* basis for the determination of responsibility. This confines the psychiatrist to an exceedingly short tether and is usually his undoing. There is much more to be said about mental disease, motivations and of behavior, and the psychiatrist can do little else but cut corners on the question of 'knowledge'." Committee on Forensic Psychiatry, Group for the Advancement of Psychiatry, Criminal Responsibility and Psychiatric Expert Testimony 17 (Preliminary Report). The last sentence was deleted from the final version, GAP Report No. 25 (1954).

this task simply by fitting, or refusing to fit, the defendant into one of the categories of exculpatory mental illness. But even if psychiatric diagnosis is sufficiently flexible to permit this kind of manipulation,[15] it does not provide a satisfactory solution from a legal standpoint. The difficulty of deciding the issue of responsibility may not be avoided by turning it over entirely to the experts.

One solution might have been to formulate a new and broader definition of "exculpatory mental illness," in order to retain M'Naghten's goal of offering the psychiatrist a limited role, i. e., ascertaining whether the defendant suffered from such an illness. But we found it impossible to formulate a general definition which would eliminate the need to evaluate blameworthiness in each individual case. Our problem, therefore, was to make it clear that evaluation was to be made not by the experts but by the jury. On the basis of past experience we feared that any concrete definitions we might offer the jury for guidance would promptly find their way into the standard repertoire of psychiatric testimony, capable again of yes-or-no answers, thereby returning the ultimate issues to the keeping of the psychiatrists.

For inspiration we turned to a model long familiar to the law, the method of assessing fault in negligence cases. We articulated no precise definition of responsibility, as the law articulates no precise definition of negligence. Instead in each case we allow the jury to hear all relevant information and ask it to decide whether by prevailing community standards the defendant was at fault. Thus the jury not only makes the factual determination that the defendant behaved in a certain manner, or that his mental condition was of a certain character, but also fixes the legal norm against which the mental condition and its relationship to the behavior must be measured. The role of the expert is to tell the jury anything he can about the relationship between the defendant's behavior and his state of mind. The jury decides in the light of that information whether the defendant can justly be held responsible for the harmful consequences of his act, or whether, on the contrary, the harm should be attributed to chance, for example, or to mental disorder.

The principle of *Durham* was to impose responsibility only if an act was the product of a free choice on the part of the defendant, and not of a mental disease or defect. In adopting the term "product" we borrowed again from the law of torts. In negligence cases the law is concerned with the relationship between the defendant's conduct and the resultant injury. Even when it is possible to establish some sort of causation, the requirement of "proximate cause" permits the jury to decide that the negligence was too slight or the causal connection too remote to have legal significance. *Durham* uses the term product not to limit liability but to limit its avoidance. Nevertheless, the function of productivity is similar to the function of proximate cause. In criminal cases the law is concerned with the relationship between the defendant's mental condition and his unlawful conduct. Even though it is usually possible to establish some sort of causal relationship between almost any mental illness and the unlawful conduct, the requirement of productivity permits the jury to decide that the illness was too slight or the causal connection too remote to have legal significance.

Critics of *Durham* said the product requirement was illusory, because no psychiatrist would be able to deny the possibility of a causal connection between the illness and the act.[16] Consequently, it

---

15. *See* R. Leifer, In the Name of Mental Health 196–98 (1969) ; T. Szasz, Law, Liberty, and Psychiatry 136–37 (1963).

16. *See, e. g.*, Wechsler, The Criteria of Criminal Responsibility, 22 U.Chi.L.Rev.

367 (1955) ; Frigillana v. United States, 113 U.S.App.D.C. 328, 331, 307 F.2d 665, 668 (1962) ; State v. Lucas, 30 N.J. 37, 70–71, 152 A.2d 50, 67 (1959).

was argued, responsibility would turn solely on the question of mental disease, a question clearly within the scope of psychiatric expertise. Thus *Durham* would increase the power of the expert to decide legal and moral questions, rather than cut it down. We intended, however, that the inquiry into productivity would define the moral determination inherent in any determination of responsibility and commit it to the judgment of the jury rather than that of the experts. We expected that if a mental illness was present, and the experts could not exclude causation entirely, the issue would ordinarily go to the jury as a question of degree.

## III. THE NEED TO ABANDON THE DURHAM–McDONALD TEST

Ever since this court announced its new test of responsibility in 1954, we have been struggling with the problem of distinguishing between the uniquely psychiatric elements of the determination of responsibility, and the legal and moral elements of that determination. We have repeatedly urged psychiatrists to avoid using the conclusory labels of either psychiatry or law.[17] Testimony in terms of the legal conclusion that an act was or was not the product of mental disease invites the jury to abdicate its function and acquiesce in the conclusion of the experts. Testimony in terms of psychiatric labels obscures the fact that a defendant's responsibility does not turn on whether or not the experts have given his condition a name and the status of disease.[18]

Since *Durham* we have been engaged in a continuing process of refining and explicating the rule of that case. Carter v. United States defined the term "product" in broad terms designed to restrict conclusory expert testimony and expand the basic factual information available to the jury.[19] Later McDonald v. United States sought to do the same for the term "mental disease or defect"[20] by discouraging the use of psychiatric labels which often served to hide the fact that

17. *E. g.*, Washington v. United States, 127 U.S.App.D.C. 29, 390 F.2d 444 (1967); McDonald v. United States, 114 U.S. App.D.C. 120, 312 F.2d 847 (1962) (*en banc*); Campbell v. United States, 113 U.S.App.D.C. 260, 307 F.2d 597 (1962); Briscoe v. United States, 101 U.S.App. D.C. 318, 248 F.2d 640 (1957) (statement of Bazelon, J. in relation to petition for leave to appeal in forma pauperis); Stewart v. United States, 101 U.S.App. D.C. 51, 247 F.2d 42 (1957); Stewart v. United States, 94 U.S.App.D.C. 293, 214 F.2d 879 (1954).

18. As a result of the sudden decision of St. Elizabeth's Hospital in 1957 to treat "sociopathic personality disturbance" as a mental illness, the court has been very sensitive to the danger of allowing psychiatric labels to determine legal results. *See* Blocker v. United States, 110 U.S. App.D.C. 41, 48–50, 288 F.2d 853, 860– 862 (1961) (Burger, J., concurring); Blocker v. United States, 107 U.S.App. D.C. 63, 274 F.2d 572 (1959). *Compare* United States v. Collins, 139 U.S.App. D.C. 392, 400–401 n. 3, 433 F.2d 550, 558–559 n. 3 (1970) (concurring and dissenting opinion) (changing psychiatric views of narcotic addiction); Salzman v. United States, 131 U.S.App.D.C. 393, 407–408 n. 43, 405 F.2d 358, 372–373

n. 43 (1968) (Wright, J., concurring) (alcoholism).

19. 102 U.S.App.D.C. 227, 252 F.2d 608 (1957). The trial court had instructed the jury that the act must be the direct consequence or natural result of the illness. This court disapproved that instruction and formulated a test that purported to include virtually any mode of effective causation. The illness might have been the source of the defendant's urge to do the act, or it might have exaggerated an otherwise ordinary response to an external threat; it might have impaired his ability to control impulses normally repressed, or it might have impaired his appreciation of the necessity for such control. So long as "the disease made the effective or decisive difference between doing and not doing the act," then the act was the product of the disease for the purpose of *Durham*.

20. 114 U.S.App.D.C. 120, 124, 312 F.2d 847, 851 (1962) (*en banc*). In order to prevent expert opinion from controlling the question of responsibility, we set forth a legal definition of mental illness against which expert testimony could be measured.

the experts were providing virtually no information about the defendant's underlying condition.[21] The point in both cases was to invite all the information that modern knowledge could provide, to guide the jury's consideration of the moral, legal, and medical elements in the issue of responsibility. But most psychiatrists declined the invitation and continued to decide themselves when an illness should relieve a defendant of responsibility. Therefore in Washington v. United States we reluctantly took the step of prohibiting all psychiatric testimony in terms of the issue of productivity, on the ground that such testimony was particularly likely to usurp the jury's function of resolving the ultimate question of guilt.[22] We said that the existence of disease was a medical question

21. The use of conclusory psychiatric labels without description of the underlying data carries an assurance of certainty while systematically hiding from the jury the considerations that influenced the expert's opinion. Unfortunately, it is not uncommon for extraneous and undisclosed factors to be taken into account. For example, the witness may have moulded his testimony so as to make possible the legal disposition which he considered most beneficial to the defendant or the public. Or, if the witness is a psychiatrist at a government hospital which receives persons found not guilty by reason of insanity, his diagnosis may be designed to insure that a person he considered untreatable or a troublemaker would not be returned to the custody of his hospital. And even if psychiatrists do not make a deliberate effort to frame their diagnoses in terms of a preferred legal disposition, their conclusions may still be colored by other factors not directly related to the subject's condition. *See, e. g.,* Brown, The Doctor's Reasons for Referral, in The Prevention of Hospitalization 131 (M. Greenblatt, R. Moore, R. Albert & M. Solomon eds. 1963) ; Katz, Cole & Lowery, Studies of the Diagnostic Process: The Influence of Symptom Perception, Past Experience, and Ethnic Background on Diagnostic Decisions, 125 Am.J.Psych. 937 (1969).

Moreover, the use of conclusory labels often makes it impossible for the jury to appreciate other potentially critical shortcomings of the expert opinion. The expert witness may have been unable to prepare adequately for trial, perhaps because he lacked the time or the facilities to carry out an adequate examination of the accused. Or he may have lacked the ability or the training to evaluate an unusual condition. Perhaps the state of psychiatric knowledge generally would not permit an unequivocal diagnosis of the defendant's condition by even the most outstanding expert. So long as these deficiencies hide behind the experts' jargon and conclusions, the jury cannot rationally deal with even the medical component of the responsibility question. The solution is not, of course, to bar expert testimony except where that testimony is utterly unimpeachable. In the words of the *Washington* instruction to expert witnesses in responsibility cases,

We recognize that an opinion may be merely a balance of probabilities and that we cannot demand absolute certainty. Thus you may testify to opinions that are within the zone of reasonable medical certainty. The crucial point is that the jury should know how your opinion may be affected by limitations of time or facilities in the examination of this defendant or by limitations in present psychiatric knowledge. The underlying facts you have obtained may be so scanty or the state of professional knowledge so unsure that you cannot fairly venture any opinion. If so, you should not hesitate to say so. And, again, if you do give an opinion, you should explain what you did to obtain the underlying facts, what these facts are, how they led to the opinion, and what, if any, are the uncertainties in the opinion.

129 U.S.App.D.C. 29, 43, 390 F.2d 444, 458 (1967). The Court's retention today of the bulk of the *Washington* instruction, *see* page 1027 n. 43 *infra,* including the portion quoted above, reaffirms our determination to advise the jury fully about what we know—and what we do not know—about the defendant.

22. 129 U.S.App.D.C. 29, 40–41, 390 F.2d 444, 455–456 (1967). The reluctance of the court to enforce a rigid limitation on expert testimony has been apparent from the start. Although the *Washington* opinion expressly prohibits testimony "directly in terms of 'product,' or even 'result' or 'cause' " the sample instruction to expert witnesses appended to the opinion does not prohibit such testimony; it merely advises the expert that "it will not be necessary for you to express an opinion on whether the alleged crime was a 'product' of a mental disease or defect and

which psychiatrists could properly answer, but the question of productivity was the ultimate question for the jury, involving a mixture of medical information and moral judgment.

The reason for the *Washington* rule was to reserve exclusively for the jury one part of the determination of criminal responsibility. By prohibiting testimony in terms of the ultimate question of productivity we sought to focus on the need for testimony in depth concerning the nature, extent, and manifestations of the defendant's disability. The purpose was to give the jury an adequate basis for deciding whether the disability was such that it would be unjust to condemn the defendant for his conduct.

In practice, however, under *Durham* and its progeny psychiatrists have continued to make moral and legal judgments beyond the proper scope of their professional expertise.[23] Even after *Washington,* the District Court continues to commit defendants to the public mental hospital for examination under a standard order that asks for a conclusion on productivity.[24] And the doctors who perform most of the examinations have shown little reluctance to answer that an illness was present but the act was not its product. The testimony takes a form that indicates that the psychiatrists are in fact making a moral judgment, that they are finding an illness which in their view is not *suffi-*

*ciently* serious or *sufficiently* related to the act to warrant acquittal. And that, of course, is precisely the judgment that we have entrusted not to the experts but to the jury.

Moreover, the productivity requirement tends to focus the attention of expert witnesses and the jury on extraneous and inappropriate issues, and to divert them from the core of the question of responsibility. *Durham* suggested that the government could establish criminal responsibility either by proving freedom from illness or by proving that the illness did not cause the act. And one way to prove that the illness did not cause the act is to prove that the defendant would have done it anyway. *Carter* even more explicitly than *Durham* invited the government to establish responsibility by proving that the defendant would have committed the act even if he had not been ill. *Carter* stated that productivity amounted to causation of the "but for" variety: an act is the product of mental disease if "the accused would not have committed the act he did commit if he had not been diseased as he was." [25] This approach invited experts and juries to speculate about the defendant's character, and convict him on the ground that he would have been "bad" if he had not been sick.[26]

The abuses of the productivity inquiry are strikingly illustrated by the record

---

you will not be asked to do so." *Id.* at 42, 390 F.2d at 457. *See also* the concurring opinion of Judge Fahy. *Id.* at 45–46, 390 F.2d at 460–461.

23. There is, of course, great pressure on the experts to decide the moral questions tacitly in the guise of making a scientific determination, and thereby relieve society of the need to make some difficult decisions. We can easily understand why the experts yield to that pressure, but we cannot approve the result or stop trying to force the moral questions out of the scientific domain and into the public arena.

24. See pages 1013–1014 *supra.*

25. 102 U.S.App.D.C. at 236, 252 F.2d at 617.

26. *Carter* acknowledged the problem at issue here, but dismissed it as a "logician's nicety," stating that in the ordinary case we made the "tacit assumption that if the disease had not existed the person would have been a law-abiding citizen." *Id.* Taken literally, that assumption amounts to an assumption of productivity and hence of nonresponsibility. Perhaps it would have been more accurate to say that in the ordinary case it is not anticipated that the inquiry into productivity will focus on the likelihood that the defendant would have committed the act without his illness. As a prediction that statement has proved false, and the problem should not be ignored.

in this case. Since the expert witnesses agreed that appellant suffered from a substantial disorder, his conviction would seem to depend on the jury's resolution of the question of productivity. The government's two expert witnesses both found mental illness without productivity. The testimony of these two witnesses is open to at least two interpretations. It may be that they regarded appellant's illness as highly specific in its operation: that its only effect on appellant's behavior was to produce an occasional reflex-like explosive reaction following instantly on the heels of the triggering event rather than an hour or two later; that the illness could have no relation to behavior of the type that resulted in appellant's prosecution. Putting aside the conclusory parts of their testimony, the balance of their testimony so understood could support a jury finding of criminal responsibility.

But it is not clear whether the conflict among the experts related to the scope of the illness or to its legal significance. In other testimony the government witnesses seem to reject such a tightly compartmentalized view of appellant's mental and emotional processes.[27] There is reason to suspect that their conclusion was based not on a professional judgment about the scope of the illness but rather on the view that the illness was irrelevant because appellant would have committed the crime in any event. Their testimony suggests that they regarded appellant's act as a normal response for someone in his circumstances.[28]

Clearly, firing a shotgun through a closed door is not a normal response for everyone who is hurt in a fight, though it may well be for some people. The criminal law assumes that there is a spectrum of "normality," and that some "normal" people commit crimes while others do not. We cannot allow either the experts or the jury to speculate about where on that spectrum the defendant would belong if he were not mentally ill. That sort of speculation is especially pernicious because it is likely to discriminate systematically against inner-city slum residents like appellant, since violent unlawful behavior is more common in the slums than in middle class neighborhoods. To regard behavior as the product of illness in the suburbs but "normal" in the slums is to establish an odious double standard of morality and responsibility.

The insanity defense is based on the premise that it is unjust to convict a man for behavior he could not control. There is a high incidence of mental illness in inner-city slum areas,[29] and we are bound to give it the same significance in dealing with their residents as we do in dealing with other people.[30] If ap-

27. Dr. Weickhardt testified that people with appellant's illness certainly do not have as good control over their behavior as other people, that in some cases they become irritable and angry faster than normal people, and that under stress they may react impulsively. Dr. Platkin testified that appellant's illness involved emotional instability, "a low fuse level of tolerance," and a general pattern of getting involved in fights and reacting way out of proportion to a situation.

28. *See* page 1014 *supra*.

29. A. Hollingshead & F. Redlich, Social Class and Mental Illness (1958).

30. *Compare* In 're Betty Jean Williams, No. 27–220–3 (D.C.Juv.Ct., Oct. 20, 1959) (denying motion for mental examination):

Her precocious sexual experiences are certainly pathetic but neither in themselves nor in conjunction with the associated mental symptoms are they indicative of a mental disturbance sufficient to prevent her understanding of the proceedings or assisting in her defense. Such experiences are far from being uncommon among children in her socioeconomic situation with the result that the traumatic effect may be expected to be far less than it would be in the case of a child raised by parents and relatives with different habits.

Memorandum opinion at 2.

The assumption that poor people are less seriously affected by traumatic events and by mental illness provides a convenient rationale for society's refusal to provide the resources that would be necessary to deal honestly with their problems. The

pellant's behavior controls were substantially impaired by mental illness, he should not be held responsible on the ground that it is "normal" for those in his environment to behave that way,[31] or even because the examining psychiatrist believed that "under the same circumstances I would want to get even with somebody who broke my jaw." [32]

## IV. THE COURT'S ARTICULATED REASONS FOR REPLACING *DURHAM–McDONALD* WITH *ALI–DONALD*

In my view, the ALI test of criminal responsibility, with or without the *McDonald* side bar, cannot remedy the problems in the administration of the defense which have come to light as a result of our efforts to implement the *Durham–McDonald* rule. While I assume my brethren do not share my pessimistic appraisal of the new test, they make no real effort to justify this change. Pages 981–985 of the Court's opinion are devoted to the articulation of two reasons for adopting the ALI test: (A) the "interest of uniformity of judicial approach and vocabulary, with room for variations and adjustments," majority opinion at 984–985; and (B) the "need to depart from [the] 'product' formulation and undue dominance by experts," majority opinion at 981–983.

## A. THE INTEREST OF UNIFORMITY

At issue here is no garden variety "uniformity." Whatever the benefit of having the Circuits in substantial alignment on important questions of law, that is clearly not the benefit which the Court is seeking here. The other Circuits that have adopted the ALI test have taken a variety of substantially different approaches to the interpretation of its language.[33] And today this Court adopts a variation on the ALI theme which differs, in design at least, from the approach of every other court. But the Court makes clear that uniformity in substance is not our goal, but only uniformity in vocabulary. If all of us speak the same language, the Court reasons, judicial communication will be enhanced.

Even accepting the argument at face value, it contributes very little to the resolution of the issue. For the argument does not even purport to demonstrate that the ALI test is inherently preferable to *Durham-McDonald* or any other test. I do not mean to disparage the value of judicial communication, but it is surely a concern of markedly less importance than the substantive merits of the test.

In any case, it is far from clear that our adoption of the new test will, in fact, enhance communication. The Court assumes that the lessons we have learned from *Durham-McDonald* have been "lost

---

underlying explanation for the *Williams* decision is not that Miss Williams failed to present a convincing claim of mental disorder, but rather that her claim was no more compelling than that of many other children, more numerous than the court could possibly help. "In view of respondent's personal history it is scarcely surprising that she feels 'tense and unhappy and in need of psychiatric help.' But so do a vast number of the children coming before this court." *Id.*

31. *Compare* United States v. Carter, 141 U.S.App.D.C. 46, 55 n. 14, 436 F.2d 200, 209 n. 14 (1970) (concurring opinion of Bazelon, C. J.) (rejecting psychiatrist's speculation that, had appellant not suffered from anxiety, he might nevertheless have become addicted to drugs, because

he lived in an environment where drug addiction was common).

32. *See* page 1014 *supra.*

33. The variety of approaches which hide behind ALI's language are carefully delineated in the excellent brief filed by William H. Dempsey, the amicus appointed by this Court, at 980–986. Mr. Dempsey's brief focuses on the construction of the ALI test by federal appellate courts. It would thus be a most useful line of inquiry to determine how the differences on the appellate level are reflected in the transcripts of cases tried in these other jurisdictions. It may well be that the variation in approaches revealed by Mr. Dempsey's study is only the tip of the iceberg.

in translation" to the other Circuits, and that their lessons have been similarly lost to us. The problem apparently arises because of "blockage due to jargon." Majority opinion at 984. It is not clear to me how one would prove or disprove that assertion. But as a matter of logic —and surely as a reason for adopting the ALI test—the assertion is entirely unpersuasive. In fact, if I were to devise a paradigm scheme for blocking communication, I would arrange for courts to hide major differences behind uniform language, so that the differences would be overlooked by all but the most astute observers. That is precisely the result we have achieved by adopting the all-things-to-all-people language of the ALI test. By contrast, the singular phrasing of our prior rule encouraged its analysis by courts and commentators, and forced us to compare our approach with the approach of other courts. I do not see how we can reasonably expect our adoption of the ALI test to enhance our communication with other courts.

### B. THE NEED TO DEPART FROM THE PRODUCT FORMULATION

The questions initially raised on this appeal pertained to our decision in Washington v. United States, 129 U.S.App.D. C. 29, 390 F.2d 444 (1967), barring conclusory expert testimony on the issue of productivity. Appellant insisted at the outset that *Washington*'s prohibition had been disregarded at trial, and he asked us to demonstrate our opposition to expert domination of the process by enforcing the *Washington* rule. This Court, *sua sponte*, altered the focus of the inquiry by calling into question our test of responsibility, and by asking the parties and amici curiae to canvass the arguments for and against a change in the *Durham-McDonald* rule.

In examining the ALI test now adopted by this Court, it is important to keep in mind the origins of this case and the problem which the adoption of a new test is designed to solve. The great bulk of the Court's opinion is devoted to an explication of the ALI test as adopted in this jurisdiction. Since the clarification of ambiguous language now may minimize litigation later, that is, of course, an important undertaking. But the critical question before us is whether or not the adoption of the ALI test is likely to make any significant inroad on the problem of expert domination. The answer to that question depends in large part upon an understanding of the reasons why *Durham*'s productivity requirement became a convenient handle for expert domination.

*Durham* did not invent the question of causality. Every responsibility test demands (or assumes) some link between the defendant's act and his impairment; *Durham* merely gave explicit recognition to the issue. Thus, the critical question is not *whether* the act must be related to the impairment ("mental disease," "defect of reason," or whatever), but rather how directly, if at all, the jury's attention should be focused on the question.

It is still not clear precisely what the concept of causality means in this context, or whether it is an intelligible concept at all. Yet *Durham* forced the concept out from its hiding place behind the murky language of other responsibility tests and made the productivity question the ultimate issue for the jury. In our effort to clarify the question we held that an act was to be considered the "product" of a mental disease only if it would not have been committed *but for* the disease—the disease must have "made the effective or decisive difference between doing and not doing the act." Carter v. United States, 102 U.S.App. D.C. 227, 236, 252 F.2d 608, 617 (1957). That definition gave the false impression that we understood the concept of causality fully and could draw meaningful and distinct lines between sufficient and insufficient cause—between acts that were caused by mental illness and acts that were not.

Notwithstanding the expectations to the contrary of the courts and commenta-

tors who examined the *Durham* rule,[34] the productivity requirement became a formidable obstacle to the presentation of a successful responsibility defense. Even as recently as 1970 one federal court suggested that the "product portion of the test seems superfluous," reasoning that once a disability had been established, it would ordinarily be impossible to prove that it had no relationship to the unlawful act. Wade v. United States, 426 F.2d 64, 69 (9th Cir. 1970). Nevertheless, psychiatrists in this jurisdiction have often concluded—and convinced juries— that a mentally ill defendant should be convicted because his act was not the product of his illness. *See* United States v. Eichberg, 142 U.S.App.D.C. 110, 113, 439 F.2d 620, 628 (1971) (Bazelon, C. J., concurring).

This development may have allayed the fears of some who expected *Durham* to produce a vast increase in the number of insanity acquittals. After all, it was only the productivity requirement that stood between the liberalized concept of mental illness and acquittal; insistence on a rigid, and often impossible, showing of causal connection was an obvious means of reining in the defense. But the primary drawback of the productivity requirement was not that it reduced the number of insanity acquittals, for it is extremely unlikely, in my opinion, that juries would have acquitted many more defendants if the product formulation had never been devised. The real difficulty was that the superficial simplicity of the productivity question made it seem susceptible of an unambiguous medical or scientific answer. As a consequence, jurors too often relied on the conclusions of the experts, failing to see that the "gravity of an impairment and its relevance to the acts charged are both questions of degree, which can only be resolved with reference to the community's sense of when it is just to hold a man responsible for his act."

United States v. Eichberg, 142 U.S.App. D.C. 110, 113, 439 F.2d 620, 623 (1971) (concurring opinion).

As I understand the Court's opinion, the rationale for the switch from *Durham-McDonald* to ALI-*McDonald* can be summarized as follows: The primary flaw of our prior test was its emphasis on productivity, which permitted "undue dominance" by the expert witnesses who testified on the issue of responsibility. Majority opinion at 981. The remedy is not to depart from the product *requirement* (which would hardly be possible in any case since the requirement is an integral part of every responsibility test), but to depart from the product *formulation*. The ALI test retains the "core requirement" of productivity, in the sense that there must be a "meaningful relationship between the mental illness and the incident charged." *Id.* at 983. But the question of causality does not occupy a position of prominence under ALI comparable to the position that the product requirement occupied under *Durham*. By eliminating the term "product" we can eliminate the vocabulary which was "conducive to a testimonial mystique permitting expert dominance and encroachment on the jury's function." *Id.* The foregoing reasoning of my brethren represents the primary articulated justification for adoption of the ALI test, and the validity of the analysis must, therefore, be considered with great care.

1. The Court's reasoning suggests that our primary goal is to deemphasize the question of productivity or causality. Yet there is strong reason to suspect that adopting the ALI test will not bring us closer to that goal. The difficulty of applying the ALI productivity requirement —and hence the amount of attention which the requirement will attract—is likely to vary with the nature of the defendant's impairment. If the defendant cannot "distinguish 'good and evil,' i. e., if he 'doth not know what he is doing,

---

34. United States v. Eichberg, 142 U.S.App. D.C. 110, 118 n. 40, 439 F.2d 620, 628

n. 40 (1971) (Bazelon, C. J., concurring). *See* page 1016 and n. 16 *supra*.

no more than * * * a wild beast,' " [35] he may well lack the capacity to appreciate the wrongfulness of *any* act or to conform *any* act to the requirements of law. In that case, a jury is likely to conclude that the defendant's impairment "caused" his act, irrespective of the act he allegedly committed. If the defendant's impairment is not so severe as to render him a "wild beast," the question of productivity is still unlikely to present great difficulty so long as the impairment is deep enough and pervasive enough to compel the conclusion that most of his acts are substantially affected by the impairment. A finding of non-productivity will not often be made where the defendant is suffering from a psychosis or other severe disorder, because the defendant's act will, in all probability, bear a strong and obvious relationship to the impairment.[36] And even where the question is close, juries may often resolve their doubts in favor of a finding of causality in order to insure that the defendant is committed to a hospital rather than a penitentiary.

The real difficulty with the causality requirement arises when the defendant's impairment is a neurotic condition or personality disorder. It appears that these conditions are often encapsulated, in the sense that they may have a significant impact on some aspects of the defendant's behavior, while leaving his personality substantially intact.[37] In these

---

35. Durham v. United States, 94 U.S. App.D.C. 228, 235, 214 F.2d 862, 869 (1954), *quoting* Glueck, Mental Disorder and the Criminal Law 138–39 (1925), and Rex v. Arnold, 16 How.St.Tr. 695, 764 (1724).

36. *See, e. g.,* Royal Comm'n on Capital Punishment 1949–53, Report § 280 at 99:

> Where a person suffering from a mental abnormality commits a crime, there must always be some likelihood that the abnormality has played some part in the causation of the crime; and, generally speaking, the graver the abnormality and the more serious the crime, the more probable it must be that there is a causal connection between them.

J. Page, Psychopathology: The Science of Understanding Deviance 30–32 (1971):

> The label of "psychosis" is essentially restricted to the most severe behavior disorders that occur in adults and children. * * * A significant distinctive feature of psychotic behavior is that it is relatively independent of voluntary control or external reality. * * * A second distinctive feature consists of varying degrees of personality distintegration with consequent significant impairment in personal and social functioning. As a rule, the behavior of psychotic individuals is so defective and disorganized that they require care or supervision. * * *
>
> The psychotic person finds it difficult or impossible to differentiate between fantasies and actual experiences. Wishes tend to be confused with facts; imagined dangers, slights, and misdeeds are accepted as real, and real ones are grossly exaggerated or misinterpreted. Whereas normal people attempt to adapt their behavior to the expectations and demands of the physical and social environment, the psychotic's reactions are more or less exclusively dominated by inner dictates. * * *
>
> The personality disintegration and reality distortion characteristic of psychoses are strikingly apparent in delusions and hallucinations. * * * Other types of mental patients, and normal persons as well, may also hold onto false beliefs and experience hallucinations. *What distinguishes psychotic behavior is not the presence or absence of delusions and hallucinations per se, but rather the extent to which they pervade, dominate, and distort the person's perceptions, feelings, decisions, and actions.*

(Emphasis supplied.)

37. *See, e. g.,* Page, *supra* note 36, at 33–35. Of course, even some psychoses may be substantially encapsulated, in which case a productivity problem could obviously arise. Page points out that "[i]n contrast to other psychotic reactions that are accompanied by a general disorganization of personality and gross impairment in general functioning, paranoia and paranoid states consist mainly of a capsulated persecutory or grandiose delusional system in an otherwise relatively intact personality. The patient's functioning is unaffected in areas outside of his delusional system." *Id.* at 32. Thus, it is possible to imagine a perplexing question of productivity in a case involving, for example, a businessman who

cases disputes will often arise concerning the relationship of the act to the impairment. And snce the impairment may be much less severe than a psychosis, the defense will often not be aided by a presumption that hospitalization is the appropriate disposition. In fact, the jury may be convinced that the non-psychotic defendant deserves criminal punishment even though the experts consider him mentally ill. And they may use the productivity requirement as a handle for the rejection of the responsibility defense.

In short, the most efficient means of eliminating the productivity problem (but not the productivity question) is to limit the definition of exculpatory mental illness to those conditions which are so severe that in most cases a finding of productivity can readily be made. It can reasonably be argued that the intent of the ALI draftsmen was to make the responsibility defense available only to defendants suffering from psychoses or other severe disabilities.[38] Under that interpretation, which is apparently accepted by at least some other federal jurisdictions,[39] the productivity issue should rarely present great difficulty. But that interpretation is plainly not the one adopted by the Court in today's opinion. As I read the Court's opinion, the retention of the *McDonald* definition of mental illness reaffirms our long-standing view that, in the words of Mr. Dempsey's amicus brief, "the defense is not restricted to persons suffering from the gravest types of mental disorders. While the jury must find that the defendant's 'mental or emotional processes' have been 'substantially affected' and his 'behavior controls' 'substantially impaired,' the jury is not bound by whether those consequences flow from what the psychiatrists label a 'psychosis,' 'pyschoneurosis,' a 'sociopathic personality,' an 'emotionally unstable personality,' or whatever." [40] If we are indeed to retain the expansive definition of mental illness implicit in *Durham* and formalized in *McDonald,* then the productivity question will remain a source of controversy and debate.

Unlike *Durham,* which focused on the relationship between the defendant's mental illness (impairment) and his *act,* the ALI test focuses on the relationship between the defendant's mental illness and his *impairment.* In the words of the test, the impairment must exist "as a result" of mental illness. But productivity in the *Durham* sense—the relationship between the impairment and the act—is not abolished; it is concealed in two questions which are implicit in the test: Could the defendant appreciate the wrongfulness of the particular act he committed? Could he have conformed that particular act to the requirements of law? So long as the defendant's impairment is a psychosis or other severe disability and is roughly consonant with his act, the answers to those questions should be sufficiently obvious that the questions will not even seem to arise. But where the defense is predicated on a less severe form of impairment—as it apparently can still be in this jurisdiction—those questions will assume the burden that has been carried up to now by *Durham's* explicit requirement of productivity.

had cheated on his income tax for many years, and who eventually developed a full-blown paranoid delusional system. If he continued to falsify his return after the onset of his illness, the question of productivity would presumably present great difficulty.

38. *See* amicus brief of William H. Dempsey at 18–19, citing, inter alia, an explanatory comment by the Reporter of the Model Penal Code, Professor Wechsler: "[I]t was thought that the criterion should ask if there was * * * a deprivation of 'substantial capacity' to know or to control, *meaning thereby the reduction of the capacity to the vagrant and trivial dimensions characteristic of the most severe afflictions of the mind."* Wechsler, Codification of Criminal Law in the United States: The Model Penal Code, 68 Colum.L.Rev. 1425, 1443 (1968) (emphasis added).

39. *See* amicus brief of William H. Dempsey at 19–31.

40. *Id.* at 16 (footnotes omitted).

The operation of the causality requirement implicit in the ALI test can be illustrated by considering how Brawner would have been tried under the new test. The expert witnesses would presumably characterize his condition as an explosive personality disorder, manifested in an inability to deal with provocation. The act which Brawner committed—shooting through a closed door in retaliation for a blow to his jaw a short while before—is surely consistent with his condition. It could thus be said that in at least some situations Brawner apparently lacked substantial capacity to conform this kind of behavior to the requirements of law. But I have little doubt that the government would seek to introduce expert testimony, as it did under *Durham,* that Brawner committed this act not because of his personality disorder, but rather because he wanted "to get even with somebody who broke [his] jaw." *See* page 1014 *supra.* The issue raised by this line of testimony need not be called a productivity or causality question. But whatever it is called, it is functionally identical to the productivity question that routinely arose under *Durham.*

The Court undoubtedly recognizes that retention of *McDonald*'s open-ended definition of mental illness will require an inquiry into causality in a large number of cases. In marked contrast to the opinions of the other federal courts that have adopted the ALI test,[41] the Court's opinion places great emphasis on the causality question. Superficially, the Court's references are directed only at the first stage of the causality question under the ALI test—the relationship between the illness and the impairment rather than the relationship between the impairment and the act. But the question raised by that first stage is so trivial and the Court's references to causality are so numerous that it is hard to avoid the implication that the references are primarily aimed at the second stage of the productivity question. Those references carry an implicit assurance that acquittal under the ALI test will be no less difficult for a defendant without a pervasive disability than it has always been under *Durham.*

The critical question, therefore, is how the productivity issue will be presented to the jury. As I pointed out above, the *Durham* formulation gave the false impression that the question required a medical or scientific answer. The ALI language could fare better, since it does not invite the expert witnesses to offer a flat and seemingly scientific answer that the impairment did or did not "cause" the act. But while there is some promise in the language of the ALI test, I fear that the Court's construction of that language may dissipate much of that promise. The ALI test provides that "a person is not responsible for criminal conduct if at the time of such conduct *as a result* of mental disease or defect he lacks substantial capacity * * *" (Emphasis supplied.) The Court maintains that the causality requirement lurks in the term "as a result," suggesting that the "mental disease of a kleptomaniac does not entail as a 'result' a lack of capacity to conform to the law prohibiting rape." Majority opinion at 991. The term "as a result" does, of course, contain a requirement of causality. But it refers only to the *first stage* of the requirement under the ALI test, indicating that the impairment must be caused by the mental disease. But the crucial question of causality—the link between the impairment and the act—is not reflected in the term "as a result." It inheres in the concepts of "appreciating wrongfulness" and "conforming conduct." Thus, if kleptomania is an abnormal condition of the mind, then for

41. Of the other Circuit opinions cited by the Court at page 979 *supra,* only one even acknowledges the existence of a causality question under the ALI test. *See* United States v. Freeman, 357 F.2d 606, 623 (2d Cir. 1966) :

> Relieved of their burden of divining *precise* causal relationships, the judge or jury can concentrate upon the ultimate decisions which are properly theirs, fully informed as to the facts. [Emphasis added.]

purposes of the ALI test a kleptomaniac "lacks substantial capacity as a result of mental disease" regardless of the act he allegedly committed. But if he is charged with rape, his responsibility defense would presumably fail because, even though he may lack capacity to appreciate the wrongfulness of theft or to conform his conduct to the requirements of the law prohibiting theft, he may in fact have substantial capacity to appreciate the wrongfulness of rape and to conform his conduct to the requirements of the law prohibiting rape.

My concern with the source of the ALI productivity requirement is not intended as an exercise in the splitting of hairs. By making the term "as a result" carry not only the unimportant first stage of the causality question, but also the critical second stage, the Court repeats precisely the mistake it correctly identifies in *Durham:* the articulation of a catchphrase that facilitates conclusory expert testimony and that obscures the moral and legal overtones of the productivity question. Where a psychiatrist would formerly have testified that the act was not the "product" of the disease, he can now assert that the disease of the defendant does not entail as a "result" the kind of impairment that could have produced the act in question. Under my view of the ALI language, a psychiatrist attempting to present a conclusory no-productivity argument would have to lead the jury through the murky waters of "appreciating wrongfulness" and "conforming conduct," and in all likelihood the jury would be lost almost from the outset. If the causality requirement cannot readily be expressed as an uncomplicated yes-no question, there is a good chance that juries would begin to recognize that the requirement subsumes the

moral and legal questions which lie at the heart of the responsibility defense.

2. Our opinion in *Washington* recognized that the productivity requirement can lead to domination by the expert witnesses not so much because they testify about the issue, but because they testify about the issue in conclusory terms. For that reason, we barred conclusory testimony on this issue, and urged the experts to disclose the factual data from which the jury could draw reasonable inferences about the defendant's condition. Inexplicably, the Court now concludes that *Washington* is "superseded— on this point—by our change today of the ultimate rule," majority opinion at 1003. Yet, as the Court repeatedly makes clear, the change of the ultimate rule leaves standing the causality requirement. The net effect of today's decision is, therefore, to require the experts to drop the term "product" in favor of the term "result," and to permit them once again to tell the jury in conclusory terms that the act was not caused by the defendant's impairment.[42] To be sure, a mystique has developed around the term "product," and the elimination of that term should undercut the mystique. But I see no reason to assume that the term "result" is immune to the identical development, especially in view of the Court's unexplained determination that experts should once again be permitted to testify in conclusory terms on the issue of causality.

3. If our primary goal is, in fact, to achieve a reduction in expert domination of the process, the gratuitous overruling of one aspect of Washington v. United States [43] is not the only—and perhaps not the most important—step backward. The Court identifies the productivity requirement as the chief villain that per-

---

42. *Washington,* of course, made clear that psychiatrists "should not speak directly in terms of 'product,' or even '*result*' or 'cause.'" 129 U.S.App.D.C. 29, 41, 390 F.2d 444, 456 (1967) (emphasis added).

43. The Court does retain, however, the portion of the Washington instruction

unrelated to the issue of productivity. I applaud that decision because of the significant salutary effect that the instruction has had on the adjudication of the responsibility issue in this jurisdiction. *See* page 1018 n. 21 *supra.*

mits the experts to encroach on the jury's function. But there is another aspect of the test which is at least as susceptible to expert domination. Like *Durham*, the ALI test demands a "mental disease" as a condition of non-responsibility. And the Court today holds that the definition of "mental disease" announced in *Mc-Donald* will be applicable to the ALI test. Nevertheless, *Brawner*'s discussion of the term suggests at least a partial erosion of the *McDonald* view that "mental disease" is a legal concept, and that "neither the court nor the jury is bound by *ad hoc* definitions or conclusions as to what experts state is a disease or defect." 114 U.S.App.D.C. 120, 124, 312 F.2d 847, 851 (1962).

The Court today asserts that it has rejected "suggestions to adopt a rule that disentangles the insanity defense from a medical model," and adds that a successful responsibility defense must be predicated on the existence of an "ascertainable condition characterized by 'a broad consensus that free will does not exist.'" Majority opinion at 995. I fear that counsel, the experts, and the trial courts will view that requirement as a delegation of sweeping new authority to the medical experts.

Of course, the Court does point out that a defendant can make a broad presentation to the jury, offering all of the evidence, even if not strictly medical, which is pertinent to an abnormal condition of the mind. But that broad presentation is already guaranteed by the traditional rules of evidence. The real impact of the Court's decision is to establish a barrier which will prevent some defendants from taking any evidence at all to the jury on the issue of responsibility. The power to open and close that barrier is effectively delegated to the psychiatric experts.

We can only speculate on the impact of this requirement, but it seems likely to produce very substantial distortions of the process. First, it focuses attention on an entirely irrelevant issue. If a defendant is prepared to present evidence that his mental or emotional processes and behavior controls were in fact impaired, it is not clear why anything should turn on the experts' view of his condition in the abstract.

Second, the requirement obliges the defendant to make a vastly greater showing to have the issue of reponsibility submitted to the jury than to have any other issue submitted. We held many years ago that "sanity is an 'essential' issue which, if actually litigated—that is, if 'some proof is adduced' tending to support the defense—must be submitted to the jury under the guidance of instructions." Tatum v. United States, 88 U.S. App.D.C. 386, 389, 190 F.2d 612, 615 (1951). Conceding "that any attempt to formulate a quantitative measure of the amount of evidence necessary to raise an issue can produce no more than an illusory definiteness," we pointed out that "so long as there was *some evidence relevant to the issue* * * * the credibility and force of such evidence must be for the jury, and cannot be matter of law for the decision of the court." 88 U.S.App.D.C. at 390, 190 F.2d at 616, quoting from Kinard v. United States, 68 App.D.C. 250, 253–254, 96 F. 2d 522, 525–526 (1938). As I read the Court's opinion, a defendant who can introduce "some evidence" that his capacity to control his behavior was in fact impaired cannot take the responsibility issue to the jury unless he can also offer, should the question be put in issue, "convincing evidence" that he is suffering from a medically-recognized condition characterized by a broad consensus that free will does not exist.[44]

Still, the greatest difficulty is not that the requirement shifts attention onto an extraneous issue or that it imposes an unwarranted obstacle to the presenta-

---

44. Compare Heard v. United States, 121 U.S.App.D.C. 37, 40, 348 F.2d 43, 46 (1965): "[T]here was *no evidence that appellant's capacity to control his be-* havior was impaired.* * * * [T]he *McDonald* standard for submission of the criminal responsibility issue was not met * * * *" (emphasis supplied).

tion of an affirmative defense. Those difficulties could be tolerated if the requirement of a "broad consensus that free will does not exist" reflected the Court's effort to achieve some important purpose of the responsibility defense. At no point in its opinion does the Court explain why the boundary of a legal concept—criminal responsibility—should be marked by medical concepts, especially when the validity of the "medical model" is seriously questioned by some eminent psychiatrists.[45] Nor does the Court explain what it means by "convincing evidence" of the existence of a "broad concensus." If five psychiatrists are prepared to assert that a particular condition *does* tend to impair free will, how many psychiatrists must be willing to testify that it *does not* have such an effect before we can preclude a responsibility defense on the ground that there is no "broad consensus" that the defendant's condition tends to impair free will? How many psychiatrists must be convinced that a particular condition is "medical" in nature before a defendant will be permitted, within the confines of

the "medical model," to predicate a responsibility defense on such a condition?

The Court similarly fails to explain how medical experts can be expected to provide information about the impairment of free will, when free will would seem to be a philosophical and not a medical concept. If psychiatrists will be required to frame their testimony in terms of this non-medical concept, then the Court will have resurrected M'Naghten with one ironic twist. Under M'Naghten, medical experts effectively answered moral and legal questions, and cloaked the answers in medical terminology. The Court now seems to ask experts to make moral and legal determinations about the nature of an exculpatory condition, and invites them to state their conclusions in *non-medical* terms.

It is possible, however, that the Court's reference to free will is not intended to carry moral or philosophical implications, but is nothing more than a short-hand for the component of the ALI test which refers to substantial capacity to conform conduct to the requirements of law.[46] If

45. *See* United States v. Eichberg, 142 U.S. App.D.C. 110, 116 & n. 31, 439 F.2d 620, 626 & n. 31 (1971) (Bazelon, C. J., concurring), citing

J. Elkes, *Word Fallout: or, on the Hazards of Explanation*, in The Psychopathology of Adolescence 118 (1970) (presidential address, Am. Psychopathological Ass'n) ; R. Leifer, In the Name of Mental Health, 196–98 (1969) ; K. Menninger, *Toward A Unitary Concept of Mental Illness*, in A Psychiatrist's World 516 (1959) ; K. Menninger, *Changing Concepts of Disease*, in A Psychiatrist's World 670 (1959) ; M. Roth, *Seeking Common Ground in Contemporary Psychiatry*, 62 Proceedings of the Royal Soc'y of Medicine 765 (1969) (presidential address, section of psychiatry) ; M. Susser, Community Psychiatry 10–20 (1968) ; T. Szasz, The Myth of Mental Illness (1961).

The medical model of mental illness has been questioned ever more extensively by behavioral scientists outside psychiatry. *See, e. g.,* G. Albee, *The Uncertain Future of Clinical Psychology*, 25 American Psychologist 1071 (1970) (presidential address, Am. Psychological Ass'n) ; E. Wolf, *Learning*

*Theory and Psychoanalysis*, 39 British Journal of Medical Psychology 525 (1969) (paper and critical evaluations) ; The Mental Patient: Studies in the Sociology of Deviance (S. Spitzer & N. Denzin ed. 1968).

*Cf.* Blocker v. United States, 110 U.S. App.D.C. 41, 48, 288 F.2d 853, 860 (1961) (Burger, J., concurring) ("no rule of law can possibly be sound or workable which is dependent upon the terms of another discipline whose members are in profound disagreement about what those terms mean") ; Campbell v. United States, 113 U.S.App.D.C. 260, 266, 307 F.2d 597, 603 (1962) (Burger, J., dissenting).

46. The circularity of our new test becomes apparent when the three facets—ALI, McDonald, and the "broad consensus"— are read together and in proper sequence. Henceforth, a person is not criminally responsible if, as a result of mental disease or defect, which is (a) an abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavior controls, and (b) an ascertainable condition characterized by a broad consensus that free

so, it is unclear why the Court omits reference to the second component of the ALI test: namely, the capacity to appreciate the wrongfulness of conduct. Is that omission premised on a determination that the cognitive element is irrelevant to responsibility? Or does it mean, perhaps, that the element of cognition is subsumed within the concept of behavior control? *See* United States v. Currens, 290 F.2d 751, 774 (3d Cir. 1961). These questions, and others which are no less extraneous to the question genuinely in issue, will have to be answered in the course of applying this new requirement.

Of course, the fact that the requirement is illogical, unwieldy, and an invitation to expert domination does not necessarily mean that it should not be adopted. I suggested in a recent opinion that adoption of an explicit medical model may be the only available means of fending off a number of difficult questions concerning our handling of a dangerous defendant who has been found not guilty for lack of responsibility, but who cannot be committed to a medical institution for medical care. In that same opinion I outlined several alternative approaches and attempted to point out the advantages and disadvantages of each. *See* United States v. Alexander & Murdock, 152 U.S. App.D.C. —— at —— – ——, 471 F.2d 923 at 960–965 (April 21, 1972). But the Court does not disclose the reasoning that underlies its adoption of the medical model. Nor does it provide any indication of the purpose of this limitation on the legal concept of responsibility. The disadvantages of clinging to a medical model are shouldered without acknowledgment or explanation. What does emerge clearly from the Court's opinion is that we have now turned over to the experts a substantial part of the inquiry, without making clear why expert domination in this context—as opposed to the context of productivity—is unobjectionable.

## V. THE ADVANTAGES OF A RULE THAT INSTRUCTS THE JURY TO ACQUIT THE DEFENDANT IF HE CANNOT JUSTLY BE HELD RESPONSIBLE

The effort to preserve the jury's function from encroachments by the experts must begin with a clear understanding of what that function is. In determining the responsibility issue, a jury has two important tasks:

In the first place it measures the extent to which the defendant's mental and emotional processes and behavior controls were impaired at the time of the unlawful act. The answer to that question is elusive, but no more so than many other facts that a jury must find beyond a reasonable doubt in a criminal trial. * * * The second function is to evaluate that impairment in light of community standards of blameworthiness, to determine whether the defendant's impairment makes it unjust to hold him responsible. The jury's unique qualification for making that determination justifies our unusual deference to the jury's resolution of the issue of responsibility.[47]

Nothing in the Court's opinion today suggests a departure from our long-standing view that the second of these two functions—the evaluation of the defendant's impairment in light of community standards of blameworthiness—is the very essence of the jury's role. The Court points out, for example, that

[i]t is the sense of justice propounded by those charged with making and declaring the law—legislatures and courts—that lays down the rule that persons without substantial capacity to know or control the act shall be excused. *The jury is concerned with applying the community understanding of this broad rule to particular lay and medical facts. Where the matter is unclear it naturally will call on its*

will does not exist, he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

47. United States v. Eichberg, 142 U.S. App.D.C. 110, 114–115, 439 F.2d 620, 624–625 (1971) (Bazelon, C. J., concurring).

*own sense of justice to help it determine the matter.* [Emphasis added.] Majority opinion at 988. And again,

> The doctrine of criminal responsibility is such that there can be no doubt "of the complicated nature of the decision to be made—intertwining moral, legal, and medical judgments," * * * * [J]ury decisions have been accorded unusual deference even when they have found responsibility in the face of a powerful record, with medical evidence uncontradicted, pointing toward exculpation. The "moral" elements of the decision are not defined exclusively by religious considerations but by the *totality of underlying conceptions of ethics and justice shared by the community, as expressed by its jury surrogate.* [Emphasis added; citations omitted.]

Majority opinion at 982.[48] *See also* majority opinion at 990.

Against this background it is clear that *Durham* focused the jury's attention on the wrong question—on the relationship between the act and the impairment rather than on the blameworthiness of the defendant's action measured by prevailing community standards. If the ALI test is indeed an improvement, it is not because it focuses attention on the *right* question, but only because it makes the *wrong* question so obscure that jurors may abandon the effort to answer it literally.

Instead of asking the jury whether the act was caused by the impairment, our new test asks the jury to wrestle with such unfamiliar, if not incomprehensible, concepts as the capacity to appreciate the wrongfulness of one's action, and the capacity to conform one's conduct to the requirements of law. The best hope for our new test is that jurors will regularly conclude that no one—including the

experts—can provide a meaningful answer to the questions posed by the ALI test. And in their search for some semblance of an intelligible standard, they may be forced to consider whether it would be just to hold the defendant responsible for his action. By that indirect approach our new test may lead juries to disregard (or at least depreciate) the conclusory testimony of the experts, and to make the "intertwining moral, legal, and medical judgments" on which the resolution of the responsibility question properly depends. The Court's own opinion hints at this approach, maintaining that "[t]here is wisdom in the view that a jury generally understands well enough that an instruction composed in flexible terms gives it sufficient latitude so that, without disregarding the instruction, it can provide that application of the instruction which harmonizes with its sense of justice. The ALI rule generally communicates that meaning." Majority opinion at 988–989.

The Court's approach may very well succeed and encourage jurors to look behind the testimony and recommendations of the experts. But, as I have tried to demonstrate above, there is also a significant possibility that our new test will leave the power of the experts intact—or even make possible an enlargement of their influence. In my opinion, an instruction that tells the jurors candidly what their function is, is the instruction most likely to encourage the jurors to resist encroachments on that function. In itself, that might not be sufficient justification for adopting such a test if it were clear that its adoption would entail substantial costs as a necessary by-product. But I am unaware of any costs that compel us to adopt instead the ALI test, which offers so much less promise of dealing with the problems

---

**48.** The Court continues with a quotation from *Williams v. Florida,* 399 U.S. 78, 100, 90 S.Ct. 1893, 1906, 26 L.Ed.2d 446 (1970), pointing out that the essential feature of a jury "lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community's participation and shared responsibility that results from that group's determination of guilt or innocence."

that initially brought this case to our attention.

Our instruction to the jury should provide that a defendant is not responsible *if at the time of his unlawful conduct his mental or emotional processes or behavior controls were impaired to such an extent that he cannot justly be held responsible for his act*. This test would ask the psychiatrist a single question: what is the nature of the impairment of the defendant's mental and emotional processes and behavior controls? It would leave for the jury the question whether that impairment is sufficient to relieve the defendant of responsibility for the particular act charged.[49]

The purpose of this proposed instruction is to focus the jury's attention on the legal and moral aspects of criminal responsibility, and to make clear why the determination of responsibility is entrusted to the jury and not the expert witnesses. That, plainly, is not to say that the jury should be cast adrift to acquit or convict the defendant according to caprice. The jury would not be instructed to find a defendant responsible if that seems just, and to find him not responsible if that seems just. On the contrary, the instruction would incorporate the very requirements—impairment of mental or emotional processes and behavior controls—that *McDonald* established as prerequisites of the responsibility defense.

The proposed instruction has the additional advantage of avoiding any explicit reference to "mental disease" or "abnormal condition of the mind." As used in our prior tests, these terms were never intended to exclude disabilities that originate in diseases of the body,[50] but

simply reflect the fact that the defense of non-responsibility has traditionally been associated with mental illness, or in the language of an earlier day, "insanity." Washington v. United States, 129 U.S.App.D.C. at 37 n. 23, 390 F.2d at 452 n. 23. Moreover,

> our experience has made it clear that the terms we use—"mental disease or defect" and "abnormal condition of the mind"—carry a distinct flavor of pathology. And they deflect attention from the crucial functional question —did the defendant lack the ability to make any meaningful choice of action —to an artificial and misleading excursion into the thicket of psychiatric diagnosis and nomenclature.

United States v. Alexander & Murdock, 152 U.S.App.D.C. —— at ——––——, 471 F.2d 923 at 960–961 (April 21, 1972), (dissenting opinion).

I would adopt an instruction based on the language of *McDonald*, which seems to me more comprehensible than the language of the ALI test. The capacity to appreciate the wrongfulness of conduct and the capacity to conform conduct to the requirements of the law are, I fear, concepts with little meaning to experts or to jurors. But for the present purpose, the critical aspect of the proposed jury instruction is not the use of the *McDonald* terminology or the omission of any reference to an "abnormal condition of the mind." If the Court is convinced that the terminology of the ALI test would illuminate the jury's inquiry, or that the terms "mental disease" or "abnormal condition of the mind" should, for whatever reason, be retained, it is still possible to draft an instruction that clearly describes the jury's role in

49. *Cf.* Holloway v. United States, 80 U.S. App.D.C. 3, 4, 148 F.2d 665, 666 (1945): "The application of these tests [*McNaghten* and irresistible impulse], however they are phrased, to a borderline case can be nothing more than a moral judgment that it is just or unjust to blame the defendant for what he did."

50. Thus, it is distressing to find in the case at bar that the prosecutor and the

court below seemed concerned with establishing that appellant's epileptoid disorder may have been "physiological as over against mental." The determination of criminal responsibility cannot turn on the outcome of a debate about whether epilepsy is a mental illness or a physical one.

deciding when the defendant's incapacity is sufficient to warrant exculpation. In fact, a minority of the ALI draftsmen (along with Professor Wechsler, the reporter of the Model Penal Code) proposed a test providing that a person

> is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect his capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law is *so substantially impaired that he cannot justly be held responsible.*

By contrast, the majority ALI test, now adopted by this Court, provides that a person

> is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

The difference between the two approaches does not pertain to the type of showing a defendant must make. Both require the defendant to demonstrate a particular form of incapacity. The approaches diverge in establishing a standard to determine when the incapacity is sufficient to exculpate the defendant. Under the ALI majority view, the jury must acquit if the defendant's capacity is *substantially* impaired. The ALI minority would require acquittal where the defendant's capacity is *so substantially impaired that he cannot justly be held responsible.*

The ALI ultimately rejected the minority approach because "[s]ome members of the Council deemed it unwise to present questions of justice to the jury, preferring a submission that *in form, at least,* confines the inquiry to fact." [51] The Court apparently shares this view, and rejects an instruction "overtly cast in terms of 'justice'" on the grounds that such an instruction "cannot feasibly be restricted to the ambit of what may

properly be taken into account but will splash with unconfinable and malign consequences." Majority opinion at 987. That argument seems to present two separate justifications for pretending that the inquiry is confined to fact.

First, the argument apparently reflects a concern that adoption of the "justice" approach would permit the introduction at trial of extraneous information. But under the approach urged by a minority of the ALI Council, a defendant must still demonstrate that proffered evidence is relevant to an impairment of capacity. The test does not provide him with a license to introduce evidence merely for the purpose of engendering sympathy for him in the jury. Adoption of the "justice" approach would still leave standing all of the traditional obstacles to the introduction of irrelevant evidence.

The Court's second ground of objection is apparently that an instruction cast in terms of justice would permit the jury to convict or acquit without regard to legal standard. The Court points out, for example, that

> [i]t is one thing * * * to tolerate and even welcome the jury's sense of equity as a force that affects its application of instructions which state the legal rules that crystallize the requirements of justice as determined by the lawmakers of the community. It is quite another to set the jury at large, without such crystallization, to evolve its own legal rules and standards of justice.

Majority opinion at 989. I take it that in the Court's view the majority version of the ALI test offers the jury "legal rules that crystallize the requirements of justice as determined by the lawmakers of the community," and that the minority version sets the jury adrift without such crystallized rules. What, then, are these crystallized rules? I pointed out above that while the minority version asks the jury to measure the impairment in terms of its own sense of justice, the majority

---

51. Model Penal Code § 4.01, Comment at 159 (Tent.Draft No. 4, 1955) (emphasis

added). See ALI Proceedings 206–20 (May 21, 1955) (unpublished).

version requires acquittal if the incapacity is *substantial,* and requires conviction if the incapacity is *insubstantial.* Can we seriously maintain that the majority ALI instruction is preferable because its determination that the impairment must be "substantial" reflects a crystallization of the requirements of justice by the lawmakers of the community? Naturally, we would all prefer a rule that could, as a matter of law, draw a bright line between responsible and non-responsible defendants. But the ALI test adopted by this Court is plainly not such a rule. It offers the jury no real help in making the "intertwining moral, legal, and medical judgments" that all of us expect. In fact, because it describes the question as one of fact it may lull the jury into the mistaken assumption that the question of responsibility can best be resolved by experts, leaving the jury at the mercy of the witness who asserts most persuasively that, in his expert judgment, the defendant's capacity was or was not *substantially* impaired.

It is not at all clear that the approach I have suggested—whether based on the terminology of the ALI test or *McDonald* —would finally bar encroachments on the jury's function. Nevertheless, this approach—unlike the majority ALI test adopted by the Court—comes directly to grips with the problem of expert domination in a manner that is at least responsive to our experience under *Durham.* The majority ALI test merely reshuffles and obfuscates the *Durham* components; it does nothing to sort out for the jury the difference between its function and the function of the expert witnesses.

Our instruction should make clear that in order to convict a defendant the jury must first determine, on the basis of expert opinion and the factual background disclosed by the experts, the extent to which the defendant's mental and emotional processes and behavior controls were impaired, and then find, on the basis of community moral standards, that the degree of impairment was sufficiently slight that the defendant can fairly be blamed and held responsible for his act like any other person.[52]

To expand the scope of the inquiry in this way would not invite a significant increase in the number of acquittals. It would, however, encourage greater commitment to the effort to understand how each criminal defendant came to act as he did. Even if juries were consistently to set the standard of responsibility so low that virtually every defendant would meet it, they would still have to confront the causes of criminal conduct in a way that might teach us all something about human behavior. And they would be giving defendants the kind of careful, individual study that should precede any decision as consequential as the imposition of moral condemnation on another human being.

## VI. PRACTICAL PROBLEMS OF THE DEFENSE AND THE DISPOSITION OF THIS CASE

In a distressing number of recent cases this Court has been asked to consider questions unrelated to the substantive test of responsibility, but which have, as a practical matter, far greater impact on the operation of the defense than the language of the rule. The Court's

---

52. In United States v. Alexander & Murdock, 152 U.S.App.D.C. — at — – —, 171 F.2d 923 at 960–965 (April 21, 1972), (separate opinion), I pointed out that changes in the reach of the responsibility defense could have important ramifications for the doctrine of civil commitment. If we diminish the class of persons who can be found criminally responsible, we may produce a concomitant expansion in the class of persons who can be subjected to involuntary civil commitment. Adoption of a jury instruction like the minority ALI test would presumably not give rise to such an expansion since the test does not expand the category of persons who can be exculpated by a responsibility defense. It merely gives explicit recognition to the jury's function in resolving a question of degree. That same function is implicit in every test of criminal responsibility.

decision to abandon *Durham-McDonald* in favor of ALI–*McDonald* does nothing to obsolete these questions or the Court's responses to them. If our paramount goal is an improvement of the process of adjudication of the responsibility issue, our attention should be focused on these questions rather than on the ultimate definition of the test. Obviously, these questions cannot all be resolved by one opinion. But the Court's approach to the disposition of this case offers some indication of the manner in which these questions will be handled in the future.

1. The one consistent note in the Court's analysis of our experience under *Durham* is the objection to domination by the experts accomplished through the productivity requirement. We attempted to deal with that problem in Washington v. United States by barring conclusory, expert testimony on the issue of productivity. Virtually all of the expert witnesses at Brawner's trial agreed that he was suffering from an abnormal condition of the mind. The issue in dispute was productivity—the ultimate issue for the jury. And the transcript is riddled with conclusory, expert testimony on that issue. It is hard to imagine a case which could make a stronger appeal for enforcement of the *Washington* rule.

After hearing one of his expert witnesses state that Brawner had a "personality disorder connected with epilepsy," the prosecutor asked the witness:

Did you also come to any opinion concerning whether or not the crimes in this case were causally related to the mental illness which you diagnosed?

After defense counsel's objection to the question was overruled, the prosecutor asked again:

What was your conclusion as to whether or not there was a causal relationship between the two matters?

The witness replied:

It was my conclusion that there was no causal relationship between his mental disorder and the alleged offense.

Transcript at 464. To be sure, this testimony was not phrased in terms of "product," but the jury could hardly avoid the message that causality was the cutting edge of the responsibility test and that at least some of the experts were convinced that causality did not exist in this case. Nevertheless, the Court refuses to overturn the conviction despite this patent violation of the letter and the spirit of the *Washington* rule.

I suggested above that the abandonment of the term "product" may have some beneficial effect in reducing the mystique that surrounds the causality question in this jurisdiction. But I also noted that the Court has made available a new handle for conclusory testimony on the issue of causality—"result"—and at the same time it has lifted the ban on conclusory testimony on this issue. The transcript of Brawner's trial offers a glimpse of what we can expect from responsibility trials under the ALI test. The Court's unwillingness to reverse Brawner's conviction on this ground makes clear that this Court and the trial courts no longer have any weapons to combat the problem of conclusory testimony and the resulting domination by experts.[53]

53. The Court's refusal to reverse the conviction rests in part on the doctrine of "curative admissibility." There may be cases in which a party's introduction of irrelevant or otherwise inadmissible testimony confers on his adversary the right to introduce in rebuttal further evidence that would otherwise be inadmissible. But such a rule is discretionary and cannot be invoked when it would subvert a fundamental substantive policy like that of *Washington*, to preserve for the jury its critical role in assessing criminal responsibility. See United States v. Winston, 145 U.S.App.D.C. 67, 447 F.2d 1236 (1971); United States v. Thompson, 150 U.S.App.D.C. 403, 465 F.2d 583 (May 8, 1972). See generally 1 J. Wigmore, Evidence § 15 (3d ed. 1940, Supp.1964). Defense counsel's inquiry into productivity here was undoubtedly inspired by the certain knowledge that the government would ground its case on evidence of nonproductivity. Before any expert testimony was presented, the trial court correctly stated the *Washington* rule, but

2. Since 1895 the federal courts have taken the position that if the defendant introduces "some evidence" of insanity, the issue will be submitted to the jury and the government will bear the burden of proving responsibility beyond a reasonable doubt. Davis v. United States, 160 U.S. 469, 484, 16 S.Ct. 353, 40 L.Ed. 499 (1895). Yet as the responsibility defense has developed under our case law, it has become increasingly clear that the defendant carries an overwhelming practical burden which is not acknowledged in the traditional rule. As a practical matter, the defendant often has very great difficulty obtaining adequate expert assistance to gather the information necessary for the presentation of a significant defense. If he can obtain such information, his defense will often prove vulnerable to attack unrelated to the real merit of his responsibility claim. And even if the attack is very weak the defendant will rarely be entitled to a directed verdict. *See* United States v. Eichberg, 142 U.S.App.D.C. 110, 112–113, 439 F.2d 620, 622–623 (1971).

With limited access to expert psychiatric assistance, indigent defendants normally rely on the government to provide an adequate psychiatric examination at the hospital to which the defendant is committed for observation. In a large number of cases the government's experts are called to testify on behalf of the defense, and their testimony has often proved inadequate. In one recent case, for example, the trial court concluded that the testimony of a government expert testifying for the defense was completely unacceptable under the principles of Washington v. United States, and he struck the testimony as inadmissible. Yet the trial court refused to grant the defendant's motion for a mistrial or a new mental examination by experts capable of explaining their findings to a court. And this Court affirmed that ruling. United States v. Alex-

ander & Murdock, 152 U.S.App.D.C. —— at —— – ——, 471 F.2d 923 at 952–957 (April 21, 1972) (Bazelon, C. J., dissenting). *See also* United States v. Leazer, 148 U.S.App.D.C. 356 at 362, 460 F.2d 864 at 870 (Jan. 19, 1972) (Bazelon, C. J., concurring). If an indigent defendant relies on the government for assistance in preparing his case and if there is no remedy when the government's assistance is legally inadequate, it will be little consolation to the defendant that the government still carries the burden of persuasion on that issue.

The practical burden on the defendant is greatly enhanced by the ease with which defense testimony can often be torn to pieces on cross-examination. Where a psychiatrist testifying for the government asserts that the defendant did not suffer from any abnormal condition which could impair his mental processes or behavior controls, defense counsel must have considerable expertise in psychiatry to pick out the weak points in the analysis. Yet "very few attorneys, if any, possess the requisite expertise, and we have no automatic procedure for enabling them to consult with psychiatric experts in the preparation and conduct of the defense." United States v. Leazer, 148 U.S.App.D.C. 356 at 363, 460 F.2d 864 at 871 (Jan. 19, 1972), (Bazelon, C. J., concurring). Even where the defendant has obvious symptoms of mental disorder, defense counsel is frequently helpless to rebut the suggestion by government psychiatrists that the defendant is malingering. If he produces testimony from a private psychiatrist that the defendant is not a malingerer, he is almost sure to find that the government and its expert witnesses will disparage that testimony on the grounds that it was based on an insufficient period of observation. *See, e. g.*, United States v. Bennett, 148 U.S. App.D.C. 364 at 366–367, n. 4, 460 F.2d 872 at 874–875, n. 4 (Jan. 19, 1972),

failed to apply it during the ensuing examination of both prosecution and defense witnesses. We cannot say that the effect of the prosecution's impermissible testi-

mony was neutralized by that of the defense. The proper approach was not to admit both but to exclude both.

United States v. Schappel, 144 U.S.App. D.C. 240, 445 F.2d 716 (1971); Rollerson v. United States, 119 U.S.App.D.C. 400, 343 F.2d 269 (1964).[54]

There are other grounds on which the testimony of defense psychiatrists is extremely vulnerable. A psychiatrist or psychologist who testifies that the defendant suffered from some mental illness exposes himself to what the Court appropriately terms "know-nothing appeals to ignorance." Majority opinion at 1004. For example, "by requiring the witness to describe in isolation the most minute 'symptoms' on which the diagnosis rests—the defendant's answer to a particular question or his reaction to a particular ink-blot—the prosecution may succeed in making these symptoms seem trivial or commonplace." United States v. Leazer, 148 U.S.App.D.C. 356 at 363, 460 F.2d 864 at 871 (Jan. 19, 1972), (Bazelon, C. J., concurring). At Brawner's trial, the prosecutor ridiculed the testimony of a defense psychologist in his summation to the jury:

Ladies and gentlemen, then we came to that ink blot, and the doctor said, well, the usual thing about that was those anatomical things, and how many of them were there. Well, let's see, and he counts, and there are four. How many responses? Fourteen of them. Fourteen responses and four of them turn out to be anatomical things—hearts or whatever it happened to be. Is there something unusual about that? Is a man crazy when he sees a heart or something else four times, four different anatomical things or maybe the same things in those little drawings, these little ink blots? After all, they are just blots of ink. Is a man crazy when he sees them?

Transcript of closing arguments at 36–37. We have seen almost identical efforts to ridicule defense experts in other cases. *See* United States v. Alexander & Murdock, 152 U.S.App.D.C. —— at —— ——, 471 F.2d 923 at 955 (April 1972), (Bazelon, C. J., dissenting); United States v. Leazer, 148 U.S.App.D.C. 356 at 363–364, 460 F.2d 864 at 871–872 (Jan. 19, 1972) (Bazelon, C. J., concurring); United States v. McNeil, 140 U.S.App.D.C. 228, 231–235, 434 F.2d 502, 505–509 (1970) (Bazelon, C. J., concurring). The difficulty of presenting credible expert testimony is a major part of the burden on the defendant.

The defendant might be able to cope with these obstacles to the successful use of the defense if we were willing to set aside jury verdicts unsupported by the evidence. In fact, we have been extremely reluctant to overturn a jury verdict even in the face of substantial evidence that the defendant's act was the product of a condition which impaired his mental or emotional processes and behavior controls. *See, e. g.,* United States v. Eichberg, 142 U.S.App.D.C. 110, 439 F.2d 620 (1971). If the burden of proof does rest on the government, then acquittal should be required not only when non-responsibility is proved, but also when there is a reasonable doubt about responsibility.

At Brawner's trial, both the prosecution and the defense offered evidence that the defendant was suffering from an abnormal condition of the mind which

---

54. One recent study of jury behavior in responsibility cases suggests that jurors have a systematic tendency to view a defendant as sane when the expert testimony is in conflict. *See* Klein & Temerlin, On Expert Testimony in Sanity Cases, 149 J. Nervous & Mental Disease 435 (1969). Summarizing the study, which was based on the behavior of 96 mock juries, the authors conclude that

jurors were influenced by expert testimony when the testimony was not conflicting. In cases of conflicting expert testimony, or when there was no expert witness, there was a tendency for the jury to vote sane even though the defendant was clearly psychotic by the usual clinical criteria.

*Id.* at 438. Earlier in the same article, the authors described the "tendency" as "overwhelming." *Id.* at 437. *See also* R. Simon, The Jury & the Defense of Insanity (1967).

could impair behavior controls. While the testimony on productivity was expressed largely in conclusory terms, the record does contain a substantial amount of evidence which could support the view that the act was very closely tied to the impairment. In my view, there are two theories which can explain our failure to reverse the conviction on the grounds that a reasonable man must have had a reasonable doubt about the defendant's criminal responsibility. First, our deference to the jury's resolution of this issue may be attributable to its special role in evaluating the defendant's impairment in light of community concepts of blameworthiness, to determine whether that impairment makes it unjust to hold him responsible. *See* United States v. Eichberg, 142 U.S.App.D.C. 110, 114–115, 439 F.2d 620, 624–625 (1971) (Bazelon, C. J., concurring). But it becomes increasingly difficult to rely on that explanation in the face of this Court's refusal to make the special function of the jury explicit in the jury instruction. And reliance on the jury's special function seems dangerously misplaced in a case, such as this one, where the testimony on the only issue in dispute was phrased in such conclusory terms that expert domination is almost inevitable. If we will not take meaningful action to curtail domination by the experts, then we should not rely, in upholding the jury's verdict, on the jury's supposed ability to make a kind of judgment that it almost surely did not make.

A second possible explanation for our refusal to set aside the verdict is that we have relaxed the standard of proof in responsibility cases. In fact, Congress enacted a statute in 1970 which purports to shift onto the defendant the burden of establishing insanity by a preponderance of the evidence. 24 D.C.Code § 301 (j). Under that standard one could reasonably conclude that the verdict should not be set aside. But the constitutional validity of the statute is open to very serious question. United States v. Trantham, 145 U.S.App.D.C. 113, 120, 448 F. 2d 1036, 1043 (1971) (statement in sup-

port of rehearing en banc); United States v. Eichberg, 142 U.S.App.D.C. 110, 114, 439 F.2d 620, 624 (1971) (concurring opinion). *See* In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

The Court declines to consider the constitutionality of the statute and instead provides the district court with alternative instructions on the burden of proof. In my opinion, we should resolve at this time the question of the statute's constitutionality. If the statutory change is invalid and the government must prove beyond a reasonable doubt that the defendant was responsible for his conduct, we can no longer pretend not to notice that defendants are being overwhelmed by an invisible burden of proof. And if the statute's attempt to shift the burden of persuasion onto the defendant is constitutional, then we must still take steps to facilitate the production at trial of meaningful information by both the government and the defense.

3. I applaud the Court's decision to overturn Fisher v. United States, 80 U. S.App.D.C. 96, 149 F.2d 28 (1945), aff'd, 328 U.S. 463, 66 S.Ct. 1318, 90 L.Ed. 1382 (1946) and Stewart v. United States, 107 U.S.App.D.C. 159, 275 F.2d 617 (1960), rev'd on other grounds, 366 U.S. 1, 81 S.Ct. 941, 6 L.Ed.2d 84 (1961), and to make clear that a defendant can introduce psychiatric and other expert testimony to negative specific intent. I suggested in two recent cases that *Fisher* and *Stewart* did not preclude our adoption of this doctrine, inaptly termed "diminished responsibility," and that it was therefore unnecessary to overrule those cases. *See* United States v. Bryant, 153 U.S.App.D.C. ——, 471 F.2d 1040 (April 21, 1972) (dissenting opinion); United States v. Alexander & Murdock, 152 U.S.App.D.C. ——, 471 F.2d 923 (April 21, 1972) (dissenting opinion). Two panels of this Court rejected my view and concluded that the doctrine could not be accepted without an en banc decision of the Court. The Court now sits en banc and concludes that expert testimony is relevant to the determina-

tion of specific intent where the defendant is charged with murder in the first degree.

The Court points out, however, that it does not decide whether the doctrine is applicable to cases of second-degree murder, where the prosecution must prove that the defendant acted with a state of mind called "malice." In *Murdock*, where the defendant was charged with second-degree murder, I discussed the argument against applying the doctrine so as to reduce the offense of second-degree murder to manslaughter. The argument rests on the premise

> that malice refers not to a state of mind, but to an objective set of circumstances; it can be negated by evidence of circumstances that would provoke a reasonable man to act in the heat of passion, but not by evidence of actual subjective provocation and passion. * * * In a recent series of cases, however, we reviewed with some care the concept of malice, and concluded, *inter alia*, that it is not entirely an objective matter, but has subjective elements as well.

152 U.S.App.D.C. at ——, 471 F.2d at 950 (footnotes omitted). But even though the Court apparently concedes that in some cases malice is established on a subjective standard, it concludes that the "matter * * * requires further analysis and reflection," and "[t]he problem is [therefore] remitted to future consideration." Majority opinion at 1002 n. 75.

While I am convinced that the question can be resolved without delay, I would have no objection to the Court's cautious approach if the question had no application to the case before us. But it should be clear that the question is directly relevant to the disposition of this case. Although originally charged with first-degree murder, Brawner was acquitted on that count by the trial court before the case was submitted to the jury. He was convicted of murder in the second-degree. The Court thus resolves the question of diminished responsibility up to the point where it becomes relevant to this case, and it remits to future consideration the only aspect of the issue which could have any bearing on the outcome of the case before us. That bizarre result is justified with the comment that "future consideration * * * will be aided by the availability of a specific factual context." Majority opinion at 1002, n. 75. The Court's refusal to consider the question in the case before us, where a "specific factual context" plainly exists, seems to me entirely inconsistent with the fair and efficient administration of justice.

## VII. CONCLUSION

This Court's search for a new set of words to define the elusive concept of responsibility has a distinctly archaic quality. The arguments for and against the *Durham* wording, the wording of the majority and minority versions of the ALI test, and the wording of *McDonald*, were clearly articulated many years ago. What should by now be clear is that the problems of the responsibility defense cannot be resolved by adopting for the standard or the jury instruction any new formulation of words. The practical operation of the defense is primarily controlled by other factors, including the quality of counsel, the attitude of the trial judge, the ability of the expert witnesses, and the adequacy of the pretrial mental examination. If the adoption of the ALI test produces some improvement in the quality of adjudication of the responsibility issue, that, of course, is all to the good. But we cannot allow our search for the perfect choice of words to deflect our attention from the far more important practical questions. For it is on those questions that the rationality and fairness of the responsibility defense will ultimately turn.